IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **PAUL D. CASEY, et al.** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Case No. 1:13-cv-1452** |
| **v.** ) | |
| ) | |
| **JASON WARD, et al.** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT KYUNG RHEE d/b/a RHEE'S McDONALD'S' MOTION FOR SUMMARY JUDGMENT

COMES NOW Defendant Kyung Rhee d/b/a Rhee's McDonald's (hereinafter "Defendant"), by and through counsel, BONNER KIERNAN TREBACH & CROCIATA, LLP, pursuant to Fed. R. Civ. Proc. 56 and submits the following Memorandum of Points and Authorities in Support of its Motion for Summary Judgment on each of the grounds set forth in the Motion.

## FACTUAL BACKGROUND

**A.      Complaint Allegations**

This action began as a wrongful death and survival action originally filed against Defendant Rhee's McDonald's, its original franchisor McDonald's Corporation, three alleged assailants, and several bars near the scene of the injurious incident.  The Amended Complaint alleges that, late in the night of September 22-23, 2011, Co-Defendants Jason Ward, Justin Ruark, and Brian Giblin were patrons of the bars called Ozio, Camelot, Mighty Pint, Sign of the Whale, and Rumors near the 1900 block of M Street (the "Bar Defendants"), and that the

bars continued to serve the three assailant Defendants alcoholic beverages while they were visibly intoxicated. (*See* Amended Complaint, ¶¶ 23-24.) Following their "bar hopping," Defendants Ward, Ruark and Giblin arrived at the McDonald's restaurant located at 1916 M Street NW, Washington D.C., after 1:00 a.m. on September 23 and began engaging in allegedly rowdy behavior.[1] (*Id.*, ¶¶ 33 & 35.) The Amended Complaint alleges that Plaintiffs' Decedent, Patrick Casey, arrived at the McDonald's restaurant soon thereafter to his friends. (*Id.*, ¶ 37.)

The Amended Complaint then alleges that, while at the McDonald's restaurant, Defendants Ward, Ruark, and Giblin initiated a verbal altercation with Patrick Casey. (*Id.*, ¶ 38.) According to the Amended Complaint, Patrick Casey's friend, David Lindsey, allegedly attempted to leave the restaurant, but Co-Defendant Giblin chased after him and pushed Mr. Lindsey. At that time, Patrick Casey allegedly tried to step in to defuse the situation. (*Id.*, ¶ 39.) The Amended Complaint then alleges that Defendant Ward delivered a "sucker punch" to Patrick Casey's head outside the restaurant, causing Casey to fall to the ground and strike his head on the concrete sidewalk. (*Id.*, ¶ 40.) The impact of the punch allegedly caused Patrick Casey to sustain severe head trauma and brain hemorrhaging. (*Id.*, ¶ 42.) He was admitted to George Washington Hospital, unsuccessfully treated, and pronounced dead at 2:30 p.m. on September 27, 2011. (*Id.*, ¶¶ 47-49.)

**B.    Procedural Status of the Case**

Plaintiffs, the parents of Patrick Casey, filed the original Complaint on September 23, 2013, alleging a wrongful death and survival action against Co-Defendants Jason Ward, Justin

---

[1] The actual times of events alleged in the Amended Complaint – apparently based on documents then available – have since been shown to be one hour earlier than the times alleged therein. That time difference is not material to disposition of the pending Motions for Summary Judgment, because all the relevant events occurred during a period of less than 25 minutes. For sake of consistency, actual times are used throughout these motion papers.

Ruark, and Brian Giblin, Co-Defendants Ozio, Camelot, Mighty Pint, Sign of the Whale, and Rumors, as well as Kyung Rhee d/b/a Rhee's McDonald's and McDonald's Corporation. (*Id.* at ¶¶ 55-101.) In response to various Motions to Dismiss, the Court dismissed Plaintiffs' wrongful death and assault-and-battery claims as barred by applicable statutes of limitation, leaving Plaintiffs with only negligence-based survival claims.

The Court also dismissed the remaining claims against the Bar Defendants, despite the allegation that the bars continued to serve alcoholic beverages to Co-Defendants Ward, Ruark and Giblin while they were all visibly intoxicated. (*Id.* at ¶ 24.) In dismissing those Defendants, the Court held that the Amended Complaint failed to plead facts capable of showing the "more heightened showing of foreseeability" of intervening criminal or otherwise intentionally injurious acts of third parties than would be required if the third parties' alleged misconduct were merely negligent. (*See Casey v. Ward*, 67 F. Supp. 3d 45, 53-54 (D.D.C. 2014) (*citing Potts v. District of Columbia*, 697 A.2d 1249, 1252 (D.C. 1997), and *Bailey v. District of Columbia*, 668 A.2d 708, 717 (D.C. 1991).)

Since the Court's decision dismissing the Defendant bar operators, Plaintiffs have settled with and dismissed Defendants Ward and Giblin and have voluntarily dismissed Defendant Ruark without prejudice. (Ruark Dep., at 236-38.) Accordingly, the sole remaining actions now are negligence-based claims against Defendants Rhee's McDonald's and McDonald's Corporation.

Fact discovery closed in August 2015, and expert discovery closes on January 31, 2016.

## C.    Key Witnesses

### 1.    The Potential Eye-Witnesses

There are four groups of actual or potential witnesses to the subject incident between

1:00 a.m. and 2:00 a.m. in the early morning hours of September 23, 2011: (1) Patrick Casey, who had been at a private party, and his two friends, David Lindsey and Clare Jun, who had been at a private party and a rock concert venue; (2) Defendants Jason Ward, Justin Ruark and Brian Giblin, who had been bar hopping in the nearby bars; (3) Connor Murphy, Andrew Guild and David Rosenzweig, who were undergraduate students at George Washington University who had come from their dormitory to the restaurant for a late-night meal; and (4) several workers at the restaurant, including shift manager Jose Martinez, cashier and kitchen worker Sonia Santos (*see* Santos Dep., at 17), and kitchen worker Francesca Lainez (*see* Lainez Dep., at 16-17), whose shift had begun around 8:00 p.m. on September 22.

### 2.    The Corporate Witnesses

#### a.    Personnel of Rhee's McDonald's

Defendant Kyung Rhee d/b/a/ Rhee's McDonald's has been a McDonald's restaurant franchisee operator since at least May 22, 1995, when he signed a Franchise Agreement and attached Operators Lease with McDonald's Corporation. As of January 2005, through an Agreement entitled Master Assignment and Assumption of Franchise agreement between McDonald's Corporation and a subsidiary of McDonald's Corporation called McDonald's USA, LLC, McDonald's USA, LLC became the franchisor for the Rhee's McDonalds franchise. Defendant Kyung Rhee is the owner of the restaurant operation, Andy Liu is Defendant Rhee's area supervisor for the restaurant and Damary Fuentes was the restaurant's general manager. None was present at the time of the Casey incident.

#### b.    Personnel of McDonald's Corporation

Vivian Warfield, a Business Consultant employed by McDonald's USA, LLC (Warfield Dep., at 19-20), testified about the franchise agreement and lease between Defendant Kyung

Rhee d/b/a Rhee's McDonald's and Defendant McDonald's prior to January 1, 2005, and between Defendant Rhee's McDonald's and non-defendant McDonald's USA, LLC since January 1, 2005. Johnny Webb, a regional security manager for McDonald's Corporation (Webb Dep., at 41-42), testified about McDonald's Corporation security practices, which are required of McDonald's company owned and operated restaurants, but are only recommended to franchisee-operated restaurants.

**D.      Statement of Key Undisputed Material Facts**

There are only a few key material facts concerning Plaintiffs' remaining negligence-based survival action, and none of them are genuinely in dispute:

(1)      Plaintiffs have cited only 10 incidents in or near the restaurant during the preceding 26 months, and the only recent incident even arguably similar in time (early morning after midnight), place (violence within the restaurant) and context (two 20-to-25-year-old white males harassing and then punching a group comprising one male and two females aged 26-27) began with male suspects teasing  females and escalated only when the female's male companion intervened, and neither group was intoxicated. (*See* accompanying Statement of Material Facts ("SOMF") No. 1, filed herewith.)

(2)      At about 1:13 a.m., Patrick Casey's friends David Lindsey and Clare Jun arrived at the restaurant, got in line, placed their food order, waited for their food, met up with Casey while waiting for the food, received their food, and sat down with Casey in the front half of the restaurant about 14 minutes later and began eating, without noticeable incident or encounter with Defendants Ward, Ruark or Giblin, even though Patrick Casey reportedly was loud and boisterous. (*See* SOMF No. 2.)

(3)      At about 1:16 a.m. while Lindsey and Jun were in line several places ahead,

Defendants Jason Ward, Justin Ruark and Brian Giblin arrived, got in line, ordered food, waited for their food and took their food, and sat down at the very front of the restaurant. About 20 minutes later, they began eating, without any encounter with the Casey group or any notable incident, except that Ward and Giblin spent about 2 minutes "horsing around" with each other while Ruark stood by in line before they placed their food order. (*See* SOMF No. 3.)

(4)    After a few minutes of banter on "male topics" between the two, nearby tables, Patrick Casey got up at 1:41:34 and walked over to the other group's store-front table, and Justin Ruark immediately stood up and faced Casey. (*See* SOMF No. 4.)

(5)    Casey's approach to the other table and the ensuing conversation was provoked at least in part by some provocative remark the Ward table's occupants directed at his table, but there may also have been provocative remarks from Casey or David Lindsey about the Ward table's occupants. (*See* SOMF No. 5.)

(6)    About 40-45 seconds later, David Lindsey got up and walked over to the Ward table, made a gay-slur remark to its occupants table, and then headed toward the restaurant's nearby front door, as Casey backed away in the same direction. (*See* SOMF No. 6.)

(7)    In response to Lindsey's gay-slur remark, Brian Giblin stood up at about 1:42:42, approached Lindsey with his hands out. (*See* SOMF No. 7.)

(8)    During the next 20 seconds after Giblin stood up, Lindsey tried to go to the door, Giblin tried to follow him, Casey at first stood in the way, then turned and went toward the door, followed by Ward and then Ruark, during which movement Casey made a remark to the other group about "taking it outside" and "kicking all your asses." (*See* SOMF No. 8.)

(9)    During this same 20 seconds, voices are raised and there is pushing and shoving at the door, but within the next 30 seconds Lindsey, Giblin, Casey and Ward have all exited to

the immediately adjacent sidewalk through the glass double doors of the restaurant. (*See* SOMF No. 9.)

(10)    At the end of the same 20 seconds, having reached the sidewalk, Casey grabbed Giblin, spun him around, and threw him to the ground. (*See* SOMF No. 10.)

(11)    A few seconds later, to protect Giblin, Jason Ward cocks his arm and punches Casey while Casey is still focused on Giblin, knocking Casey backwards away from the restaurant door and causing him to fall to the ground, striking the back of his head on the sidewalk. (*See* SOMF No. 11.)

(12)    After being thrown to the ground by Casey, Giblin immediately got up and began running down the street. Ward re-entered the restaurant briefly to summon Ruark, and those two followed Giblin down the street. (*See* SOMF No. 12.)

(13)    Realizing that Casey was badly hurt, Lindsey called 911. (*See* SOMF No. 13.)

(14)    Police officers in the area began arriving, and the reported response time was about 73 seconds, not including the time for Lindsey's call to be placed and connected. (*See* SOMF No. 14.)

(15)    Defendants Ward and Giblin engaged in "horsing around" during the last few minutes they waited in line to order food at the restaurant, smiling and laughing while Defendant Ruark looked on. (*See* SOMF No.15.)

(16)    There is no evidence that the restaurant manager saw the horsing around while waiting to order food, asked Ward and Giblin to leave the restaurant, or called the police. (*See* SOMF No. 16.)

(17)    There is no evidence that the situation would have led to blows solely because of anything provocative that the groups said to each other before Patrick Casey got up and

7

approached Ward's group.  (*See* SOMF No. 17.)

(18)   After Lindsey's gay-slur remark, the situation further escalated toward blows because Patrick Casey suggested to the occupants of the other table that they "take it outside" and stated that he would "kick all your asses." (*See* SOMF No. 18.)

(19)   From that point forward, the whole incident occurred so quickly – in less than 20 seconds – and at the front doors of the restaurant, that neither a required call to the police nor the presence of a security guard somewhere in the restaurant would have prevented Patrick Casey and the others from "taking it outside" and continuing the physical confrontation on the sidewalk where Casey had just said he would "kick all your asses." (*See* SOMF No. 19.)

(20)   Max Podlone, the only customer not involved in the confrontation who tried to reach the front of the restaurant in time to consider intervening in the confrontation arrived too late to prevent Ward from punching Casey after Casey grabbed Giblin. (*See* SOMF No. 20.)

(21)   The restaurant's shift manager, Jose Martinez, overheard the latter part of the confrontation at the front of the restaurant, but there is no evidence that he or any other restaurant worker was aware of anything before the last 20 seconds preceding the fight outside. (*See* SOMF No. 21.)

(22)   Martinez did not call the police when he first realized there was a confrontation between customers just before Casey was punched and injured outside the restaurant, but it would be sheer speculation to assume that the police could have arrived in time to stop the confrontation before Casey was injured. (*See* SOMF No. 22.)

(23)   There is no evidence that Ward would have punched Casey if Casey had not first grabbed and thrown Giblin, and there is no evidence that Giblin struck Casey first. (*See* SOMF No. 23.)

8

(24)    There is no evidence that anyone in the restaurant complained to the restaurant manager or otherwise feared for their safety at any time.  (*See* SOMF No. 24.)

The evidentiary basis for these undisputed material facts is set forth in the Statement of Material Facts filed herewith, which is respectfully incorporated herein by reference.

## STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law. *Briggs v. WMATA*, 481 F.3d 839, 843 (D.C. Cir. 2007), *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (*quoting* Fed.. R. Civ. P. 56(c)). Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317 , 322 (1986). Thus, the moving Defendants are entitled to summary judgment if, viewing the evidence in the light most favorable to Plaintiffs, and drawing all reasonable inferences in Plaintiffs' favor, no reasonable jury could find that Plaintiffs established each of the elements of negligence. *Briggs*, 481 F.3d at 843; *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002).

A party moving for summary judgment bears the "initial responsibility" of demonstrating "the absence of a genuine issue of material fact." *Beckwith v. Interstate Management Co., LLC*, 82 F. Supp. 3d 255, 258 (D.D.C. 2015), *citing Celotex*, 477 U.S. at 323. In response, the non-moving party must "go beyond the pleadings" and "designate specific factsw showing that there is a genuine issue for trial. *Beckwith*, 82 F. Supp. 3d at 258, *citing Celotex*, 477 U.S. at 324.

Here, the moving Defendants are entitled to summary judgment if the undisputed

material facts fail to establish the "more heightened showing of foreseeability" in light of the relationship of the parties that is required where the injury was caused by the intervening criminal or other intentionally injurious act of a third party. *See Beckwith*, 82 F. Supp. 2d at 258, *citing Clement v. Peoples Drug Stores, Inc.*, 634 A.2d 425, 427 (D.C. 1993). Likewise, even if the event were foreseeable under the aforementioned heightened-showing standard, the moving Defendants are entitled to summary judgment if the undisputed material facts fail to establish a requisite national standard of care for similarly situated restaurant operators. *See Beckwith*, 82 F. Supp. 2d at 258, *citing Clement*, 634 A.2d at 429-30.

## ARGUMENT

I.  **Plaintiffs Cannot Make the "More Heightened Showing of Foreseeability" Establishing a Duty to Prevent a Criminal or Other Intentionally Injurious Act.**

When an injury is caused by the intervening criminal act of a third party, District of Columbia law holds that liability depends upon "a more heightened showing of foreseeability" than would be required if the injurious act was merely negligent. *Bailey*, 668 A.2d at 819, *citing Clement*, 634 A.2d at 428; *Galloway v. Safeway Stores, Inc.*, 632 A.2d 736, 739-40 (D.C. 1993); *McKeithean v. WMATA*, 588 A.2d 708, 716-17 (D.C. 1991); *District of Columbia v. Doe*, 524 A.2d 30, 32 (D.C. 1987); *Ellis v. Safeway Stores, Inc.*, 410 A.2d 1381, 1382-83 (D.C. 1979); *accord, Cook v. Safeway Stores, Inc.*, 354 A.2d 507, 508-09 (D.C. 1976); *St. Paul Fire & Marine Ins. Co. v. James G. Davis Construction Corp.*, 350 A.2d 751, 752-53 (D.C. 1976); *Graham v. Safeway Stores, Inc.*, 316 A.2d 852, 853 (D.C. 1974); *Sigmund v. Starwood Urban Retail VI, LLC*, 617 F.3d 512, 514-16 (D.C. Cir. 2010); *Doe v. Dominion Bank of Washington, N.A.*, 963 F.2d 1552, 1560-62 (1992).

District of Columbia cases since *Bailey* are in accord. *See, e.g., UDC Board of Trustees v. DiSalvo*, 974 A.2d 868, 718 (D.C. 2009); *Bruno v. Western Union Financial Services, Inc.*,

973 A.2d 713, 718-21 (D.C. 2009); *District of Columbia v. Beretta, U.S.A., Corp.*, 872 A.2d 633, 641 (D.C. 2005); *Potts*, 697 A.2d at 1252; *Workman v. United Methodist Committee*, 320 F.3d 259, 263 (D.C. Cir. 2003); *Beckwith*, 82 F. Supp. 3d at 257-62; *Oliver v. Abdul Products II, Inc.*, 2005 U.S. Dist. LEXIS 38200, at *6-*11 (D.D.C. Dec. 20, 2005).

Where the "heightened showing" is required, the requirement is a "demanding" one, and the proof must be "precise." *Potts*, 697 A.2d at 1252. Foreseeability cannot be predicated upon "generic information" such as crime rates, *Bailey*, 668 A.2d at 820, or evidence that the defendant's employees worked in a "criminally active environment," *Clement*, 634 A.2d at 429. The plaintiff is not required to show "previous occurrences of the particular type of harm," but must show "a combination of factors [that] give [the defendant] an increased awareness of the danger of a particular criminal act." *Doe*, 524 A.2d at 33. By the same token, evidence regarding previous occurrences of the same kind of harm should not be material when the nature of the "particular criminal act" resulting in that harm was different.

Under this test, particular acts by criminal intruders cannot be considered as relevant to the future occurrence of intentionally injurious conduct by lawful invitees. *See Beckwith*, 82 F. Supp. 3d at 261 (citing *Shadday v. Omni Hotels Management Corp.*, 477 F.3d 511, 516 (7h Cir. 2007). Likewise, while the fact that Ward's punch resulted in Casey's death, the meaning of the "particular criminal act" implies that not all punches are the same, and that a reasonable defensive punch is not the same as a malicious offensive punch for purposes of the "prior similar acts" test. *See id.* Otherwise, most criminal acts would be foreseeable to all business operators in a city like the District of Columbia with a substantial history of criminal conduct, which clearly is not the law. *See Beckwith*, 82 F. Supp. 3d at 260-61, *citing Kline v. 1500 Massachusetts Ave. Apartment Corp.*, 439 F.2d 477, 483 (D.C. Cir. 1970).

11

Restaurants, grocers and other shopkeepers are not the "absolute insurers of the safety of all people on their property." *See, e.g., Galloway*, 632 A.2d at 739 (*quoting Ellis*, 410 A.2d at 1382, *quoting Graham*, 316 A.2d at 854). In determining whether the plaintiff has made a more heightened showing of foreseeability, District of Columbia courts evaluate two issues on a sliding scale: (1) whether the defendant was on notice of the specific possible harm; and (2) whether a special relationship existed between the plaintiff and the defendant that lessens the heightened foreseeability requirement. *See DiSalvo*, 974 A.2d at 872; *Workman*, 320 F.3d at 263; *Beckwith*, 82 F. Supp. 3d at 258; *Oliver*, 2005 U.S. Dist. LEXIS 38200, at *6-*7.

First, to meet the notice threshold, the plaintiff must provide specific and precise proof that the defendant had a "heightened or increased awareness" of the threat of harm. *Workman*, 320 F.3d at 264; *Oliver*, 2005 U.S. Dist. LEXIS 38200, at *7. In that regard, notice of actual defects in implemented deterrents and other security measures, such as broken doors or locks, is far more probative of notice than mere "speculation" about whether additional security measures would have provided the deterrent effect necessary to prevent the alleged assault. *See Beckwith*, 82 F. Supp. 3d at 261 n.7, *citing Bruno*, 973 A.2d 713, 721 (D.C. 2009). Second, "if the relationship between the parties strongly suggests a duty of protection, then specific evidence of foreseeability is less important, whereas if the relationship is not the type that entails a duty of protection, then the evidentiary hurdle is higher." *Workman*, 320 F.3d at 264; *Oliver*, 2005 U.S. Dist. LEXIS 38200, at *8-*9. In the latter regard, the District of Columbia Court of Appeals has found such a special relationship only between a school and its pupil, because of the school's duty of custodial care, and between and landlord and a tenant, where the landlord was "in the better position to know about security threats and to protect against them." *See id.* Restaurant operators do not have any such special relationship with their adult

patrons in the District of Columbia. *See id.*

The fact that large numbers of college age or other young people are attending an event, or patronizing a bar or restaurant, and the knowledge that such people are or have been consuming alcoholic beverages, is not sufficient to show notice to the defendant, because it is generic information that cannot prove the required heightened awareness. *See Oliver*, 2005 U.S. Dist. LEXIS 38200, at *9-*10, *citing Bailey*, 668 A.2d at 820.  While there is evidence of at least one punching event and several arguments in the restaurant during the previous 24 months, such minimal "crime statistics" are not sufficient to show that any punching assault – let alone a resulting homicide – was likely on the evening of September 22-23, 2011.  *See id.* Instead, restaurants and grocers have been held to be on notice of a heightened degree of foreseeability of criminal or other intentionally injurious conduct only where there were specific prior or ongoing incidents involving the assailant(s).  *See Grasso v. Blue Bell Waffle Shop, Inc.*, 164 A.2d 475, 475-77 (D.C. 1960) (restaurant owner potentially liable for continuing, physically aggressive conduct of off-duty employee, where restaurant neither restrained nor ejected employee and did not call police); *Viands v. Safeway Stores, Inc.*, 107 A.2d 118, 118-21 (D.C. 1954) (grocer had months of notice that groups of "agile, scurrying and troublesome boys" assembled each day in front of the store contending for the privilege of hauling each customer's purchases back home).

Furthermore, the assault on Patrick Casey at issue here was not unprovoked, even under the reasonable view of the evidence most favorable to Plaintiffs.  Specifically, (a) Patrick Casey chose to get up and approach the Ward group, in response to allegedly provocative comments, but he and his friends could have left the restaurant, and there is no non-speculative evidence that the Ward group would have followed them under those circumstances;

13

(b) David Lindsey and perhaps Casey too made gay-slur comments to the Ward group;

(c) Casey at first blocked the Ward group's exit path, then pushed and shoved with them at the

door; and (d) once into or out the door, Casey grabbed Giblin and threw him to the ground,

and (e) it was only at that point that Jason Ward struck Casey. Most of all, in this regard,

Lindsey's (and potentially Casey's) use of gay-slur remarks could not possibly have been

foreseen by the restaurant operator or its staff on duty that night.

It should not go unsaid that the Court has already dismissed on the pleadings the

Plaintiffs' case against the neighboring bar operators, on the very same grounds that the

moving Defendants seek summary judgment in this Section I.A. *See Casey*, 67 F. Supp. 3d at

53-54. In reaching that decision on the pleadings against the bars, the Court recognized that

serving alcoholic beverages to "[a]n intoxicated person, or any person who appears to be

intoxicated," is prohibited by law, and is an appropriate basis for a "negligence *per se*" jury

instruction. The Court dismissed the case because "Casey's death – assuming the truth of the

allegations – was caused by the intentional – and unforeseeable – torts of third parties," albeit

the very customers the bars were alleged to have further intoxicated. On that broad basis, the

Court therefore held that "any connection to the alleged negligence on the part of the bar is too

attenuated to support a valid cause of action, and thus plaintiffs' actions against the bar

defendants must fail." *Id*. at 54.

The legal standard applied in the Court's ruling as to the bar Defendants is now the law

of the case in this action. The law-of-the-case doctrine prevents re-litigation of the same issue

in the same case by "courts" of "coordinate jurisdiction," which includes re-litigation before the

same judge that made the first decision as well as re-litigation before a different judge. *See,

e.g., Puckrein v. Jenkins*, 884 A.2d 46, 55-56 (D.C. 2005); *Weinberg v. Johnson*, 518 A.2d 985,

987-89 (D.C. 1986); *Johnson v. Fairfax Village Condominium IV Unit Owners Ass'n*, 641 A.2d 495, 503 (D.C. 1994); *Kaplan v. Pointer*, 501 A.2d 1269, 1270 (D.C. 1985). The doctrine applies when the first ruling has sufficient finality and when that ruling is not "clearly erroneous in light of newly-presented facts or a change in substantive law." *See Johnson*, 641 A.2d at 503; *Kritsidimas v. Sheshkin*, 411 A.2d 370, 372 (D.C. 1980); *Kaplan*, 501 A.2d at 1272. A ruling that grants or denies summary judgment is sufficiently final for the law-of-the-case doctrine to apply (*see Johnson*, 641 A.2d at 503), and a decision to dismiss all or a portion of a complaint for failure to state a claim likewise must have sufficient finality. *See id.*

Here, having adopted and followed that standard in dismissing the bar Defendants, it would be manifestly unjust to apply a less rigorous legal standard or to apply it less rigorously in deciding the instant Motion of the moving Defendants. As a result, to justify denying the pending Motion, the Court would have to identify specific facts and circumstances that legally differentiate the situation of the moving Defendants, who served only food to the individual Defendants, from the situation of the bar Defendants, who allegedly served alcoholic beverages to the individual Defendants even though they already were visibly intoxicated.[2] *See id.* Indeed, if the bar Defendants are not to share in the legal exposure here, it is outrageous to argue that the moving Defendants' restaurant should bear any legal exposure either.

As shown above, the criminal or otherwise intentionally injurious misconduct by Defendants Ward and Giblin was no more foreseeable to the moving Defendants than it was to the now-dismissed bar operators who continued to sell alcoholic beverages to already-

---

[2] In the alternative, if the Court were to change its legal standard, or change its application of the standard, or both, the Court would be obligated to revisit the role of the bar Defendants in the case, either by reopening Plaintiffs' case against the Bar defendants, or by granting the moving Defendants leave to bring the bar Defendants back into the case as third-party defendants, as well as such further or other relief as might be required to do substantial justice between all the parties.

intoxicated patrons. Instead, the undisputed material facts make it clear that Plaintiffs are unable to make the "more heightened showing of foreseeability" that Patrick Casey and David Lindsey would approach the other table, provoke Brian Giblin and his friends with gay-slur remarks, and exacerbate the situation further with an invitation to "take it outside" to "beat all your asses," or that Patrick Case would grab Giblin and throw him to the ground and that, either in defense of Giblin or in retaliation, Jason Ward would "sucker punch" Casey out on the sidewalk, knocking him to the ground where he fatally struck his head on the pavement.

II.    **Plaintiffs Have Failed to Show That the Moving Defendants Had a Duty to Eject Ward, Giblin and Ruark from the Restaurant, to Intervene Physically, to Call the Police, or to Employ a Security Guard on the Night of the Incident, or That There Is Any Related, Requisite Standard of Care.**

Attendant to any reasonable duty of care is the standard or care by which such duty is to be discharged. For purposes of this action, the Court has already ruled that the bar Defendants had no duty to anticipate and take steps to prevent the Casey incident, and thus any arguable negligence in serving alcoholic beverages to already intoxicated patrons was held to be non-actionable. *See Casey*, 67 F. Supp. 3d at 53-54. Likewise, with regard to the moving Defendants, the existence of a duty would be causally immaterial if there is nothing more that the moving Defendants were legally required to do to decrease the risk of harm resulting from criminal or other intentionally injurious conduct. *See Beckwith*, 82 F. Supp. 3d at 264 n.11.

There is a potential overlap between the existence of any cognizable duty, on the one hand, and the standard of care that would apply to determining whether the defendant had discharged its duty. *See, e.g., Beckwith*, 82 F. Supp. 3d at 262-63, *citing Briggs*, 481 F.3d at 841, and *Varner v. District of Columbia*, 891 A.2d 260, 269 (D.C. 2006). Where "the defendant is alleged to have failed to protect the plaintiff from harm, the expert 'must clearly

16

articulate and reference the standard of care by which the defendant's actions can be measured" and "must show that the standard is accepted in the industry." *See Beckwith*, 82 F. Supp. 3d at 262, *citing Varner*, 891 A.2d at 269; *Novak*, 570 F.3d at 313, *citing Pannell v. District of Columbia*, 829 A.2d 474, 479-80 (D.C. 2003), and *Clark v. District of Columbia*, 708 A.2d 632, 635 (D.C. 1997). In the latter regard, the expert must support a purported standard of care by showing that it has been accepted as controlling for operation of facilities and enterprises similar to the defendant's facilities and enterprises. *See Novak*, 570 F.3d at 313, *citing Briggs*, 481 F.3d at 847. No such expert showing has been made here. (*Compare* Ex. A hereto, Foster expert Report. *passim* (no statement or cognizable support from trade literature or otherwise about a specific national standard of care for quick-service restaurants to have security guards), and Foster Dep., *passim*, *with* Ex. B hereto, Clark expert Report, at 5 ("there is not standard or requirement for security personnel in a fast food restaurant").)

Furthermore, "[a]n expert may not rely upon the general duty of care to establish an objective standard requiring specific conduct." *Varner*, 891 A.2d at 267. Likewise, the plaintiff may not "rely on '[a]n expert's conclusory opinion . . . without any showing that the proffered standard has been promulgated or is generally known . . . .'" *Briggs*, 481 F.3d at 847. Similarly, the expert's opinion "as to what he or she would do under similar circumstances" cannot suffice to establish a standard of care. *Briggs*, 481 F.3d at 846 (*quoting Clark*, 708 A.2d at 635). Indeed, it is what people in the restaurant business regularly do, not what people in the security industry would like them to do, that determines the standard of care in the industry.

The facts and analysis of the *Briggs* case are particularly instructive here. In *Briggs*, the plaintiff brought a wrongful death and survival action arising from the murder of her adult son at the a Metro station entrance that was undergoing construction work, complaining that the

area lacked adequate illumination and that visibility of the surrounding area was impaired by the presence of protective fences and plywood walls near the Metro entrance. *See id.* at 842. Plaintiff Briggs contended that WMATA as a common carrier owed a "special duty" to protect its passengers, that all she needed to establish was foreseeability of the crime committed against her decedent, and that no expert testimony was required in that regard. *See id.*, 481 F.3d at 844. To support her case, she submitted the testimony of an expert on safety precautions that relied on a practical concept called Crime Prevention Through Environmental Design, as well as studies showing that street lighting decreases crime, an OSHA standard assertedly used to prevent robbery in retail stores, and lighting standards in WMATA's own internal manuals. *Id.* at 842-43.

Following the logic of *McKethean*, 588 A.2d at 712, the *Briggs* court held first that WMATA did not have a requisite duty of care because, at the time, the injured parties were not passengers in WMATA's custody. *See id.* at 843-45. As the *Briggs* court pointed out, a common carrier's special duty ends once the customer has left the vehicle and ceased to be a passenger. *Id.* at 844-45. Similarly, any special duty the moving Defendants here might have had to Patrick Casey ended the moment he ceased to be a patron within the restaurant. *See id.*

Second, the *Briggs* court held that expert testimony was required to establish WMATA's duty of care (id. at 845-46), noting that "expert testimony is routinely required 'in negligence cases . . . which involve issues of safety, security and crime prevention'." *See id.*, *citing Varner*, 891 A.2d at 267 & 269. For example, where a woman was injured as people rushed to leave an event, the court held that "common knowledge and experience . . . is a far cry from experience with the process of planning for the handling of large crowds in such circumstances." *See id.* at 846, *citing Hill v. Metropolitan African Methodist Episcopal*

18

*Church.*, 779 A.2d 906, 910 (D.C. 2001).

<u>Third</u>, the *Briggs* court held that the plaintiff's expert there had failed to carry that burden. *See id.* at 846-48. As the court explained there, the testimony of the plaintiff's expert "rested on only generalized objectives" such as "increasing visibility." *Id.* at 847, *citing Pannell*, 829 A.2d at 479-80. As the court explained: "The recommendations, albeit laudatory, are too vague to allow a jury to compare the requirements of a 'specific standard' with appellees' conduct." *See id.* Instead, "[t]he purported standards here are both too general and too vague to satisfy the requirements of D.C. law." *Id.* Likewise, the *Briggs* court held that WMATA's own lighting manuals did not establish a national standard of care, because such manuals set forth internal goals that may exceed the standard of care. *Id.* at 848. As the *Briggs* court summed it up, the facts that a particular lighting concept is "widely used . . . in security design and practice," "that [certain] OSHA standards have been used for years in addressing robbery prevention" and that there would have been better lighting under WMATA's own internal requirements, do not establish any standard of care not to be breached.

In the instant case, a putative standard of care <u>could not</u> be established without Plaintiffs presenting adequate expert testimony. *See id.*; *accord, Night & Day Management, LLC v. Butler*, 101 A.3d 1033, 1038-39 (D.C. 2014) (nightclub's duty of care as to any security arrangements to prevent fighting required expert testimony, and absence of security guards or surveillance cameras in room where fight occurred does not establish any related standard of care). Likewise, the nature of a restaurant operator's standard of care in dealing with physically powerful, intoxicated and potentially rowdy customers – with security guards or otherwise – is well beyond the knowledge of ordinary jurors (*see id.*), who as individual bystanders would have no duty whatsoever to intervene in a verbal or physical altercation

19

between five 200-260 pound or heavier young adult men.

As shown below, it is clear from the expert Report submitted Plaintiff's security expert, Lance R. Foster, and his deposition transcript that Foster could only offer his own personal opinions about what the restaurant here could or should have done, and that his opinions were at most an "aspirational" standard in the security industry, rather than any established standard of care in general practice in restaurants and locations similar to Defendant Rhee's restaurant and the surrounding neighborhood. *See Beckwith*, 82 F. Supp. 3d at 263-64, *citing Briggs*, 481 F.3d at 841 & 846-48 & n.9, and *Varner*, 891 A.2d at 269 & 272-73.

Moreover, as detailed below, Mr. Foster's testimony largely centered on "foreseeability" of a similar incident taking place, rather than on any nationally recognized specific standard of care to follow once the Court holds that there was a legal duty based on the requisite level of foreseeability. Expert opinions generally <u>are not</u> material to the Court's own legal duty to decide whether there was any such duty here, and while Mr. Foster acknowledged at deposition that he was not entitled to testify about the existence of a legal duty, he repeatedly offered opinions about foreseeability. Mr. Foster also offered personal opinions that use of security guards or off-duty policemen might have curbed rowdy behavior, but could not offer any substantial evidence that a specific national standard of care required the use of such security personnel.

Regarding the existence of a duty, the Foster Report plays up the details of certain prior incidents – one more than two years earlier – without regard for the "more heightened showing of foreseeability" required by law. Thus, in describing three 2009 incidents that reportedly occurred two years or more before the date of the Casey incident, the Foster Report provides facts linking certain incidents to those addressed in Fact Section E.1, *supra*, which explains the

significant differences between those incidents and the Casey incident, or fails to provide enough information for a finder of fact to determine whether such other incidents are actually relevant here. Similarly, the Foster Report takes undue license with certain conclusory statements quoted from deposition testimony or witness affidavits, failing to differentiate between merely noisy events and violent events, as well as failing to differentiate between physical hostile people and other kinds of "crazy" people.

Next, the Foster Report purports to discuss "inherent risks" of operating a 24-hour-a day restaurant and of serving intoxicated customers. In the first regard, the Foster Report goes no further than to quote a McDonald's operating manual generally referring to "special security concerns" about late night operation, without citing any required special precautions mentioned in the manual or elsewhere. In the second regard, the Foster Report cites generic testimony that intoxicated people can hurt others, that many restaurant patrons that night appeared to be intoxicated, and that the restaurant had no "policy to determine if [the customers are intoxicated]. On that basis, the Foster Report asserts that restaurants near bars (whose own operators have no legal liability here) have a "vulnerable location" and therefore need "additional security" measures to deal with intoxicated patrons, without citing any basis for any such greater standard of care.

The Foster Report then asserts that the moving Defendant operating the restaurant where the Casey incident occurred "does not appear . . . [to have had] a security plan, a security guard, or appropriate training on security." *Id*. at 7. To the contrary, the restaurant's operator had a very clear security plan: (1) do not get involved physically with persons behaving violently, (2) ask argumentative or abusive persons to leave, and (3) call the police in the event of a physical altercation. (*See* Rhee Dep., at 33-35 (as cited in Foster Report, at 9-10).)

21

The restaurant policy in the event of a fight is to call the police, or use the restaurant's panic alarm system, and the restaurant's policy regarding arguments and abusive speech is to ask the person to stop, or leave, and to call the police if they refuse. (*See* Rhee Dep., at 122; Liu Dep., at 35-38 (same); Fuentes Dep., at 18.)

Similarly, the Foster Report (at 9-10) asserts that the restaurant operator failed to follow the security plan adopted by McDonald's Corporation, as set forth in a corporate Security Manual. However, while that manual required company-owned restaurants to follow its security manual, it did not impose any such requirement on franchisee-owned restaurants, and instead only recommended consideration of the company manual when the franchisee decided what security measures to adopt and follow. (*See* Webb Dep., at 34-38, 44-50 & 83-85.)

As alluded to above, the Foster Report (*id.* at 15) closes with the following, legally inadequate conclusion: "[I]t is my preliminary opinion that the security procedures followed by the McDonald's Restaurant at 1916 M Street . . . on September 23, 2011, were inadequate, fell below the National Standard of Care, and fell below Rhee's McDonald's' own security policy," that McDonald's Corporation "failed to provide appropriate training to [franchisee] managers to respond to situations such as this and failed to implement and oversee adequate security practices and measurers at its franchise restaurants," and that "the failures described in detail above resulted in the violent attack on Mr. Casey." Nowhere in that conclusion or anything preceding it, however, does the Foster Report set forth the substance of any specific national standard of care, let alone set forth the basis for that putative standard of care in widely promulgated or adopted standards and practices. Instead, for all intents and purposes, the Foster Report is just a series of personal opinions. (*See id., passim.*)

Not surprisingly, the recent Foster Deposition did not reveal anything more specific

purporting to make a more heightened showing of foreseeability, or any basis for supporting a specific standard of care in widely promulgated or general adopted standards and practices. While clearly conceding that he lacked the "expertise" to determine whether the restaurant operator had a legal duty to protect Patrick Casey under the circumstances here (Foster Dep., at 43 & 172-73), Mr. Foster presented himself as an expert on "foreseeability," without having any apparent understanding that evaluating foreseeability is an issue for the Court, rather than a jury. (*See id., passim.*) Mr. Foster also asserted that the moving Defendants should have hired a private guard or off-duty policeman to provide night-time security at the restaurant, but failed to offer a shred of evidence that such security precautions were required by any specific national standard of care.

Regarding foreseeability, according to Mr. Foster, the biggest factor to consider in assessing "foreseeability" of the particular kind of crime that occurred in the incident at issue is "the location's "experience, their crime history, and have they had any other types of crime, and particularly violent crime." (*Id*. at 99-100.) Presumably because of the relatively low level of similar crimes at or near the moving Defendants' restaurant during the previous two years, Mr. Foster relied heavily on the fact that there were numerous bars in the area and the assumption that the restaurant's customers late at night included many intoxicated bar patrons. (*See id*. at 100-112 & 1188-89.) In that regard, however, Mr. Foster had to concede that the fact that a restaurant is serving customers who became intoxicated elsewhere does not necessarily increase the foreseeability that violent crime will occur. (*Id*. at 110-11.)

When asked what kind of security plan this restaurant should have had, Mr. Foster was unable to offer more than generalities (*id*. at 111-12):

> Q. . . . You state that, "It does not appear that McDonald's had a security plan ." I asked you earlier what the security plan should have been. <u>How would that have</u>

23

made the premises reasonably safe for Patrick Casey in this specific incident?

A. Specifically, I can't give you an answer. But in general, a security plan would set down the risk of a particular location, and then what actions should be taken, what employees should know to do under certain circumstances, what they should be looking for.

Q. All right. So I understand you clearly, you cannot state today whether those practices would have made the premises safe for Patrick Casey in this specific incident?

A. I can't state one way or the other.

According to Mr. Foster, the proper security plan for this restaurant would be essentially what was already in place (id. at 114-16):

Q. Your scenario. You just said that you would expect the manager to take action, so what is it you would expect manager to do?

A. Again, paying attention to the environment, and if he sees a circumstance where he feels there is a problem, then I would expect him to speak with the people, ask them to stop whatever they're doing. If they refuse or threaten him or anyone else, ask them to leave, and if that doesn't work, call the police.

Q. And isn't that exactly what Mr. Liu in his deposition testified that that is their policy?

A. Yes.

The only evidence regarding awareness by the restaurant's shift manager that night, Jose Martinez, is in the affidavit Plaintiffs' counsel procured from him, which states that the first notice Martinez had of the Casey incident was the pushing and shoving at the front door, which began **less than 20 seconds** before the brief fight erupted outside. (*See* Martinez Aff., ¶¶ 7-8.) In that regard, Mr. Foster also conceded that the intermittent problem that the restaurant experienced in the operation of the frontward-facing security camera the night of the Casey incident did not contribute to causing the incident, because "the restaurant was so small that everyone could see what was going on," and Martinez, "the manager, did observe this behavior." (*Id.* at 116-17.)

Surprisingly, according to Mr. Foster, the details of the Casey incident were not important for his opinions regarding foreseeability and standard of care. (*See* Foster Dep., at 30-42, 44-55, 57-78.)  <u>First</u>, and foremost, Mr. Foster admitted not considering the fact that there were less than 75 seconds between the time when Patrick Casey got up from his seat to go over to the Ward table and the time both groups left the restaurant. (*See id*. at 119-20.) Furthermore, in that regard, even assuming there had been a security guard present in the restaurant, Foster could not say that the guard would have been able to prevent the brief fight that occurred (*id*. at 120):

> Q. If a security guard walked over to Mr. Casey and his companions and Mr. Ward and his companions <u>as they were exiting the restaurant</u>, wouldn't he or she just let them leave?
>
> A. <u>I can't answer that</u>.

Likewise, Mr. Foster could not cite any basis in the record for the shift manager, Martinez, or a hypothetical security guard having been on notice of a dangerous situation before the two groups headed for the front door of the restaurant. (*See id*. at 122-26.)  Instead, recognizing that security guards generally only observe and report, and do not make arrests, Mr. Foster hypothesized that the moving Defendants' restaurant should have engaged an off-duty police officer, who could have used his official powers to separate the two groups and "let one group leave, and then let the other group leave later . . . ." (*Id*. at 121-22, 128-29, 193-94 & 200.)

<u>Second</u>, Mr. Foster also mischaracterized the Casey incident as an "attack," rather than a "fight," and denied knowing or considering that Ward struck Casey only after Casey grabbed and threw Giblin. (*See id.*, at 33-36.)  Instead, according to Foster (*id*. at 43-44):

> Q. Okay. Is it your opinion, as a professional security consultant, that McDonald's should have stopped Mr. Casey from being an aggressor and starting a fight on the evening of September 23, 2011?

25

*          *          *

> A.  I think my answer previously was they certainly had plenty of opportunity to stop this conflict <u>no matter how it started or who did what</u>, and they should have realized what the circumstances were, and they should have had measures in place to stop these types of things.

> Q.  And if Mr. Casey was, in fact, the aggressor, in your opinion McDonald's is still at fault for not stopping Mr. Casey from being the aggressor; is that fair?

> A.  <u>Mr. Casey or anyone else being the aggressor</u>, yes.

In this regard, Mr. Foster appears mistaken in believing that the restaurant had any duty under District of Columbia law to prevent him from putting himself in harm's way.

<u>Third</u>, Mr. Foster's opinion did not take into consideration that Mr. Lindsey and Mr. Casey had made various provocative remarks to the Ward group, including a gay-slur remark and an invitation to "take it outside" so Casey "can kick all your asses," none of which was heard by the restaurant's shift manager, Martinez, or anyone else present in the restaurant. (*Id.* at 37, 127-28 & 149-51.)

<u>Fourth,</u> while Mr. Foster asserted that there was an inherent risk of violent crime in the restaurant from customers who arrived at the restaurant already intoxicated from purchasing alcoholic beverages elsewhere (*id.* at 44-101), he had to concede that "[j]ust because a person is intoxicated doesn't automatically mean they're going to harm anyone, that's correct." (*Id.* at 68-69.)  Likewise, Mr. Foster had to concede at deposition that a D.C. City Council report regarding the "inherent risk of serving intoxicated customers" was focused on nightclubs and other bar operators, not restaurants that do not serve alcoholic beverages, and that local law required "drinking establishments" – but not other clubs or restaurants – to have a prescribed security plan. (*Id.* at 81-86.)  Similarly, while he continued to assert that customer intoxication was a risk factor here, he had no specific recommendations – let alone any specific national

26

standard of care – for determining whether incoming customers were intoxicated or dealing with them beyond "being aware" because misconduct by intoxicated people is generally "foreseeable." (*See id.*, at 88-92.)  Nevertheless, Mr. Foster persisted in his general opinion regarding foreseeability in the false belief that there had been a significant pattern of violent incidents involving intoxicated customers (*id.* at 69):

> Q.  Right.  So what is the inherent risk of being intoxicated in the context that you're putting it in?
>
> A.  You're asking me to isolate threats.  In other words, you're asking simply about an intoxicated person or persons.  I don't think I can do that, because I'm not trying to say that a particular person, or even a group of persons, are necessarily going to be a threat.  <u>But looking</u> at the totality of the circumstances, and <u>the history of problems with intoxicated persons on the property</u>, that McDonald's should have realized there is a potential for having problems with these types of people.  That doesn't necessarily mean they should exclude them from the restaurant, but they just need to be aware of it and be prepared to take appropriate actions.

However, as shown above in summarizing the nature of the ten reported events over a 26-month period before the Casey incident, there is no temporal correlation between customer intoxication and risk of violent events – as 2010 was virtually incident free while drinking by late-night restaurant customers presumably continued unabated – and instead the only correlation is that, if a late-night incident occurs, it is not unlikely that some offending individual will have been drinking.  Such a correlation is far too weak to provide support as a relevant "foreseeability factor" here.

Regarding standard of care, Mr. Foster's expert testimony boils down to a personal opinion that the Casey incident might have been avoided if the moving Defendant's restaurant had an off-duty police officer, or at least a private security guard, present at the time, and that McDonald's "had a chance to stop it." (*See id.* at 120-27, 133-38 & 159.)  However, to the extent Mr. Foster has anything but a hindsight personal opinion in this regard, his deposition

testimony failed to defend the opinion in his Report that the moving Defendants' restaurant faced the same specific risks as two franchisee-operated McDonald's restaurants more than a mile away, one at the Verizon Center and the other on U Street. (*See id*. at 142-45.) In fact, the three areas are not similar, and in any event the use of security guards by another single franchisee cannot establish the requisite national standard of care here.

Overall, through the Foster Report and recent Foster deposition, Plaintiffs suggest four possible actions the moving Defendants might have taken in this regard:  (a) intervening verbally to eject the perpetrator or other trouble-makers, (b) intervening physically to break up the argument or fight, (c) calling the police to request help, or (d) employing a security guard in the restaurant either full time or at least during late night hours.  The evidentiary record fails to show, however, that any of those measures was required under the circumstances, that the moving Defendants were on adequate notice of the need to use such measures on the night of the Casey incident, and/or that such measures would have prevented the injury to Patrick Casey outside the restaurant.[3]  For sake of convenience, the moving Defendants address all such issues *seriatim* for each suggested preventative action.

A.    **There Was No Opportunity for Verbal Intervention, and No Reasonable Basis for Believing That Any Potentially Appropriate Verbal Intervention Would Have Prevented the Casey Incident.**

As is made clear by the affidavit that Plaintiffs' counsel secured from Jose Martinez, the restaurant's shift manager on the night of the Casey incident, Martinez did not have any notice of an argument or dispute between the Casey group and the Ward group before **the last 75 seconds** that they were in the restaurant, and indeed it appears that Martinez did not become

---

[3] Three of the ten reported incidents at or near the restaurant within the preceding 24 months occurred during the middle or late afternoon, and accordingly only the greater presence of intoxicated customers would weigh in favor of using a security guard only at night when bars were open and after they closed.

aware of the incident until the two groups were already pushing and shoving at the front door of the restaurant during **the last 20 seconds** that they were in the restaurant. (*See id.*, ¶ 7 (he observed "the beginning of the fight," with "yelling and screaming" making it clear that there was going to be a "physical fight") & ¶ 8 (after visiting the bathroom, he came out to learn that the fight was over, and called a patrolling policeman called "Officer Jose").) Martinez was at the back of the restaurant and, by the time he became aware that an incident was in full swing, there was no opportunity for him to intervene verbally from where he was standing. In addition, under the circumstances, it would be unreasonable speculation for a finder of fact to conclude that any such verbal intervention could have prevented the resulting injury, and certainly not that such a change in the outcome was more likely than not.

In an effort to create the appearance of timely relevant notice, Plaintiffs have pointed to the fact – shown clearly in the restaurant's videotape from the night of the incident – that Defendants Jason Ward and Brian Giblin were "horsing around" playfully <u>with each other</u> for several minutes while waiting in line with Justin Ruark to order food, and that at one point two other waiting patrons appear to back away from Ward and Giblin. There is no evidence, however, that Ward and Giblin were being "argumentative or abusive" at that time. Moreover, the same videotape evidence shows clearly that Ward and Giblin settled down when their turn came to order food, and remained well behaved thereafter – ordering food, waiting for their food, finding a table, sitting down, and eating their food – until more than 12 minutes thereafter, when Patrick Casey approached their table and David Lindsey made a rude gay-slur remark to them. Under the circumstances, no reasonable jury could find either (a) that the "horsing around" incident put the restaurant staff on notice that Ward would punch another patron 12-14 minutes later or (b) that the failure to eject Ward and Giblin for such horsing

around was a proximate cause of Casey's injury from Ward's punch.

Last, but not least, there is no evidence that the shift manager, Mr. Martinez, could have said anything other than telling the two groups to leave the restaurant, but that is what they were already doing.  Likewise, by the time Martinez could have reached the front of the restaurant and attempted to confront the two groups, they most probably would already be out the door, and the injurious incident most likely would already have occurred.  In this regard, the affidavit of Max Podlone, who was much closer to the front door than Martinez, indicates that even Podlone could not react quickly enough to reach the men pushing and shoving towards the door and intervene before Casey grabbed and threw Giblin and Ward then punched Casey.

Accordingly, there is no record evidence capable of showing that the restaurant operators had sufficient notice of the ongoing Casey incident to intervene verbally.

**B.    There Was No Opportunity for Physical Intervention, and No Reasonable Basis for Believing That Any Potentially Appropriate Physical Intervention Would Have Prevented the Casey Incident.**

As operators of restaurants not serving alcoholic beverages, the moving Defendants did not have a legal duty to intervene physically in the unexpected altercation between two groups of patrons who had consumed alcohol elsewhere, using security guards or otherwise.

<u>First</u>, the verbal confrontation within the restaurant began less than **75 seconds** before the two groups exited the restaurant's front door, the pushing and shoving began less than **20 seconds** before the two groups exited, and Casey was injured only **a few seconds** later.  As a result, there clearly <u>would not</u> have been sufficient time for shift manager Martinez or any other employee to assess the situation, go to the front of the restaurant, get the attention of the men at the door, and force them to disengage.  (*Compare* restaurant videotape and related timeline, *supra, with* Ex. C hereto, Podlone Aff., ¶¶ 5-11; Ex. D hereto, Martinez Aff., ¶¶ 7-8.)

30

<u>Second</u>,  the restaurant wisely had a policy of forbidding employees from intervening in any altercation physically.  None of the restaurant employees present that night was physically big or strong enough to confront the likes of Patrick Casey (a Middle East war veteran standing 6'4" and weighing over 260 pounds) or even Jason Ward (a dedicated body builder standing 5'10" and weighing 200 pounds, and the other three men were similar to Ward in size.) Physical confrontation also poses risks of actionable physical injury to the employee or the persons confronted.  Thus, there is no legal requirement in the District of Columbia for anyone but a police officer to risk physical harm by intervening in a fight or other altercation. Likewise, given the size and strength of the opposing patrons, it would be impermissible speculation for a jury to conclude that Martinez or any other employee present that night at the back of the restaurant could have prevented the fight that occurred outside the restaurant.

<u>Third</u>, and similarly, the most that a restaurant employee could lawfully have done was to ask the men to leave the restaurant, which is exactly what they were doing without needing to be asked to leave.  In other words, by the time Martinez or any other worker present that night could have reached the two groups arguing and shoving in front of the door, they had already exited the restaurant.  Any effort at physical intervention would have been futile or would have exposed the intervening worker to risks of potentially serious injury.

Accordingly, there is no record evidence capable of showing that the restaurant employees had sufficient notice of the ongoing Casey incident to intervene physically, even if the operator's security policy permitted it.

**C.     There Was No Opportunity to Call the Police before the Two Groups Left the Restaurant, and No Reasonable Basis for Believing That Calling the Police Was Needed to Protect Others Remaining in the Restaurant.**

The moving Defendants did not have a company requirement – let alone any legal

obligation – to call the police every time a verbal dispute occurred between restaurant patrons. There is no evidence that the "horsing around" engaged in by Ward and Giblin while waiting in line to order their food was a verbal dispute, as well as no evidence that they were actually in any sort of dispute at all, rather than just being playful, and no evidence that such "horsing around" expanded to anything "argumentative," abusive" or "confrontational." (*See* Ruark Dep., at 57-58 & 145-51; Giblin Dep., at 158-59 & 229-30; *see* Ward Dep., at 195-97.) Thus, there is no reasonable basis for concluding:  (a) that the moving Defendants had a duty to call the police during the horsing around,  (b) no evidence that they had a duty to call the police after the horsing around, and  (c)  no basis for concluding that there was any proximate cause between any asserted failure to call the police at that point and the altercation with the Casey group that erupted more than 12 minutes later.  In other words, there is no reasonable basis for Plaintiffs to base their claim against the moving Defendants on the "horsing around" incident near the service counter.

Likewise, there is no evidence that Jose Martinez, the restaurant's shift manager, <u>did not</u> have notice of any altercation or other problem until he saw the pushing and shoving at the door and heard the related yelling. (*See* Martinez Aff., ¶¶ 9-10.)  Likewise, the two food-preparing workers in the kitchen area never heard or saw any part of the Casey incident (*see* Santos Dep., at 46-48; Lainez Dep., at 53-54 & 58), and there is no pertinent evidence from Sam Chavez, the fourth employee working as cashier behind the service counter with Martinez, that he heard or saw the Casey incident. (*See* Liu Dep., at 88.)  Further, a law student  sitting near the Ward table did not notice any threatening altercation until the pushing and shoving between Lindsey, Casey, Giblin, and Ward at the restaurant's front, less than 20 seconds before the brief fight outside the restaurant. (Podlone Aff., ¶¶ 5-11.)  Given that Plaintiffs' counsel

procured the Martinez affidavit without any participation by the moving Defendants' counsel, it is unlikely that Mr. Martinez could offer any testimony more favorable to Plaintiffs than what appears in his affidavit. Thus, from all the available evidence, it is clear that Martinez did not hear or see anything about the Casey incident until about 20 seconds before Casey, Lindsey, Giblin and Ward exited from the restaurant's front door and Casey was injured seconds later. Under those circumstances, even if the Foster Report (at 11) is correct in asserting that the police responded to David Lindsey's 911 call after Casey had been injured only 73 seconds after receiving that call, it would be impermissible speculation for a jury to conclude that the police could have responded within 20 seconds if Martinez had called the moment he heard and saw the altercation at the front door and realized that "there was going to be a physical fight."

As a result, Plaintiffs' sole potential basis for claiming that Patrick Casey was injured as a proximate cause of the restaurant's asserted failure to call the police depends on their contention that there was sufficient time after the two groups reportedly began exchanging "trash talk" several minutes before Casey, Lindsey, Giblin and Ward exited the front door of the restaurant. (*See* Foster Report, at 11-12.) There are two key problems with this last-ditch theory from Plaintiffs. First, there is no evidence that Martinez or any other restaurant worker had actual notice when that trash talk began, or at any time **before the last 20 seconds** before Casey, Lindsey, Giblin and Ward exited the front door of the restaurant. Second, there is no credible evidence that anything potentially alarming could be seen or heard by others until after Patrick Casey stood up **less than 75 seconds** before Casey, Lindsey, Giblin and Ward exited the front door of the restaurant, until after Casey approached the other group confrontationally, and until after Lindsey had uttered his gay-slur remark, and until after Giblin stood up to confront Lindsey. Even then, there is no evidence that shift manager Martinez or any other

33

restaurant employee actually saw or heard anything alarming. Plaintiffs and their expert would be asking the jury to speculate that, even though their own witness Martinez did not realize there was going to be a fight **until about 20 seconds** before it actually occurred, a reasonably attentive shift manager should have seen and heard enough to call the police earlier.

Alternatively, the Foster Report contends that the Casey incident could have been prevented if the moving Defendants had better trained their employees in security procedures. That alternative argument fails, however, for each of the following reasons. <u>First</u>, that contention is based on aspirational statements and recommended procedures in the Security Manual used by McDonald's Corporation, which McDonald's does not require its independent franchisees to follow. As a result, the contents of that Manual should not be admissible against Rhee's McDonald's as its own internal policy. <u>Second</u>, the portions of the Security Manual quoted by the Foster Report do not set forth any specific standard of care, and instead are merely cautionary and aspirational. <u>Third</u>, contrary to the arguments in the Foster Report (at 14-15), Rhee's McDonald's is an independent franchisee, and McDonald's Corporation did not have any control over the security measures of its independent franchisees, let alone any legal duty to exercise such control, either as a franchisor (through its subsidiary McDonald's, U.S.A., LLC) or as Rhee's non-resident landlord under their Lease Agreement. *See Campbell v. Noble*, 962 A.2d 264, 266 (D.C. 2008) (as to landlord and residential tenant); *Settles v. Redstone Redevelopment Corp.*, 797 A.2d 692, 695-96 (D.C. 2002) (as to landlord and unrelated retail tenant); *accord, Smith v. Washington Sheraton Corp.*, 135 F.3d 779, 786 (D.C. Cir. 1998) (as to corporate parent and owner/operating subsidiary).[4]

---

[4] While neither McDonald's Corporation nor its subsidiaries have litigated this issue to a published decision in the District of Columbia, courts in numerous other jurisdictions have dismissed McDonald's franchisor/licensor/lessor corporations from bodily injury actions in other jurisdictions. *See, e.g.,*

Accordingly, there is no record evidence capable of showing that the restaurant operators had sufficient notice of the ongoing Casey incident to call the police.

### D. The Moving Defendants Did Not Have a Duty to Provide a Security Guard.

In reliance on a statement in the McDonald's corporate Security Manual that "security guards are often good protection against robberies" and "crowd control," the Foster Report appears to assert that the situation present at the 1916 M Street restaurant on the night of the Casey incident called for "crowd control" using security guards. However, the restaurant's videotape from that night shows that there was no "crowd" in the restaurant beyond a line of about 10 people waiting to order and a similar or smaller number waiting to pick up their food, and the restaurant's area supervisor testified that 20 people in the restaurant is not a "crowd" like 100 people descending on a restaurant at the same time after a sporting event. (*See* Liu Dep., at 41-43.) The Foster Report also relies on a statement in the corporate Security Manual that "[o]n site security personnel prevent violent crimes," as well as certain statements by witnesses to the Casey incident that the presence of a security guard "would have diffused [sic] the situation." However, neither of those assertions establishes or even supports the existence of any putative national standard of care for restaurants to follow regarding the use of security guards in the situation that was presented on the night of September 22-23, 2011.

---

*Vandemark v. McDonald's Corp.*, 904 A.2d 627, 631-36 (N.H. 2006) (rejecting claims that franchisor was actually or vicariously liable for security-related injury); *O'Banner v. McDonald's Corp.*, 670 N.E.2d 632, 1269-71 (Ill. 1996) (rejecting actual and apparent agency arguments for holding franchisor liable for slip-and-fall negligence); *Hoffnagle v. McDonald's Corp.*, 522 N.W.2d 808, 811-15 (Iowa 1994) (citing *Restatement (Second) of Torts* §§ 328E, 344 & 414 in rejecting actual or vicarious liability for security-related injury); *Khanimov v. McDonald's Corp.*, 995 N.Y.S.2d 202, 203-04 (App. Div. 2014) (same, as to slip-and-fall and hot-coffee burn claim); *Risner v. McDonald's Corp.*, 18 S.W.3d 903, 906-07 (Tex. App. 2000) (same, as to security and toxic-tort claim); *Gray v. McDonalds USA, LLC*, 874 F. Supp. 2d 743, 745-55 (W.D. Tenn. 2012) (same, as to restaurant supervisor's assault on employee); *Virgin v. McDonald's Restaurant*, 2005 U.S. Dist. LEXIS 19082, at *3-*5 (W.D. Ky. Sept. 2, 2005) (same, as to customer's slip-and-fall claim); *McLaughlin v. McDonald's Corp.*, 2002 U.S. Dist. LEXIS 4749, at *20-*33 (D. Mass. Feb. 26, 2002) (same, as to abduction from restaurant and resulting assault).

In an effort to support Plaintiffs' contention, the Foster Report (at 5-7) asserts in effect: (a) that restaurants open at night in the vicinity of bars like those near the restaurant should provide the same level of security as the bars themselves, even though only the bars contribute to the intoxication of potential bar patrons (*see id*. at 5-6); and (b) that the McDonald's restaurant at 1916 M Street should have had a security guard at night because some other McDonald's restaurants in the District of Columbia use them, such as one near the Verizon Center (where local sports teams play) or on U Street (where other types of crime existed when the decision to hire a security guard was made). (*See id*., at 6-8 & n.1.) Nowhere is there any evidence that the general situation near the M Street restaurant is equivalent to the situation near the Verizon Center or on U Street, and nowhere in the Foster Report is there any discussion of any national standard of care requiring the operators of those two franchisee-operated McDonald's restaurants to employ security guards at night. Likewise, nowhere is there any evidence that comparable restaurants place security guards outside after the bars close, let alone outside all night long.

Especially informative in this regard is *Cook*, 354 A.2d at 507-09, where a customer who had been shopping in the evening at a grocery store in an asserted high-crime area sued the store for injuries she suffered while resisting and pursuing a would be purse-snatcher and his two companions (*id*. at 507-08), the court held that the store did not have a duty to provide security guards in the evening when the incident occurred, even though there was evidence that the same store had occasionally employed security guards before the incident. *See id*. at 508-09. In particular, as the *Cook* court reported it (*id*. at 507-08):

> "[The plaintiff] was picking up groceries one evening in a Safeway store . . when a stranger (with two companions) snatched her wallet from her shopping cart. [The plaintiff] yelled, "What are you doing? You are trying to steal my wallet."

> As she said this, she stepped up to the thief and his companions and seized his arm. He dropped the wallet, wrenched his arm away, and moved rapidly toward the exit. Appellant picked up the wallet and noticed that a $20 bill which had been in it was missing. Calling out that the man was a thief, she pursued him to the checkout counter and grabbed his arm; whereupon he turned, struck [the plaintiff] in the face with his fist, and ran from the store. ...

In explaining its holding, the *Cook* court made three statements that are especially pertinent here. First, describing the plaintiff's own conduct as "a rash attempt on the part of a customer physically to restrain a purse-snatcher from fleeing the scene of the crime," the court stated that such a situation "was not one which the storekeeper could be expected to anticipate." *Id.* at 508-09. The same could be said of Patrick Casey's conduct and foreseeability to the moving Defendants here. *See id.*

Second, the court noted that the primary purpose of security guards at "banking and retail establishments is not to guard against harm to customers but to deter robbers from holding up cashiers and to curb shoplifting . . . [so that] whatever protection business visitors to a bank or shop derive from the presence of guards is merely incidental." *Id.* at 509. Given that the restaurant has no reported recent history of either armed robbery or shoplifting, there is insufficient evidence to support an argument that the restaurant should have had security guards for its own protection.

Third, and similarly, regarding a much higher crime rate than that reported in or near the moving Defendants' restaurant in the preceding 30 months, the court stated: "But simply because this hazard exists, it does not follow that the common law of negligence imposes an obligation upon private enterprises to provide armed guards to insure the safety of persons invited to do business with them." *Id.* Given the comparatively rare occurrence of similar incidents at this restaurant, the *Cook* court's conclusion applies equally here.

Accordingly, there is no evidence that the restaurant operator had any duty to employ

security guards in an effort to prevent the kind of incident that resulted in Patrick Casey's injury. (*See* Clark Report, at 5.) Furthermore, it would be impermissible speculation for a finder of fact to conclude that the presence of a security guard inside the moving Defendant's restaurant on the night of September 22-23, 2011 – even were it required – would have prevented the kind situation here, where some sort of pushing and shoving during the last 20 seconds inside the restaurant was followed by a fight and resulting injury outside the restaurant. (*See id.*, at 5-6; Rhee Dep., at 109, 112 & 120-21.) Even had a security guard been present, the guard's primary duty would be to observe and report; at most, a security guard could have asked rowdy patrons to leave, which is what they already were doing, but the guard's authority would end at the door. (*See* Clark Report, at 5.) Likewise, there is no evidence capable of showing that a security guard would have been able or legally entitled to prevent Casey, Giblin and Ward from coming to blows outside the restaurant. (*See id.*) Likewise, there is no record evidence capable of showing that the restaurant operator had a duty to employ an off-duty officer for that purpose or that even a police officer would have had probable cause to do anything more than a security guard under the circumstances.

**III.    The Moving Defendants Had No Duty to Prevent a Fight on the Public Sidewalk.**

For all the reasons set forth above, the sidewalk fight and resulting injury to Patrick Casey was no more foreseeable legally to the moving restaurant Defendants than it would have been to the bar Defendants, who had been serving alcoholic beverages and enhancing the intoxicated state of individual Defendants Ward, Giblin and Ruark. In other words, once patrons reach the public sidewalk, the moving Defendants no longer owed them any pertinent duty of care.

In this regard, it is the general rule that, absent a "special use" by the abutting private

landowner, public sidewalks and streets are a municipal responsibility, not the responsibility of abutting landowners. *Compare Quigley's Pharmacy, Inc. v. Beebe*, 261 A.2d 242, 244 (D.C. 1970) (pharmacy owner had no duty to correct defects in abutting public sidewalk), *with District of Columbia v. Texaco, Inc.*, 324 A.2d 690, 691-92 (D.C. 1974) (gas station operator responsible for maintenance of driveway over public sidewalk used by its patrons for ingress and egress), and *Merriam v. Anacostia National Bank*, 247 F.2d 596, 598-99(D.C. Cir. 1957) (bank was constructing building on its property held responsible for hazards the construction posed to pedestrians on the abutting sidewalk). Here, there are absolutely no facts indicating there was any assertion of control by the moving Defendants over the public sidewalk outside the restaurant, and therefore no duty to control hazards there, including fights or assaults.

The opinions in *Novak v. Capital Management & Development Corp.*, 452 F.3d 902, 904 & 911-14 (D.C. Cir. 2006), *on appeal after remand*, 570 F.3d 305, 312-16 (D.C. Cir. 2009), make the case for granting summary judgment to the moving Defendants here, by highlighting the sort of special circumstances – not present here – where a <u>nightclub owner</u> could reasonably be held liable to protect <u>nightclub patrons</u> from fights and assaults in <u>private alley</u> just outside the club's front door. In finding a duty to protect such patrons, the *Novak* court held that the club was putting the alley to a "substantial special use" and that "evidence of two fights per month occurring in the alley and at least two more fights per month inside the club could demonstrate foreseeability" of harm resulting from a fight or assault in the alley. *Id.* at 904-05. Notwithstanding that precedent, however, the Court here dismissed the bar Defendants, finding that the Casey incident was not within any demonstrable "more heightened showing of foreseeability."

The instant action – already decided in favor of the nearby club owners as a matter of

law – is clearly different from the *Novak* case in vital ways as to the moving restaurant Defendants as well. <u>First</u>, and foremost, the moving Defendants' restaurant <u>did not</u> make any "substantial special use" of the sidewalk outside the restaurant, and the restaurant awning provided to protect patrons from inclement weather did not play any part in creating or exacerbating the incident here. <u>Second</u>, the level of prior violent activity inside and outside the moving Defendants' restaurant was remarkably low, comprising just 10 incidents over 26 months, some of which involved unprovoked robberies or other outside attacks and others merely involved rough behavior by disgruntled would-be patrons, in marked contrast with the two fights per month in the alley and at least as many per month inside the club. <u>Third</u>, the moving Defendants here did not employ security guards, while the *Novak* club employed as many as 15 security guards and off-duty policemen, whom it was held not to have deployed appropriately. <u>Fourth</u>, the physical part of the Casey incident took **only about 20 seconds**, and was over in one punch, so there was essentially no opportunity to intervene or call police, while the Novak incident took five minutes or more before anyone from the club came to Novak's assistance in the alley outside the club. *See id*, 570 F.3d at 312.

    <u>Fifth</u>, the moving Defendant's restaurant served only food and ordinary beverages, while the club in the *Novak* case served alcoholic beverages and thus had special legal obligations by statute or ordinance to guard against the consequences of over-intoxication. <u>Sixth</u>, there is no evidence of a national standard of care for quick-service restaurants here, while in *Novak* there was evidence that the club violated a "national standard of nightclub security by failing to post security personnel outside its entrance at closing time until patrons dispersed" based on essentially uniform practice by professional nightclubs in the District. *Id.*, 570 F.3d at 313. <u>Seventh</u>, current District of Columbia law looks carefully at the so-called

relational component, and, while the *Novak* court held there was a sufficient "special relationship" between a nightclub and its patrons to make the evidence of four or more fights each month sufficient to show "more heightened foreseeability" (*id.* at 912-13), no such "duty of protection" applies to an ordinary quick-service restaurant that does not serve alcoholic beverages, especially when neither local public policy nor social custom currently expects – let alone requires – such a restaurant to screen out and exclude intoxicated would-be patrons.

For all these reasons, the Court should hold that the moving Defendants had no duty to prevent a fight on the public sidewalk even though the encounter began inside the restaurant.

**IV.    Casey and Lindsey Became Uninvited Trespassers -- Entitled to Protection Only from Reckless or Malicious Misconduct – When They Began Confrontational and Provocative Behavior against the Ward Group.**

When they invited Ward, Giblin and Ruark to "take it outside" the restaurant "to kick all your asses" after they had taunted Ward, Giblin and Ruark with gay-slur remarks, and when Mr. Casey physically attacked Mr. Giblin throwing him to the ground, Casey and Lindsey became uninvited trespassers or bare licensees to whom the moving Defendants owed no relevant legal duty, and the same is true of Ward and Giblin to the extent they intended to provoke or engage in fighting within the restaurant.  As a result, the only relevant duty the restaurant owed Patrick Casey here was to avoid willful or wanton injuries and, on the record here,  (a)  Ward's conduct was either privileged self-defense or an intentional tort, and not mere negligence, and  (b)  the restaurant's alleged breach of duty to provide greater security was at most mere negligence and even then only secondary to any primary negligence by Ward.

While District of Columbia follows the majority rule in applying a single, flexible standard of reasonable care under the circumstances of the case, District of Columbia law still adheres to the principle that "trespassers [and "bare licensees"] may, generally speaking, only

recover from landowners for injuries that were willful, wanton or that resulted from maintenance of a hidden engine of destruction." *See, e.g., Holland v. Baltimore & Ohio R. Co.,* 431 A.2d 597, 599-601 (D.C. 1981) *(en banc), following and reaffirming Firfer v. United States,* 208 F.2d 524, 528-29 (D.C. Cir. 1953); *accord, Boyrie v. E&G Property Services,* 58 A.3d 475, 477-78 (D.C. 2013); *Lacy v. Sutton Place Condominium Ass'n,* 684 A.2d 390, 393-94 & n.2 (D.C. 1996); *Sandoe v. Lefta Assocs.,* 559 A.2d 732, 738-39 (D.C. 1988) (dictum); *Morgan v. District of Columbia,* 449 A.2d 1102, 1109 n.4 (D.C. 1982); *WMATA v. Ward,* 433 A.2d 1072, 1073-74 (D.C. 1981), *aff'd on other grounds,* 468 A.2d 1306 (D.C. 1983) *(en banc); Nelson v. United States,* 838 F.2d 1280, 1285 (D.C. Cir. 1988); *Jeffries v. Potomac Development Corp.,* 822 F.2d 87, 94 (D.C. Cir. 1987); *Daisey v. Colonial Parking, Inc.,* 331 F.2d 777, 778-80 (D.C. Cir. 1963); *See Rude v. Dancing Crab at Washington Harbour, LP,* 245 F.R.D. 18, 24-25 (D.D.C. 2007).

As the *Firfer* opinion explains, "a trespasser is 'a person who enters <u>or remains</u> upon land in the possession of another without a privilege to do so created by the possessor's consent or otherwise.' Restatement Torts, [§] 329 (1934). The difference between a trespasser and a bare licensee is that the [trespasser] commits (technically) a wrong to the landowner by being on the premises; while the [bare licensee], by virtue of consent or acquiescence of the owner, does not. But as regards a claim of negligence against the owner of the land there is no distinction between them; each alike must take the premises as he finds them, and cannot hold the owner to liability based upon negligence in failing to make the premises safe." *Id.,* 208 F.2d at 528. "One may also be lawfully on the premises 'by mere sufferance or acquiescence' of the landowner, <u>as where the landowner has not objected to a general or customary use of the premises</u>." *Boyrie,* 58 A.2d at 478. Here, the invitation or license that the restaurant extended

42

to Casey and the other participants in the altercation also was limited, not just in terms of access to particular parts of the premises, but also for the obvious particular purpose of purchasing and eating food at a table provided by the operator, and did not extend to conducting threatening arguments or violent altercations.[5]

Furthermore, there was no need for the restaurant to post warnings that provocation and violence was not permitted, because that duty is imposed by District of Columbia law (*see, e.g.,* D.C. Code §§ 22-1321(a) & (g) (prohibiting disorderly conduct, including "jostling") & D.C. Code § 22-404 (prohibiting assault and threatened assault)), which all persons are presumed to know and obey. *See Conley v. United States*, 79 A.3d 270, 283-84 (D.C. 2013); *Bsharah v. United States*, 646 A.2d 993, (D.C. 1994); *McIntosh v. Washington*, 395 A.2d 744, 756 (D.C. 1978) (ignorance of the law is no defense).

Plaintiffs' likely response – that Patrick Casey could not become a trespasser or "bare licensee" until he had been asked to leave – is not supported either by the law or the facts. Legally, an invitation or license may be revoked implicitly, by operation of law (*see Firfer, supra*) or expressly, if the owner asks the invitee or licensee to leave by exercising the common-law privilege to refuse service or otherwise. *See Firfer*, 208 F.2d at 528-29; *Rude,*

---

[5] Dictum in several cases since *Holland* states that the general standard of reasonable care under the circumstances applies to all invitees and licensees, arguably implying that "bare licensees" are entitled to reasonable care under the circumstances, but neither the facts nor the analysis in those cases actually addresses a "bare licensee" situation. *See, e.g., Toomer v. William C Smith & Co.*, 112 A.3d 324, 327-28 & n.8 (D.C. 2015) (key issue in *Toomer* was plaintiff's asserted "rescuer" status), *citing Young v. Sherwin-Williams Co.*, 569 A.2d 1173, 177-79 & n.7 (D.C. 1990) (another rescuer-privilege case), and *Foshee v. Consolidated R. Corp.*, 849 F.2d 657, 660 (D.C. Cir. 1988) (dissenting opinion of Wald, C.J.).

Furthermore, because *Holland* was an *en banc* opinion, none of the just-cited cases is binding or even persuasive authority on the point. *See id.* Thus, this case potentially presents a case of first impression since *Holland* as to the legal issues of whether District of Columbia law (a) still treats bare licensees the same as trespassers and/or (b) now classifies bare-licensee status and behavior as trespassory, as well as the factual question of whether Patrick Casey became a trespasser / "bare invitee" entitled only to protection from willful or wanton injury.

245 F.R.D. at 24-25.  In *Firfer*, the plaintiff injured on a non-public part of the Jefferson Memorial grounds lost his status as an express or implied licensee when he accessed the grassy plot where he was injured when he stepped in a hole "by climbing a ten-foot retaining wall, by squeezing through a thick hedge, or by jumping three 'steps' each with a riser of two feet or more." *See id*. at 528.  Notably there, "[t]he fact that no warning signals were posted . . . is of no significance since the natural and artificial obstacles to an entry onto the grassy plot area were warning enough in themselves."  *Id*. at 528-29.

Factually, the best outcome for Plaintiffs here would be a finding that Patrick Casey's conduct was neither provocative enough or aggressive enough for the restaurant staff to have had any reason to invite him to leave.  That hypothetical finding would be unreasonable on the evidentiary record before the Court, because David Lindsey admits making the provocative gay-slur remark to the occupants of the other table in Lindsey's presence, there is testimony that Casey repeated the same remark, and there is no evidence that Patrick Casey did not suggest that they "take it outside" the restaurant where he would "beat all your asses."  The evidence also shows that Mr. Casey physically threw Mr. Giblin to the ground before he was struck by Mr. Ward.  As a result, the Court would be entitled to conclude that Casey's status had been reduced to trespasser or "bare invitee."  Furthermore, there is no evidence that Patrick Casey purchased any food, on the video surveillance or otherwise, and instead merely came into the restaurant to keep his friends' company.

In addition, the hypothetical finding that Patrick Casey's conduct was neither provocative enough or aggressive enough for the restaurant staff to have had any reason to invite him to leave would also compel a finding – in the absence of any evidence of inflammatory or threatening statements from the Ward group – that the moving Defendants

could <u>not</u> have had actual notice of a problem or disturbance after the Ward group got their food and sat down to eat <u>until the last-second pushing and shoving at the door and related yelling finally attracted the attention of Jose Martinez, the restaurant's shift manager</u>. The latter finding, of course, would be fatal to Plaintiff's claim of negligence by the moving Defendants, even under the "should have had a security guard" theory, because there would not have been any time for the security guard to recognize the disturbance, evaluate the situation, and intervene before Casey, Lindsey, Giblin and Ward could get out the restaurant's front door.

Accordingly, under settled District of Columbia law, the moving Defendants are entitled to summary judgment on the grounds that they did not owe Patrick Casey a duty of reasonable care under the circumstances because he was a trespasser or "bare invitee" at the time he was injured or, in the alternative, that they did not have any duty to him at all for the reasons set forth in Argument Sections I and II, *supra*.

## CONCLUSION

WHEREFORE, for all the reasons set forth above, in the accompanying Motion, the Statement of Undisputed Material Facts, and supporting deposition testimony and other exhibits, the moving Defendants are entitled to summary judgment as a matter of law.

Dated this 3rd day of February 2016.

Respectfully submitted,

BONNER KIERNAN TREBACH & CROCIATA, LLP

/s/ Michael L. Pivor

Joseph J. Bottiglieri, Esquire #418523
Michael L. Pivor, Esquire #500911
1233 20th Street, N.W.
Suite 800
Washington, D.C. 20036
(202) 712-7000
(202) 712-7100 Fax
jbottiglieri@bonnerkiernan.com
mpivor@bonnerkiernan.com
*Counsel for Defendant Kyung Rhee
d/b/a Rhee's McDonalds*