# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PAUL D. CASEY, *et al.* | ) |
| | ) |
| Plaintiffs. | ) |
| | ) |
| v. | ) Civ. No. 1:13-cv-1452 (RJL) |
| | ) |
| JASON WARD, *et al.* | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

---

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS KYUNG RHEE AND MCDONALDS CORPORATION'S MOTIONS FOR SUMMARY JUDGMENT**

---

Brendan J. Klaproth (D.C. Bar No. 999360)
Klaproth Law PLLC
406 5th Street NW, Suite 350
Washington, D.C. 20001
Tel:    202-618-2344
Fax:    202-618-4636
Email  bklaproth@klaprothlaw.com
*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

I.    INTRODUCTION ..................................................................................................... 1

II.   STATEMENT OF FACTS ...................................................................................... 3

      A. Background on Patrick Casey ........................................................................ 3

      B. Patrick Casey is Attacked and Killed at the McDonalds Restaurant ................... 4

         1. Ward Was "Belligerent" and "Wrestling" in Line 18 Minutes Prior to
            Attacking Patrick Casey .......................................................................... 5

      C. The McDonalds Restaurant Has a Significant History of Violent Crime ........... 10

         1. Customer Testimony and Video Evidence of Crime in the McDonalds
            Restaurant ............................................................................................. 10

         2. D.C. Metropolitan Police Incident Reports Detailing Prior Crime ....................... 11

         3. Testimony by McDonalds Staff of Violent Crime in the Restaurant ..................... 13

         4. Continued Pattern of Violent Crime in the McDonalds Restaurant ...................... 14

      D. When the Nearby Bars Close, the McDonalds Restaurant is Busier, the
         Customers Are Generally Intoxicated, and the Restaurant is Understaffed ....... 14

      E. The McDonalds Restaurant's Failure to Implement Security Measures in
         Response to the Violent History of Crime in the Restaurant ................................ 15

         1. The McDonalds Restaurant Does Not Have a Standard Security Policy .............. 15

         2. The McDonalds Restaurant Would Only Hire a Security Guard if Customers
            Were Assaulted "Everyday" in the Restaurant ......................................... 17

         3. Nearby McDonalds Restaurants Have Armed Security Guards ............................ 18

      F. Relationship Between the McDonalds Restaurant and McDonalds
         Corporation ................................................................................................. 19

      G. Jason Ward's Drunken Fights Near the McDonalds Restaurant ......................... 20

III.  STANDARD OF REVIEW .................................................................................... 21

IV.   ARGUMENT .......................................................................................................... 22

      A. The McDonalds Restaurant Negligently Failed to Protect Patrick Casey
         From Foreseeable Crime .............................................................................. 22

1. The McDonalds Restaurant Had a "Heightened Foreseeability" of Crime Failed to Protect its Customers from Foreseeable Crime ........................................ 23

2. The McDonalds Restaurant's Duty to Protect its Customers, Such as Patrick Casey, Extended to its Egress and Under its Awning ............................................ 26

3. The McDonalds Restaurant Breached its Duty to Protect Patrick Casey from the Foreseeable Assault by Failing to Hire a Security Guard................................ 28

**B. The McDonalds Restaurant Negligently Failed to Follow its Own Policy to Call the Police** ........................................................................................................... 34

1. McDonalds Breached its Duty (and its Policy) to Call the Police When Ward was "Belligerent" and "Wrestling" While in Line .................................................. 35

2. The McDonalds Restaurant Breached its Duty (and its Policy) to Call the Police When the Altercation Started ........................................................................ 36

**C. The McDonalds Restaurant Negligently Failed to Train and Supervise its Employees** ............................................................................................................... 38

**D. McDonalds Corporation's Negligence** ................................................................. 40

**V.    CONCLUSION** ........................................................................................................ 45

"There's no room for violence under the Golden Arches..."
- McDonalds Twitter Message, April 23, 2011
——————
"McDonalds security policy was to do nothing…"
-Shift Manager of the McDonalds Restaurant

Plaintiffs Paul and Abigail Casey respectfully submit this Memorandum of Points and Authorities in Support of Plaintiffs' Consolidated Opposition to Defendant McDonalds Corporation's and Defendant Rhee's Motions for Summary Judgment.

## I.  INTRODUCTION

Patrick Casey, a U.S. veteran and war hero, enrolled in a Master's degree program at the George Washington University in 2011 after returning from his tour of duty in Afghanistan. His whole life was ahead of him.  Only weeks into his graduate program, however, Patrick Casey was violently killed in a District of Columbia McDonalds restaurant.

Patrick Casey's murder was not a random act of violence.  Quite the contrary, the McDonalds restaurant located at 1916 M Street NW, Washington D.C. was a magnet for violent crime prior to the attack on Patrick Casey. McDonalds employees testified there were violent altercations "***once a month***" in the Restaurant.  In fact, in the six months preceding the assault on Patrick Casey, there were three assaults with a dangerous weapon and significant bodily injury occurring in the Restaurant. Despite the known history of violence, Kyung Rhee, the owner of the restaurant (hereinafter "Rhee," "McDonalds Restaurant," or "Restaurant"), took no reasonable steps to protect Patrick Casey, or any patrons of the restaurant, from the known violence that had been occurring at the Restaurant. When confronted with the undisputed prior acts of violence (which includes a video of a woman being punched in the face by a man in the Restaurant), Rhee's indifferent response was, "I don't know. I didn't think about [it]." That is exactly what this case is about—the McDonalds Restaurant's complete disregard for the safety of its customers.

1

Conceding that it took no reasonable steps to prevent the foreseeable assault on Patrick Casey, McDonalds instead begs this Court to believe that it owed no duty use reasonable care to protect Patrick Casey. McDonalds is wrong. It fundamental and well-settled law that a business has a duty of care to protect its customers from foreseeable crime on its premises. *Novak v. Capital Mgmt. & Dev. Corp.*, 452 F.3d 902, 907 (2006) (hereinafter "*Novak I*"). Indeed, McDonalds' own security manual acknowledges this duty by stating, "security is the number one priority in your restaurant…stringent security procedures can help prevent crimes…[and] can minimize the chances of anyone in your restaurant becoming a victim." Recognizing the duty of care owed to its customers, McDonalds Corporation recommends the hiring of armed security guards for "crowd," burglary prevention," and "robbery prevention." Mr. and Mrs. Casey's security expert reinforces McDonalds Corporation's recommendation by opining that given the history of violent crime and other inherent risks at the Restaurant, the McDonalds Restaurant was required to have security personnel. This is not, however, an aspirational standard of care that McDonalds erroneously claims. Indeed, nearby McDonalds restaurants have adopted this standard security policy by hiring armed security guards to protect their customers. In fact, McDonalds shift manager admitted that "If there was a security guard in the McDonalds [on the night Patrick Casey was attacked], ***the security guard would have certainly had the opportunity to break up the fight or intervene while the customers were yelling in the restaurant***."

The McDonalds Restaurant is not, however, just liable for the death of Patrick Casey for failing to take reasonable steps to keep its customers safe from foreseeable violent crime. McDonalds also failed to follow the most minimal security practice required by its own policies of calling the police when the altercation that resulted in Patrick Casey's death began. For 18 minutes, three visibly "drunk" and "belligerent" patrons at the McDonalds Restaurant caused a

2

commotion and threatened violence. During that 18-minute period, the McDonalds Restaurant employees did nothing. The shift manager that night stated: "It started with yelling and screaming in the front of the restaurant. I did see the three bad guys…every person in the restaurant could hear it. ***It was clear from the yelling that there was going to be a physical fight***." Martinez Aff. at ¶ 7 [Ex. 6]. Rather than ask the assailants to leave the restaurant or call the police (as every person in a supervisory position for the Restaurant testified should have been done), the shift manager instead "went to the bathroom." *Id*. at ¶ 8. In fact, no employee intervened or called the police. If the police had been called, Patrick Casey would be alive. We know this because the police arrived within 73 seconds once a customer called 911 after the attack on Patrick Casey. Had McDonalds undertaken even the most minimal security practice of asking disruptive and "belligerent" customers to leave the Restaurant or call the police, as it was required to do by its own policies, Patrick Casey would be alive.

Patrick Casey had a bright future ahead of him when he moved to Washington, D.C. He survived IED attacks in Afghanistan, only to be brutally killed in the nation's Capital. Our country was robbed of one of its finest and Patrick's family was robbed of the son, brother, and soldier they loved and treasured. Patrick's parents, Paul and Abigail Casey, bring this action on behalf of Patrick Casey against the McDonalds Restaurant and McDonalds Corporation (collectively "McDonalds") for failing to take reasonable security measures to keep its patrons safe, especially in light of the history of violence in the McDonalds Restaurant.

## II.    STATEMENT OF FACTS

### A. Background on Patrick Casey

Before he needlessly lost his life, Patrick Casey saved countless lives as a soldier in Afghanistan. *See* Letter of Captain Alexander White Patterson ("Pat quickly became my counter-IED expert. Day after day he would lead the patrol [in Afghanistan] with twice the ammunition, explosives, and humanitarian aid than that of the other soldiers. Metal detector in hand, he cleared

a safe path for our platoon to follow. He found multiple IED's and enemy weapons caches, saving countless America, and Afghan lives…") [Ex. 10]. Patrick joined the U.S. Army a few years after graduating from RPI with a degree in Management and Engineering, where he was also a celebrated football player. Paul Casey Dep. 13:8-11 [Ex. A]; *Id.* at 20:13-3. Like many of our men and women in uniform, Patrick gave up a lucrative career State-side to serve his Country. Serving as an infantryman in the Army, Patrick Casey learned Arabic and Pashtu. Gail Casey Dep. 59:10-17 [Ex. B]. While providing security detail in Afghanistan for Richard Engel, the foreign news correspondent, Richard Engel recommended to Patrick Casey that he return to the United States to get a Master's degree. Gail Casey Dep. 59:18-60:13 [Ex. B]; *see* Photo of Patrick Casey [Ex. 11]. Patrick Casey did just that. After concluding a tour of duty in Afghanistan and receiving a honorable discharge, he enrolled in the International Affairs Master's program at the George Washington University in August 2011. Paul Casey Dep. 31:10-11. Given his background in the military and language skills, he was well suited for a job with the government. *Id.* Within weeks of arriving in Washington, D.C., Patrick Casey met with officials from the CIA to discuss future employment, and interviewed with the FBI. Paul Casey Dep. 31:16-21.

Only a few weeks into his semester at the George Washington University Master's program, Patrick Casey was attacked at the McDonalds Restaurant. He died on September 27, 2011. Patrick was thirty-three (33) years old at the time of his tragic death.

**B. Patrick Casey is Attacked and Killed at the McDonalds Restaurant**

Prior to arriving at the McDonalds Restaurant in the early morning of September 23, 2011, Jason Ward had spent the evening drinking at several bars nearby the Restaurant with his friends Brian Giblin and Justin Ruark. Ward, Giblin, and Ruark went to at least eight (8) bars that night prior to arriving at the Restaurant. Ruark Aff. at ¶¶ 1-3[Ex. 8]. The first bar Ward went to he ordered twenty-two (22) beers. *See* Ward Receipts [Ex. 13]. Ward ordered five (5) Bombay Sapphire's at

Public Bar. *Id.* At the last bar Ward drank at just prior to arriving at the Restaurant, Camelot Showbar, Ward and Giblin collectively spent $211.95. *Compare* Camelot Receipts [Ex. 14]; *with* Ward Dep. 167:5-16 [Ex. D]. The alcoholic "3 Royal Flushes" purchased at Camelot just before going to McDonalds were for Ward or Ruark. *Compare* Camelot Receipts [Ex. 14]; *with* Giblin Dep. 144:16-145:3 [Ex. C]. The drinks were purchased at Camelot at 1:38 am. Ruark testified that he was intoxicated enough that he "wouldn't have been comfortable driving." Ruark Dep. 139:12-21 [Ex. E]. Ward and Giblin consumed at least as much alcohol as Ruark. Ruark Aff. at ¶ 3.

On September 23, 2011 at approximately 2:15 a.m., Jason Ward arrived at the McDonalds Restaurant with his friends Brian Giblin and Justin Ruark. *See* Surveillance Video at 2:15 [Ex. 1].[1] When Ward arrived, the Restaurant was crowded and loud. Ward Dep. 55:17-19 (crowded) [Ex. D]; Ward Dep. 190:1-2 (loud and "congested"); Guild Dep. 72:11-18 (loud) [Ex. H]. At that time, there were approximately seventeen people in line at the Restaurant. Santos. Dep. 43:16 [Ex. J]. It was a very busy night "given the [limited] number of employees" compared to the large "number of people" in the Restaurant. Santos Dep. 44:22-45-5. And "everyone in that McDonald's that night more likely than not was intoxicated." Guild Dep. 70:9-12 [Ex. H].

### 1. Ward Was "Belligerent" and "Wrestling" in Line 18 Minutes Prior to Attacking Patrick Casey

Max Podlone, a current lawyer who was a customer in the McDonalds Restaurant, noticed Ward and his friends immediately. Podlone Aff. at ¶ 3 [Ex. 5]. Mr. Podlone stated, "***I noticed three guys right off the bat and told my friend, 'we gotta keep our eyes on these three guys.'***" *Id.* (emphasis added). Mr. Podlone described Ward, Giblin, and Ruark as "***being loud and drunk at the McDonalds.***" *Id.* (emphasis added). Specifically, Ward, Giblin, and Ruark "***were belligerent***

---

[1]     The timestamp on the surveillance video is one hour earlier than the actual times of the incident. Accordingly, all citations to the timestamp on the surveillance video will add one hour to reflect the correct time of the occurrences.

*while waiting in line, and were looking for a fight.*" *Id.* at ¶ 4 (emphasis added). Andrew Guild, a witness, testified "I remember thinking that [Ward, Giblin, and Ruark] were intoxicated as well." Guild Dep. 70:9-12 [Ex. H].

While waiting in line to order, Ward attempted to inappropriately touch a female customer's behind. *See* Surveillance Video at 2:26:04 [Ex. 1]. Shortly after the incident with the female in line, Ward began to wrestle with Giblin. *See Id.* at 2:27:05-2:28:39. The wrestling between Ward and Giblin took place over a period of ninety-four (94) seconds. *Id.* During the wrestling, a couple in line behind Ward, cautiously backed up "a couple more feet"—about "5 to 6 feet" in total to keep a safe distance from the wrestling Ward and Giblin. Ruark Dep. 226:21-227:18 [Ex. E]. Ruark described the wrestling as "nudging, elbowing, just kind of harassing each other." Ruark Dep. 57:16-17. At this time, Ruark was concerned they may "get in trouble or get kicked out of the McDonald's." Ruark Dep. 147:21-22. Eventually, Ruark thought it was "enough jerking around," and he broke up the wrestling between Ward and Giblin because he "didn't want anything to happen." Ruark Dep. 149:20-150:6. Ruark explained, *"[e]ventually, when no one with McDonalds tried to intervene, I was able to get them to stop before things got out of hand or we were asked to leave*." Ruark Aff. at ¶ 7 (emphasis added) [Ex. 8].

Patrick Casey arrived at the McDonald's Restaurant at approximately 2:23 am. *See* Surveillance Video at 2:23 [Ex. 1]. Patrick Casey was meeting his friends, Claire Jun and David Lindsey, at the Restaurant. Lindsey and Jun had already ordered their food when Patrick Casey arrived. Lindsey Dep. 55:11-12 [Ex. F]. Once they received their food, Patrick Casey, Jun, and Lindsey sat down at a table near the front of the restaurant. Lindsey Dep. 62:20-63:9.

While Patrick Casey, Jun, and Lindsey sat at their table "minding [their] own business," Ward and Giblin began "trash talking" and making belligerent comments towards Patrick Casey's

table. Lindsey Dep. 203:8-204:14 [Ex. F]; Ruark Dep. 66:4-6 [Ex. E].  Specifically, someone from Ward's table insulted Patrick Casey because his "hair [was] receding." Lindsey Dep. 204:8-204:14. In response, Patrick Casey "tr[ied] to make a joke about it." *Id.* 204:17-205:12. After the trash talking continued approximately for 3-5 minutes, Patrick Casey eventually went to Ward's table. Ruark Dep. 154:20-155:4; *see also* Murphy Dep. 85:13-19 [Ex. G]; *Id.* 87:5-7 (verbal altercation continued "between two and four minutes" after he changed tables "to better observe" an "escalation in hostilities."). Once Patrick Casey arrived at Ward's table, Ruark stood up and said "whoa Zangief"—a joking reference comparing Patrick Casey's appearance to a video game character. Ruark Dep. 157:6-9 [Ex. E]. In response, Patrick Casey "smirk[ed] or smil[ed]" and "laughed." Ruark Dep. 157:11-14.  Nevertheless, the "trash talking" continued. *Id*. at 159:8-10.

Shortly thereafter, Lindsey walked towards Ward's table to leave the Restaurant. Lindsey Dep. 205:22-206:2 [Ex. F]. While passing Ward's table, Lindsey joked to Ward and Giblin (who were still trash talking), "[have] fun going home alone, guys…What are you guys gay?" *Id.* at 206:7-9. Giblin and Ward "were pissed" in response to Lindsey's joke. *Id.* at 207:7. Lindsey testified, "[Giblin] in particular was really mad at me. You could tell – as soon as I saw his reaction, I regretted saying what I said." *Id.* at 207:7-10.  Lindsey walked towards the exit of the McDonalds Restaurant to avoid a confrontation with Giblin. *See* Surveillance Video at 2:42:32 [Ex. 1].

Giblin pursued Lindsey to the door of the McDonalds Restaurant, pushing past Patrick Casey. *See* Surveillance Video at 2:42:45. At the door of the Restaurant, Giblin aggressively "put his hands on [Lindsey] and he had this look on his face like – he was ready to get in an altercation…it seemed like he was in his element, like he was like getting off on it almost." Lindsey Dep. 207:14-21 [Ex. F].  Lindsey was "scared. [He] wanted to get out of [the Restaurant]."  *Id.* at 208:12-13. Giblin "had this demeanor. Like you looked into his eyes, but like there was, like, no

reaction – there was like no emotion in it. It was like…kind of scary, like–kind of like an evil look." *Id.* at 208:5-10. Lindsey then stated that he "wanted to get out of there," but Giblin "didn't take his hands off" Lindsey. *Id.* at 208:12-20.   Inside the Restaurant Giblin was "grabbing [Lindsey]…he wasn't letting go of him. He had his hold on [Lindsey]." *Id.* at 209:14-18.

At this point "red flags" were going off for Lindsey, "[i]t was just—this wasn't funny anymore. This was – this was like escalating to violence and there was no doubt in [Lindsey's] mind about it and [he] wanted to stop it." *Id* at 210:8-16. Giblin had taken "it to the next level." *Id.* at 210:17-20.  Lindsey testified he was "yelling—like screaming it at this point, like just – you know, emotionally – was like, Forget it, we're leaving. We're getting out of here, and I'm assuming – I escalated my voiced the more I had to repeat it." *Id.* at 211:11-15.

The shift manager, Jose Martinez, "observed the beginning of the fight." Martinez Aff. at ¶ 7 [Ex. 6].  Mr. Martinez described the altercation at the door of the restaurant:

> **It started with yelling and screaming in the front of the restaurant. I did see the three bad guys…the yelling was medium loud, every person in the restaurant could hear it. It was clear from the yelling there was to be a physical fight.**
>
> **During the yelling I went to the bathroom.**

Martinez Aff. at ¶¶ 7-8 (emphasis added). Martinez added, "**If there was a security guard in the McDonalds, the security guard would have certainly had the opportunity to break up the fight or intervene while the customers were yelling in the restaurant.**" *Id.* at ¶ 9; *see also* Guild Dep. 75:9:11(**would not have happened if a security guard had been there**) [Ex. H]; *see also* Giblin Letter (security guard would have defused the situation at the table) [Ex. 20].

Podlone, an independent witness and law student at the time, "heard [the] yelling near the door of the restaurant. [He] looked up and saw [Ward and Giblin] surround Patrick Casey. Patrick Casey's back was to the door." Podlone Aff. at ¶ 6. Giblin was "the most belligerent." *Id.*

According to Ruark, Giblin took it too far so Ruark attempted to defuse the situation. Ruark "***jumped in front of Giblin before he got out of the door and attempted to keep him inside the restaurant by physically restraining him, but was ultimately unsuccessful***." Ruark Aff. at ¶ 11 (emphasis added) [Ex. 8]. Ruark testified that while in the Restaurant, "***it reached a point where I did not feel that I could restrain [Giblin] without, I don't know, throwing [Giblin] on the ground or something absurd***." Ruark Dep. 174:22-175:2 (emphasis added).

After Ruark was unsuccessful in restraining Giblin, "there [wa]s a rush towards the door." Ruark Dep. 176:13-19 [Ex. E]. Giblin and Ward then "pushed Patrick through the door of the restaurant. Patrick Casey was pushed out of the door back first." Podlone Aff. at ¶ 7 [Ex. 5]; Giblin Dep. 80:6-9 (yelling continued as Giblin was "trying to push [his] way out of the… restaurant") [Ex. C]. Podlone observed, "it did not appear to [him] that Patrick Casey wanted to go outside. *Id.*

"At the moment Patrick was pushed out the door, [Podlone] stood up to make an attempt to break up the impending attack." Podlone Aff. at ¶ 8 [Ex. 5]. As Podlone "ran to the doorway" he observed "Giblin grappling and yelling." *Id*. Patrick Casey and Giblin "pushed apart and separated" (*Id.*) "right in front of the door" of the McDonalds Restaurant. Giblin Dep. 197:2-5 [Ex. C]. Giblin "stumbled over the sidewalk" as he backed up. Podlone Aff. at ¶ 8. Ward then "sucker punched Patrick Casey while Patrick Casey was looking at [Giblin]." *Id.* at ¶ 10. "Patrick Casey did not see the punch coming." *Id.* After being punched, "Patrick Casey fell backwards onto the sidewalk." *Id.* Giblin and Ward "looked at Patrick Casey on the ground…then immediately sprinted up the street away from the McDonalds restaurant." *Id.* at ¶ 11.

When Ward punched Patrick Casey, "[Patrick Casey] was outside right in front of the door" of the McDonalds Restaurant, "still under the [McDonalds] awning by the doors." Ward Dep. 223:20-224:2 [Ex. D]; *See* Photo of McDonalds Awning [Ex. 15].

"Instantly," within "seconds" after Ward punched Patrick Casey, Lindsey called 911. Lindsey Dep. 86:10-14 [Ex. F]. The paramedics arrived *73 seconds* after Lindsey called 911.  *See* MPD Event Chronology [Ex. 17]. The paramedics then took Patrick Casey to GW Hospital. Podlone Aff. at ¶ 14 [Ex. 5]. Patrick Casey remained in a medically induced coma for four days. Gail Casey Dep. 26:11-17 [Ex. C]; Paul Casey Dep. 67:13-21 [Ex. A].  Patrick Casey died on September 27, 2011 as a result of the injuries he suffered from the attack at the McDonalds restaurant. Gail Casey Dep. 54:11-13. Patrick was 33 years old at the time of his death.

**C.  The McDonalds Restaurant Has a Significant History of Violent Crime**

>**1.    Customer Testimony and Video Evidence of Crime in the McDonalds Restaurant**

Abasiakan Ekpenyong worked near the McDonalds Restaurant in 2009 and 2010. Mr. Ekpenyong would go to the McDonalds Restaurant late at night approximately once per month when he got off work. Ekpenyong Dep. 55:1-3 [Ex. R]. During that time period, Mr. Ekpenyong observed four (4) violent fights in the McDonalds Restaurant, all of which preceded the attack on Patrick Casey. *See generally* Ekpenyong Aff. [Ex. 7].

Mr. Ekpenyong filmed the first physical fight in the McDonalds Restaurant. The video is annexed hereto as Exhibit 2.[2] The video depicts a man violently striking a woman in the face near the doors of the McDonalds Restaurant. Mr. Ekpenyong described the assault as a:

>*man maliciously choke-slamming [a] woman to the ground while the McDonald's employees were looking right at them*. *No security whatsoever.* No police whatsoever. And people were leaving the restaurant. *Some of them looked like they were leaving in fear* of what just happened. And you know, it clearly shows that *there had been a fight, a pretty big brawl* there because there was stuff all over, debris all over the floor.

Ekpenyong Dep.131:18-132:7 (emphasis added) [Ex. R]. The altercation had been occurring for a

---

[2]    A DVD of the video will be delivered to Chambers.  For the convenience of the Court, all videos referenced throughout this Opposition can be accessed at this website: http://klaprothlaw.com/casey-v-mcdonalds/

"couple of minutes" prior to the beginning of the video. Ekpenyong Dep. 133:14-16.

Mr. Ekpenyong witnessed a second assault in the McDonalds Restaurants in 2009. The fight involved "two males who were intoxicated." Ekpenyong Aff. at ¶ 9. The fight took place near the restroom where the males "were pushing and shoving." Ekpenyong Dep. 88:2-11.

The third fight witnessed by Mr. Ekpenyong again involved two drunk males. Ekpenyong Aff. at ¶ 10 [Ex. 7]. Ekpenyong described the fight:

> [it] was between **two intoxicated males fighting** over a girl near the doors of the restaurant. The fight was a physical altercation, and the girl was trying to break up the physical altercation.

*Id.* (emphasis added). There was "a lot of screaming, shouting….they were both cursing at each." Ekpenyong Dep. 91:9-12 [Ex. R]. "There was pushing and shoving and swinging at each other." *Id* at 94:22-95:1. According to Mr. Ekpenyong:

> During the physical altercation…**a McDonalds employee watched the fight nonchalantly**. **The employee did not break up the fight and he did not call the police, he just watched as if it was an everyday occurrence**. The fight eventually broke up when a customer shouted that they were calling the police.

Ekpenyong Aff. at ¶ 10 (emphasis added).

The fourth altercation Mr. Ekpenyong observed at the McDonalds Restaurant was a verbal altercation between a McDonalds employee and a customer. Ekpenyong Aff. at ¶ 11 [Ex. 7]. "The customer shouted to the employee 'don't touch me.' The customer then stated he was going to tell the manager of the restaurant, and eventually the customer called the police." *Id.* Mr. Ekpenyong filmed part of the incident which is attached hereto as Exhibit 3.

### 2. D.C. Metropolitan Police Incident Reports Detailing Prior Crime

D.C. Metropolitan Police Department (MPD) incident reports, though an incomplete dataset of all the crime occurring at the Restaurant,[3] further show the history of crime occurring at

---

[3]     The altercations Ekpenyong described are not accounted for in the police reports, which

the McDonalds Restaurant. The relevant MPD incident reports are attached hereto as Ex. 18.

Below are relevant crimes occurring at the McDonalds Restaurant in the two years preceding

Patrick Casey's death.

| MPD INCIDENT REPORTS FOR CRIME IN THE MCDONALDS RESTAURANT AND IMMEDIATE VICINITY TWO YEARS PRIOR TO THE DEATH OF PATRICK CASEY | | |
|---|---|---|
| **Date** | **Crime** | **Description** |
| 11/10/2009 | Assault | Victim was standing in line at the McDonalds Restaurant when he was punched in the face by an assailant. The assailant fled the Restaurant. The attack was unprovoked. |
| 01/24/2010 | Assault with significant bodily injury | Inside bar next door to the McDonalds Restaurant, assailant groped victim's girlfriend and then "head-butted" victim causing significant injuries. |
| 05/24/2010 | Assault with significant bodily injury | Victim was found less than one block from the McDonalds Restaurant at 2:40am.  He was found with a lot of blood on the sidewalk. Assailants hit the victim with a blunt object.  At the hospital it was determined, the victim had a "broken jaw, and was very intoxicated." |
| 07/17/2010 | Assault | Victim was standing in line to order food at the McDonalds Restaurant. The assailant cut in front of victim in line and a verbal altercation ensued. The assailant then punched the victim in the nose. The assailant fled. The victim was transported to the hospital |
| 08/29/2010 | Destruction of property | The criminal "was highly intoxicated and became irate…over not being served promptly" in the Restaurant.  The criminal proceeded to break the change machine on the counter. |
| 10/17/2010 | Assault with a dangerous weapon | In front of 1919 M Street, the 3 victims were approached by the 4 assailants who asked them for money. The 3 victims were then attacked, which included getting "hit in the head with a table" and "punches to the head and neck." The female victim was knocked unconscious from the attack. |
| 11/06/2010 | Damage to property | Customer broke the front door to the Restaurant |
| 01/28/2011 | Assault | Assailant "became irate" in the McDonalds Restaurant and threw coins at the Manager of the McDonalds. |
| 02/06/2011 | Assault with a dangerous weapon and significant bodily injury | A customer in Rumors, a bar less than half a block from the McDonalds Restaurant, was struck over the head with a beer bottle. The customer's friend was also struck with an unknown object on the right side of his face. |
| 02/19/2011 | Unlawful Entry | Barred customer entered the Restaurant, and refused to leave. |
| 03/19/2011 | Assault with | The victim was inside the McDonalds Restaurant when the assailant |

demonstrates that McDonalds does not call the police when there is a fight in the Restaurant. Specifically, there is no police report accounting for the attack on the female shown in the video attached as Ex. 2, or for the three other incidents he described.

12

|  | Significant Bodily Injury | "started to verbally abuse [the witness] and throw french fries." The two assailants then pushed the victim and "began to punch [the victim] about the face with closed fists causing" injuries to the victim. The victim's female friend was knocked over into a table. The victim called the police. |
|---|---|---|
| 06/16/2011 | Robbery with gun | While at the McDonalds Restaurant, the four assailants surrounded the female victim. One of the assailants then "sprayed mace in [the victim's] face and then the other [assailant] punched and forced her to the ground." The assailants then took the victim's purse and then fled. |
| 07/17/2011 | Assault on a police offer | "a large fight occurred" at the corner of 19th and M Street (just outside the McDonalds). |
| 07/30/2011 | Assault with a dangerous weapon | While "inside of the [McDonalds Restaurant], the victim "was involved in an argument with [the assailant]. The assailant "with 9 other males" followed him outside of the McDonalds "at which time [the victim] turned around and was pepper sprayed by [the assailant]." |
| 09/04/2011 | Assault | A customer in Camelot—the same bar Ward was in before going to McDonalds and less than 1 block from the Restaurant—assaulted two individuals as he was leaving, and ripped the stair railing off the wall. |

### 3.    Testimony by McDonalds Staff of Violent Crime in the Restaurant

Moreover, the staff at the Restaurant were well aware of the problems of violence and crime in the restaurant. The manager present during the attack on Patrick Casey, Jose Martinez, stated he was "***aware of fights and violent attacks that occurred in the McDonalds Restaurant prior to the killing of the customer, Patrick Casey***, in September 2011. Although the killing of the customer in September 2011 is the first murder that [he was] aware of that occurred in the Restaurant***, there were previous incidents of violence, especially during the late night shifts***." *See* Martinez Aff. at ¶ 12 (emphasis added) [Ex. 6].

McDonalds' employee Sofia Santos testified that she observed physical altercations at the Restaurant "***once a month***" since she had been working there. Santos Dep. 75:17-6 [Ex. J]. When asked about "fight[s] in the McDonalds Restaurant, McDonalds employee Francisca Lainez testified that there were incidents involving "crazy people coming" in the Restaurant who would "insult[] each other or the customer or something or the manager or the cashier," requiring her to call the police. Lainez Dep. 35:17-36:1 [Ex. K]. When asked how many times per week this would

occur, Ms. Lainez testified "[o]h, all the time." *Id*. at 36:19.

### 4.    Continued Pattern of Violent Crime in the McDonalds Restaurant

The systemic violence in the McDonalds Restaurant has continued after Patrick Casey's death. Specifically, on October 25, 2014, a violent brawl broke out in the front of the Restaurant near the doors. *See* Surveillance of Altercation [Ex. 4]. As shown in the video, two men sitting in the exact seat Ward had been sitting in the night of the attack on Patrick Casey immediately jump from their seat, charge toward the door of the Restaurant, and begin repeatedly punching a man near the doors of the Restaurant. *Id.* at 3:23:17. Although most of the fight is occurring outside the range of the surveillance camera, the video show at least twelve (12) thrown punches.

The very next night, October 26, 2014, another fight occurred in the Restaurant. *See* Graven Decl. at ¶ 2 [Ex. 19].  Paul Graven was with a female friend at the Restaurant. Graven arrived at approximately at 2:00 am after attending a "bar crawl." Graven Decl. at ¶ 3. The Restaurant was "very crowded." As Graven sat eating his food with his female friend, a man at a table next to them started to yell at Graven and his friend. *Id*. The assailant then called Graven's friend a "whore." *Id.* at ¶ 6. Graven replied "[t]hat is inappropriate, you shouldn't speak to her like that." *Id.* The verbal altercation quickly escalated. *Id.* at ¶¶ 7-9. The altercation swept out of the Restaurant. *Id.* at ¶ 8. In front of the doors, under McDonalds' awning, Graven and the assailant "pushed each other back and forth." *Id.* at ¶ 9. Graven was then punched in the face, and in the side. *Id.* Graven's female friend was struck by the assailant as she tried to break up the fight. *Id.* Graven "did not see any security at the McDonalds during the altercation at all." *Id.* at ¶ 10. In addition, "[n]o employee asked [Graven] or the assailant to leave [and] [n]o employee called the police." *Id.*

### D.  When the Nearby Bars Close, the McDonalds Restaurant is Busier, the Customers Are Generally Intoxicated, and the Restaurant is Understaffed

The McDonalds Restaurant is open for 24-hours on Thursday, Friday, and Saturday. Rhee Dep. 51:10-11 [Ex. N]. Rhee keeps the McDonalds Restaurant open for 24-hours on Thursdays, Friday, and Saturdays because "there is a lot of bars in the neighborhood," and there are "extra customer [sic] coming into the store" at those times. Rhee Dep. 124:14-125:1.

According to McDonalds' employee Sofia Santos, "it is harder to get the orders out that quickly at nighttime [Thursday, Friday, and Saturday nights when the Restaurant is open 24 hours], because **there are less employees**. And **there are more customers**." Santos Dep. 24:13-19 (emphasis added)  [Ex. J]. When the "bars close in the area…more people come in" to the Restaurant. Lainez Dep. 28:3-4. [Ex. K]. On "Thursday and Friday….between 12:00 and 2:00…[the Restaurant] is busier and there aren't enough employees." Santos Dep. 25:7-11. During those hours at the Restaurant, Santos testified that "you can see that [the customers have] done some drinking…[because she can smell the beer." Santos Dep. 25:16-22.  This is consistent with Mr. Guild's observation on the night of the incident. Guild Dep. 70:9-12 ("everyone in that McDonald's that night more likely than not was intoxicated.") [Ex. H].

**E.  The McDonalds Restaurant's Failure to Implement Security Measures in Response to the Violent History of Crime in the Restaurant**

While Rhee claims that "security is a top priority" in the McDonalds Restaurant and that he "should do everything [he] can to provide for a safe and secure environment," the Restaurant failed to implement adequate security measures. Rhee Dep. 29:2-30:3 [Ex. N].

**1.    The McDonalds Restaurant Does Not Have a Standard Security Policy**

Rhee testified that the McDonalds Corporations Safety and Security Manual ("Security Manual") is the security policy for his Restaurant. *Id*. at 28:3-14. The Security Manual, however, is not followed by the employees in his Restaurant. Santos Dep. 28:6-22 (The first time Ms. Santos saw Security Manual was at her deposition, and, as a Spanish speaker, she could not read the

15

manual, which was written in English) [Ex. J].

The management team for the McDonalds Restaurant testified as to the security protocols for handling disruptive or intoxicated customers, such as Ward, Giblin, and Ruark. The McDonalds Restaurant manager, Damary Fuentes, testified that she trains her shift managers that if a customer is "talking loud" or using "bad words", the McDonalds staff must "[1] try to calm the person down," (2) ask the person to leave, and (3) "if they won't leave, [then] call the police." Fuentes Dep.18:7-22 [Ex. L]. In a similar vein, Andy Liu, the area supervisor for the Restaurant, testified that if a person is intoxicated, the shift manager must "ask them to leave. If it's not [sic], call 911." Liu Dep. 43:3-8 [Ex. M].  Rhee added if customers are "wrestling," the staff must call the police. Rhee Dep. 35:2-9 [Ex. N].  And "if [there is] a fight, we ask them to leave the store… Shift manager ask to leave in [sic] the store." Rhee Dep. 33:19-34:9.

In reality, however, the Restaurant has no standard security measures. As demonstrated by the testimony of employees, the security measures vary depending on which employee you ask. For example, Jose Martinez, the shift manager the night Patrick Case was killed, stated, "McDonalds security ***policy was to do nothing***." Martinez Aff. at ¶ 4 (emphasis added) [Ex. 6]. According to Martinez, "employees were instructed to never break up a fight, never touch a customer, and never remove a customer from the restaurant." *Id.*  When an assault occurs in the Restaurant, the manager for the McDonalds Restaurant Fuentes testified, "we don't get involved in that. That's the rule." Fuentes Dep. 41:20-22 [Ex L]. Similar to Fuentes, employee Sonia Santos testified that if there is a fight in the Restaurant, the McDonalds Restaurant's policy is to not ask the customer to leave the store. Santos Dep. 29:20-30:6 [Ex. J].

The only consistent security measure that can be ascertained from the McDonalds Restaurant's staff, management, and owner is that if there is either (1) **yelling** in the restaurant; (2)

a **fight** (or "wrestling") in the restaurant; or (3) an **intoxicated person** in the restaurant, then **the staff must call 911**. *See* Lainez Dep. 35:12-14 (if two customers are yelling in the restaurant "we have got to call 911, right away.") [Ex. K]; Fuentes Dep.18:7-22 (if a customer is talking too loud, must call police if customer will not leave) [Ex. L]; Liu Dep. 43:3-8 (if a person is intoxicated, required to ask to leave. If they do not, call 911) [Ex. M]; and Rhee Dep. 35:2-9 (if customers are wrestling in the Restaurant the staff must call the police) [Ex. N].

> ### 2.    The McDonalds Restaurant Would Only Hire a Security Guard if Customers Were Assaulted "Everyday" in the Restaurant

The Restaurant would consider hiring a security guard "[d]epending on the level of the risk." Liu Dep. 41:11-17. To decide whether to hire a security guard, McDonalds would consider "crowd control or a lot of gang activity, prostitution, robbery." *Id*. at 41:22-42:4. Notably, the Restaurant would not consider whether "assaults" had occurred in their Restaurant as relevant to hiring a security guard. Liu Dep. 45:7-46:5. In fact, McDonalds testified that even if an assault occurred once per month, they would not consider hiring a security guard. *Id*. at 47:8-10. The Restaurant would only consider hiring a security guard if assaults occurred in the Restaurant "everyday." Liu Dep. 46:20-21.

Rhee disagrees with his area supervisor.  Instead, Rhee wouldn't hire a security guard based on his false belief that fights do not occur in his Restaurant. Rhee Dep. 61:5-7; *Id.* at 63:20 (When asked about the Restaurant's security policy in relation to fights occurring in the Restaurant, Defendant Rhee replied "Because I didn't have that situation, so I didn't even think about it...I don't know. I didn't even think about."). After viewing the video where a woman was "punched in the face" [Ex. 2], Rhee stated that violent act occurring **inside** the Restaurant did not impact his decision to hire a security guard, because the man left the Restaurant after punching the woman and he "do[es]n't consider the outside." *Id.* at 66:20-67-14.

### 3. Nearby McDonalds Restaurants Have Armed Security Guards

The McDonalds restaurants located at 1944 14th Street ("14th St. McDonalds") and 601 F Street ("Verizon Center McDonalds"), both of which are not owned by Kyung Rhee, have armed security guards. Garrido Dep. 28:9-29:17 [Ex. Q]. The 14th St. and Verizon Center McDonalds decided to hire security guards based on a recommendation from McDonalds Corporation to "keep safe the area and make sure nothing happen in the store." *Id.* at 28:9-17. McDonalds Corporation sent a consultant to "evaluate the system of the whole restaurant." *Id.* at 29:21-22. Based on the area and crime, McDonalds Corporation "g[a]ve a recommendation" to hire a security guard "to keep a safe environment and keep it safe." *Id.* at 30:6-9. The 14th St. and Verizon Center McDonalds also consulted with "neighboring businesses" in its decision to hire security guards. *Id.* at 30:13-18. Based on those consultations, "in order to have a safe environment for the customers, the decision was to get some security." *Id.* at. 28:22-29-2.

For the 14th St. and Verizon Center McDonalds the "main reason why [they] hire security guards is just to keep everybody safe. So if something happens inside the restaurant, they are the ones who control the situation." *Id.* at 37:11-14. The responsibility of their security guards is to "Basically just keep a safe environment. So if you, as a customer, go to a restaurant, you can feel safe. And if something happens, for whatever reason, they are the ones that can control the situation." *Id.* at 37:20-38-1. But more specifically, the security guards are responsible to observe the restaurant. *Id.* at 40:12. "If there is a case with a physical fight, they will separate them and they will take them out of the restaurant and escort the same way out of the restaurant." *Id.* at. 39:2-6. Especially once the nearby bars close, it gets "more rowdy than anything else." *Id.* at 42:20. "As soon as they close the clubs, the flow comes in the restaurant." *Id.* at 53:14-15. During those times, "there's a greater need to have a security guard" because of the volume and because the patrons are most likely intoxicated. *Id.* at 53:14-21.

18

The 14th St. and Verizon Center McDonalds have been successful in "keep[ing] everbody safe" and creating "a safe environment" for their customers by hiring security guards. *Id.* at 37:11-22. The corporate designee of the 14th St. and Verizon Center does not have knowledge of even just one fight occurring in either of those restaurants since they opened in 2003. *Id.* at 66:18-67:9.

**F.  Relationship Between the McDonalds Restaurant and McDonalds Corporation**

The McDonalds Restaurant is a franchisee of McDonalds Corporation. *See* Franchise Agreement [Ex. 21]. The Franchise Agreement requires franchisees, such as Kyung Rhee, to strictly adhere to the "McDonalds System." *Id.* at 1. The Franchise Agreements details the requirements of the McDonalds System:

> The foundation of the McDonald's System and the essence of the Franchisee is the adherence by Franchisee to standards and policies of McDonald's providing for the uniform operation of all McDonald's restaurants…[which] includes serving only designated food and beverage products; the use of only prescribed equipment and building layout and designs; [and] strict adherence to … McDonald's prescribed standards of Quality, Service, and Cleanliness.

*Id.* McDonalds Corporation is required to provide "business manuals" which detail: "(a) required operations procedures;...(d) business practices and policies; and (e) other management, advertising, and personnel policies." *Id.* at 2. The franchisee, such as Rhee, must "adopt and use exclusively the formulas, methods, and policies contained in the business manuals." *Id.* One of those business manuals is McDonalds Security Manual. Warfield Dep. 39:21-40:2 [Ex. P].

In order to ensure compliance with the McDonalds System, McDonalds Corporation performs audits referred to "Short Operations Review" and "Full Operations Review." Warfield Dep. 26:3-9; 54:4-5.  The Full Operations Review contains 700 questions, of which only 3 relate to security. Warfield Dep. 35:19-36:3. In addition, McDonalds Corporation provides security "consultations" for franchise owned restaurants, as was the case for the 14th St and Verizon Center McDonalds. Webb Dep. 44:16-19 [Ex. O]; Garrido Dep. 29:21-22 [Ex. Q].

Consistent with McDonalds Corporation's oversight of franchise owned restaurants, McDonalds published a twitter message stating "there's no room for violence under the Golden Arches & our thoughts are with the victim. Action has been taken." *See* McDonalds Twitter Message [Ex. 16]. This statement was made on April 23, 2011 after a customer was attacked in a Baltimore franchise owned restaurant. *Id.*

In the case of the McDonalds Restaurant, the Regional Security Manager the Baltimore-Washington Region for McDonalds Corporation never had any communication with Kyung Rhee regarding security in the Restaurant. Webb Dep. 70:13-20 [Ex.O]. In fact, the Regional Security Manager for McDonalds Corporation did not even learn that Patrick Casey had been killed in the McDonalds Restaurant until three (3) days before his deposition—nearly 3.5 years after Patrick Casey had been killed. *Id.* at 82:9-12. Instead, the only communication from McDonalds Corporation to McDonalds Restaurant after Patrick Casey was killed was a command to contact McDonalds media hotline regarding press inquiries. Liu Dep. 82:5-8 [Ex. M].

**G. Jason Ward's Drunken Fights Near the McDonalds Restaurant**

Prior to killing Patrick Casey, Jason Ward was a bodybuilder trained in Krav Maga—a form of martial arts developed for the Israel Defense Force. *See* Photo of Ward [Ex. 12]; Ward Dep. 73:4-74:3 (bodybuilding) [Ex. D]; *Id.* at 77:18-78:4 (Krav Maga). In addition, Ward has an extensive history of violent altercations. Jerri Lynn Metcalf, the manager of a bar across the street from the McDonalds Restaurant, told the police that Ward's attack on Patrick Casey was not Ward's "first drunken scuffle." Metcalf Police Interview at 23:9-13 [Ex. T]. On one occasion about one year prior to the attack on Patrick Casey, Ward "left the club went to another bar, came back and he had been in a fight and had blood on his shirt, a busted up lip." *Id.* at 28:12-18.

Ward recounted one of his fights prior to attacking on Patrick Casey. Ruark Dep. 32:6-11 (corroborating story and stating fight took place one year prior to the attack on Patrick Casey) [Ex.

E]. After a night of drinking (Ruark Dep. 34:18-20), Ward and his friend, Justin Ruark, were walking on L Street in Dupont Circle (the McDonalds Restaurant is located on M Street in Dupont Circle), when Ward got into a fight with "four Marines." Ward Dep. 49:5-51:14 [Ex. D]. There was trash talking and a "bunch of FUs." *Id.* at 54:3-4. In response, one of the Marines "pulled a knife" on him so he responded by "punch[ing] him" in the face. Ward Dep. 55:4-5 [Ex. D].

Ward described another fight occurring in a bar located half a block from the McDonalds Restaurant. *Id.* at 43-48. Ward had been drinking at Rumors. *Id.* at 47:15-48:3. After exchanging words with "two guys," one of them hit Ward's friend over the head "with a beer bottle." *Id.* at 44:1-11. Ward reacted and "punched" the guy in the "face." *Id.* at. 45:6-7.

Even after killing Patrick Casey, Ward has continued his drunken fights. In December 2014, Ward was "too drunk" and got into a pushing match in a District of Columbia bar. *Id.* at 36:11-37:9. Before it escalated beyond pushing, Ward was removed by security. *Id.* While being escorted out of the bar, Ward punched the security guard in the face with a closed fist. *Id.* at 36:18-37:21. Fortunately, the security guard was trained to handle belligerent customers like Ward. Ward was removed from the bar and arrested. *Id.* at 39:9-40:8.

### III.    STANDARD OF REVIEW

Summary judgment is only proper if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On summary judgment, a court "must view the evidence in the light most favorable to the nonmoving party, and draw all reasonable inferences in that party's favor." *Novak I* 452 F. 3d. at 911-912. (hereinafter "*Novak I*"). Here, Plaintiffs have amassed significant evidence of McDonalds' failure to keep its patrons safe, in light of McDonalds' actual notice of persistent violent activity within the premises.

Defendants' Motions for Summary Judgment seeking dismissal of this negligence action must be

denied.

## IV.    ARGUMENT

### A.  The McDonalds Restaurant Negligently Failed to Protect Patrick Casey From Foreseeable Crime

McDonalds incorrectly claims that it owed no duty to protect Patrick Casey against assault

on its premises.[4]  McDonalds is wrong. In the District of Columbia, it is "axiomatic" that a business

owner owes a duty to protect its patrons from foreseeable dangers on its premises. *See Novak I* at

911-912.  A business owner is subject to liability to his customers "for injuries inflicted by the acts

of other patrons if the [business owner] by the exercise of reasonable care could have known that

such acts were being done or were about to be done…" *Novak I*, 452 F. 3d at 912; *see also Viands*

*v. Safeway Stores, Inc*., 107 A.2d 118 (D.C. 1954) (business owner "is liable if he has not taken

reasonable and appropriate measures to restrict the conduct of third parties of which he should

have been aware and should have realized was dangerous.").

*Novak I*, is factually analogous to the present case. In *Novak I*, a customer was "attacked

and permanently injured" as he left a bar in the District of Columbia. *Novak I*, 452 F. 3d at 904.

The plaintiff in *Novak I*, was attacked by a group of men who were standing "in the I Street alley

across from the rear exit" of the bar. *Id.* The men followed the plaintiff a few steps down the alley

and then attacked him while "still in view of the exit." *Id.*  The plaintiff sued the bar for failing to

provide security for departing patrons in the off-premise alley of the bar. *Id.* The same as

---

[4]      McDonalds attempts to paint this Court into a corner by arguing the Court's dismissal of the dram shop portion of this case requires dismissal of McDonalds as well. Rhee MSJ at 16. This argument demonstrates McDonalds fundamental misapprehension of Plaintiffs' claims against McDonalds, and ignores the well-established law of the duty that the Restaurant owed to Patrick Casey to protect him against foreseeable crime in the Restaurant.

McDonalds in this case, the defendant in *Novak I* argued: (1) its duty to its customers only existed inside the bar and (2) the bar did not have a duty to protect its customers against criminal assaults. The D.C. Circuit rejected both of these arguments. *Novak I* requires this Court to do the same.

### 1.    The McDonalds Restaurant Had a "Heightened Foreseeability" of Crime Failed to Protect its Customers from Foreseeable Crime

A business owner is liable to its customers for the "intervening criminal act" by a third party upon "a heightened showing of foreseeability." *Novak I*, 452 F. 3d at 912. As this Circuit recognized, "heightened foreseeability is present when there is a [1] 'special relationship' between the person injured by the crime and the defendant, and [2] prior, similar criminal acts have occurred in the area where the plaintiff was hurt." *Novak I*, 452 F. 3d. at 912. A "special relationship" exists between a "business invitor" and its "business invitees." *Novak I*, 452 F. 3d. at 913   Here, Kyung Rhee, a business invitor shared a special relationship with his business invitee, Patrick Casey.[5] Accordingly, the only issue before the Court is whether "prior similar criminal acts have occurred in the area where [Patrick Casey] was hurt." *Novak I*, 452 F. 3d. at 912; *see District of Columbia v. Doe,* 524 A.2d 30, 33 (D.C. 1987) (heightened showing "does not require previous occurrences of the particular type of harm, but can be met instead by a combination of factors which give defendants an increased awareness of the danger of a particular criminal act").

### a.   Evidence of Prior Similar Crimes at the McDonalds Restaurant

In *Novak I*, the D.C. Circuit held that there was a heightened showing of foreseeability based simply on the statements from the staff of the defendant bar that "fights occurred in the club

---

[5]     McDonalds' claim that it owed no duty to protect Patrick Casey because he was a "bare licensee" is factually flawed and legally erroneous, Rhee MSJ at 41.  The D.C. Court of Appeals expressly ruled that "D.C. tort law no longer distinguishes between the types of licensees or between licensees and invitees." *Toomer v. William C. Smith & Co.,* 112 A.3d 324, 328 n.8 (D.C. 2015). Moreover, it is an incredible position for McDonalds to state that Patrick Casey was "trespassing" when not one employee from the Restaurant attributed any aggression or misconduct to Patrick Casey.  In contrast, the Restaurant's shift manager referred to Ward, Ruark, and Giblin as the "bad guys."  Martinez Aff. ¶ 7-8.

'once every two weeks at least,' 'twice a month,' or 'probably 1 a month or 1 a week.'" *Novak I*, 452 F. 3d. at 913.  "One employee testified that he saw fights in the alley by the exit 'twice a month;' another said he saw 'maybe 1 or 2 fights' each month in the alley." *Id.*  The D.C. Circuit found this general description of fighting to be "evidence [that] certainly could put a reasonable club owner on heightened notice that a serious problem existed outside its door." *Id.*

Here, the evidence showing a "heightened foreseeability" of crime in the Restaurant far exceeds the threshold required by *Novak I* for a reasonable jury to conclude the attack on Patrick Casey was foreseeable.  The same as in *Novak I*, one employee testified that she observed physical altercations at the Restaurant "***once a month***" since she had been working there. Santos Dep. 75:17-6 (emphasis added).  Another employee testified that there were incidents involving "crazy people coming" in the Restaurant who would "insult[] each other or the customer or something or the manager or the cashier," requiring her to call the police." Lainez Dep. 35:17-36:1 [Ex. K]. When asked how many times per week this would occur, Ms. Lainez testified "***[o]h, all the time***." *Id*. at 36:19 (emphasis added). The manager for the McDonalds Restaurant stated, "***I am aware of fights and violent attacks that occurred in the McDonalds Restaurant prior to the killing of the customer, Patrick Casey***, in September 2011. Although the killing of the customer in September 2011 is the first murder that I am aware of that occurred in the Restaurant***, there were previous incidents of violence, especially during the late night shifts***." *See* Martinez Aff. at ¶ 12 (emphasis added) [Ex. 6].  The manager added, "a lot of incidents would happen." *Id.* at ¶ 11. These statements by the McDonald' staff alone satisfy the "heightened showing" under *Novak I.*

More so, here there is much more specific evidence of violent crime in the Restaurant than was present in *Novak I.*  Specifically, McDonalds' customer, Abasiakan Ekpenyong, gave detailed eye witness accounts of four altercations occurring in the McDonalds Restaurant—three of which

24

involved violent criminal acts. *See* Statement of Facts at II.D.1 which is hereby incorporated by reference. Mr. Ekpengyong filmed the first altercation, which he described as "***man maliciously choke-slamming [a] woman to the ground while the McDonald's employees were looking right at them***. ***No security whatsoever***." Ekpenyong Dep.131:18-132:7 (emphasis added) [Ex. R]; Video of prior altercation [Ex. 2] The video only shows the end of the altercation, but Mr. Ekpenyong stated that "there had been a fight, a pretty big brawl," for a "couple of minutes" before the start of the video. *Id.* at Ekpenyong Dep.131:18-132:7; *Id.* at 133:14-16.

The second fight involved "two males who were intoxicated." Ekpenyong Aff. at ¶ 9 [Ex. 7]. The fight took place near the restroom where the males "were pushing and shoving." Ekpenyong Dep. 88:2-11 [Ex. R]. Likewise, the third fight witnessed by Mr. Ekpenyong involved two drunk males fighting over a girl. Ekpenyong Aff. at ¶ 10. There was "a lot of screaming, shouting….they were both cursing at each other." Ekpenyong Dep. 91:9-12. "There was pushing and shoving and swinging at each other." *Id.* at 94:22-95:1. During the fight, "a McDonalds employee watched the fight nonchalantly. The employee did not break up the fight and he did not call the police, he just watched as if it was an everyday occurrence." Ekpenyong Aff. at ¶ 10 (emphasis added). The final altercation witnessed by Mr. Ekpenyong involved a McDonalds employee and a customer. *Id.* at ¶ 11. The customer shouted to the employee "don't touch me," and then the customer proceeded to call the police. *Id.*

In addition, MPD incidents reports indicate that at least six (6) criminal assaults occurred in the McDonalds Restaurant, two (2) property damage crimes, and (1) unlawful entry crime. *See* Statement of Facts, Section II.D.2. In the six months prior to the assault on Patrick Casey, there three "assault[s] with a dangerous weapon" and "with significant injuries" in the Restaurant. *Id.* There were an additional five (5) violent assaults occurring in the immediate vicinity of the

Restaurant, including one victim with a broken jaw. *Id.*  Moreover, this is not a complete picture of the violent crime in the McDonalds Restaurant, because in practice the employees did not call the police when assaults occurred in their Restaurant. Ekpenyong Dep.131:18-132:7 ("man maliciously choke-slamming [a] woman to the ground while the McDonald's employees were looking right at them. No security whatsoever. No police whatsoever.") [Ex. R]; *see* Rhee 66:20-67-14 (not necessary to call the police when an assault occurs in the Restaurant so long as the victim leaves) [Ex. N]; *see* Graven Decl. at ¶ 10. ("No employee called the police.") [Ex. 19].

To avoid presenting this case to a jury, the McDonalds Restaurant has resorted to arguing that "not all the punches are the same" (Rhee MSJ at 11) and the prior fights in the Restaurant did not involve white males (Rhee Undisputed Facts at 6-9), in an attempt to show they did not have notice.  Such an argument is not only offensive, it is legally unsound and should be rejected by this Court.  *See Novak I* at 914 n.11 (2006) (holding "We respectfully do not see a basis for such a distinction…that a business need only protect against an extremely precise level of past fighting.")

Thus, given the significant history of fights occurring in the Restaurant and with the evidence viewed most favorable to Plaintiffs, a reasonable jury could find that the Restaurant had every reason to expect that fights would continue absent the exercise of reasonable care.

### 2.    The McDonalds Restaurant's Duty to Protect its Customers, Such as Patrick Casey, Extended to its Egress and Under its Awning

McDonalds' attempts to escape its liability by arguing that its duty to protect Patrick Casey from an assault ceased at the doorway of the Restaurant. Rhee MSJ at 38-41. Not only does such an argument ignore the facts that the verbal and physical assault began in the Restaurant, with the death blow being delivered seconds after Patrick Casey was pushed out the door of the Restaurant, but this very same argument has been expressly rejected by the D.C. Circuit in *Novak I*.

A business owner's duty to protect its customer from foreseeable criminal acts "does not

strictly end at the shopkeeper's door." *Novak I*, 452 F. 3d. at 907-912. A business owner has a "duty of care to monitor entrances and exits of their premises." *Id.* at 907. In *Viands,* the court held that the business had a duty to protect customers from foreseeable harm caused by third parties on the "public sidewalk" leading to the front door of the store. *Viands*, 107 A.2d at 120. The *Viands* court reasoned "that the duty to properly maintain approaches to an invitor's property is not to be determined by the exact boundaries of the premises, and that such duty does not end at the door through which the invitee makes his exit." *Id*. Similarly, *Novak I* held that the bar had a duty to **protect its customers in the alley outside the bar**, even though it was barely "still in view of the exit," because the bar put the alley "to a substantial special use." *Novak I*, 452 F. 3d at 904. Specifically, the attack in *Novak I* occurred within a few steps of the exit of the bar and the alley was the "chief path of egress from the club." *Id.* 911.

Unlike *Novak I*, here it is undisputed that the physical altercation began in the McDonalds Restaurant. *See* Giblin Dep. 86:13-17 ("we're at the door [inside] pushing back and forth") [Ex. C]; Giblin Letter (pushing inside the restaurant); Lindsey Dep. 209:14-18 (Giblin was "grabbing me…he wasn't letting go of [him]. He had his hold on [Lindsey].") [Ex. F]; Ruark Dep. 174:22-175:2 (while inside the Restaurant "it reached a point where I did not feel that I could restrain [Giblin] without, I don't know, throwing [Giblin] on the ground or something absurd.") [Ex. E]. It's only after Patrick Casey gets pushed out the door that Ward immediately delivers the sucker punch to Patrick Casey. Ward admits that when he delivered the fatal blow, "[Patrick Casey] was outside right in front of the door" of the Restaurant, "still under the [McDonalds] awning by the doors." Ward Dep. 223:20-224:2 [Ex. D]; Giblin Letter ("we were under the awning in front of the doors) [Ex. 20]; s*ee* Photo of McDonalds Awning [Ex.15].

Thus, not only is the McDonalds Restaurant liable because the physical altercation began

in the Restaurant with the deadly blow being in the doorway, but McDonalds is also liable because the deadly punch was delivered in the only egress from the Restaurant and under the McDonalds awning. The Restaurant's awning is a steel structure extending from the doorway of the Restaurant to the curbing along the street. The awning has electrical lighting extending out from the Restaurant, and two posts cemented into the sidewalk. Rhee's argument that "there are absolutely no facts indicating there was any assertion of control by" the Restaurant of the area just outside its egress and under its awning strains credulity. Certainly a reasonable jury could find that the installation of the permanent, steel awning at the entryway of the Restaurant constitutes "a substantial special use."

But to even reach this point, the Court would have to find that McDonald's duty to keep its patrons safe is not triggered until the death blow is delivered. McDonald's duty was triggered the moment Ward and Giblin began instigating violence in the Restaurant. At that time, McDonald's was under a duty to act to protect its patrons. Accordingly, the Restaurant's liability for Patrick's death did not extinguish once he was unwillingly pushed out the doors of the Restaurant.

### 3. The McDonalds Restaurant Breached its Duty to Protect Patrick Casey from the Foreseeable Assault by Failing to Hire a Security Guard

In light of the significant history of violent crime in Restaurant, the Restaurant breached its duty of care to keep its customers safe by failing to hire a security guard. *Compare* Foster Report at 7-9 [Ex. 9]; *with Briggs v. Wash. Metro. Area Transit Auth.*, 481 F.3d 839, 846 (D.C. Cir. 2007) ("The expert must proffer a specific, articulable (and articulated) standard of care."). The weakness of McDonalds' positon on summary judgment, is shown through its desperate attempt to discredit the opinions of Mr. and Mrs. Casey's security expert, Lance Foster, as to this national standard of care, despite the fact that Mr. Foster's standard is identical to McDonalds' own written security

standards.[6] Rhee MSJ at 20. Again, these are recycled arguments that this Circuit rejected in *Novak v. Capital Mgmt. & Dev. Corp.*, 570 F.3d 305 (2009) (hereinafter "*Novak II*").[7]

"Under District of Columbia law, an expert testifying about a national standard of care must describe a specific standard rather than refer generally to safety and must show that the standard is accepted in the industry." *Novak II* at 313. "The expert must clearly articulate *and reference* a standard of care by which the defendant's actions can be measured." *Clark v. District of Columbia*, 708 A.2d 632 (D.C. 1997) (emphasis in original). It is sufficient if it can be shown that the "[1] proffered standard has been promulgated," (2) "is generally known[,]" or (3) if the purported standard "has been accepted as controlling in facilities and enterprises that are similar to defendants' facilities or enterprises." *Briggs*, 481 F.3d at 847.

First, a national standard of care is sufficient if it "has been accepted as controlling in facilities and enterprises that are similar to defendants' facilities or enterprises." *Briggs*, 481 F.3d at 847; *see also Novak II* at 313 (the national standard of care to station a security guard "outside" a bar was adequate where the security expert stated it was "standard practice" and he named other D.C. bars that follow the practice.) Here, Mr. Foster identified two neighboring McDonalds restaurants that have accepted the "standard practice" of hiring security guards in their McDonalds restaurants. *See* Foster Report at 7-8 [Ex. 9]. In particular, the 14th St. and Verizon Center

---

[6]    The Court will note that Mr. Foster's credentials are impeccable. His expert opinion in this case is based upon a tremendous amount of testimony and documentation. *See* Foster Report. Mr. Foster also made it clear his opinions are based on his experience "all over the United States." Foster Dep. 195:22-196:1.

[7]    Defendants' reliance upon *Cook v. Safeway Stores, Inc.,* 354 A.2d 507 (D.C. 1976) for the blanket assertion that a business is not required to hire security guards is inapposite. *See* Rhee MSJ at 36-37. First, *Novak II* held that the standard of care required that a security guard be placed outside the bar given the crime history at the bar. *See Novak II* at 313. Second, the plaintiff in *Cook* failed to make a "heightened showing" because he relied solely upon general crime statistics. *See also District of Columbia v. Doe*, 524 A.2d 30, 33-34 (D.C. 1987).

McDonalds hired security guards "in order to have a safe environment for the customers." Garrido Dep. 28:22-29-2 [Ex. Q]. The efficacy of hiring security guards for those restaurants was noted by Mr. Foster. Foster Report at 7-8 ("on site security personnel prevent violent crimes…Verizon Center and [14th St.] McDonalds both employed the restaurants...[and] those restaurants with the armed security guards have had no violent incidents or physical altercations prior to September 2011").  In addition to those two restaurants, Mr. Foster relied upon Mr. Garrido's testimony identifying a third McDonalds restaurant that has on-site security guards. Garrido Dep. 24:14-20. Mr. Foster's reliance upon the accepted standard of care for the 14th St. and Verizon Center McDonalds to hire security guards is alone sufficient to establish the national standard of care.

Second, a standard of care is adequate if a "proffered standard has been promulgated." *Briggs*, 481 F.3d at 847. Here, the standard of care articulated by Mr. Foster has also been promulgated in the Security Manual which Mr. Foster relied upon:

> **A.  Rhee's McDonalds' Failure to Hire a Security Guard Resulted in the Attack on Patrick Casey**
>
> Security personnel are a key component of a security plan to ensure the safety of customers at a Restaurant location, and to avoid incidents of violent crime.  McDonalds Security Manual, states:
>
> > security guards are often good protection against robberies.  Because of their extensive professional training, off-duty police officers are highly recommended for armed security guards.  If off-duty police are not available in your area, consult with your regional security manager to find a reputable security agency that provides guards with extensive training.
>
> McD 024.  The manual further recommends hiring armed security guards for "crowd control," "burglary prevention," and "robbery prevention." McD 024.  The Security Manual further states, "some restaurants use security guards as additional measures to maintain the restaurant in a safe and secure environment for their guests and crew."  McD 023.  In the instance of Verizon Center

Foster Report at 7 [Ex. 9]; *see* also Foster Dep. 121:15-17 ("And I agree with what McDonald's says in their recommendations to their franchises, that stores should try to use off-duty police officers.") [Ex. S].  As noted in the Security Manual, "Because of their extensive professional training, ***off-duty police officers are highly recommended*** for armed security guards." *Id.* This

recommendation by McDonalds to hire off-duty police officers is especially true where a restaurant, such as Rhee's, operates for 24 hours:

> ### Inherent Risks of Operating a Twenty-Four Hour Restaurant
>
> > The McDonalds' Security Manual provides:
> >
> > > [r]estaurants operating during extended hours or 24 hours have *special security concerns*. These procedures have been developed to ensure the safety and security of our restaurant crew, managers, and customers. Safety during late night hours must be at the top mind for everyone.
> >
> > McD039 (emphasis added). The Restaurant was open for twenty-four (24) hours on Thursday, Friday, and Saturday nights at the time of the assault on Patrick Casey. Rhee Dep. p. 51. Despite the *special security concerns* of operating a 24 hour restaurant, McDonalds took *no special security measures*.

*Id.* 4 [Ex. 9]. The Security Manual further recommends armed security guards for burglary prevention, crowd control, and robbery prevention. *Id.* at 7. Mr. Foster's reliance upon the standards in the Security Manual also supports the articulation of the national standard of care, because these standards are mandatory for corporate-owned McDonalds restaurants nationwide. Webb Depp. 49:8-50:6 [Ex. O]. In the Baltimore-Washington Region, there are 105 corporate owned restaurants, which have necessarily adopted this standard of care. Webb Dep. 118:7-15.

Third, in articulating the national standard of care requiring the Restaurant to hire a security guard, Mr. Foster also relied on upon the fact that the nearby bars, which serve the same intoxicated customers as McDonalds, are required to have security personnel. Mr. Foster's Reports states:

> > Intoxicated customers can contribute to the inherent risk of violent crimes at a location. The D.C. Alcoholic Beverage Control Board has acknowledged this well-accepted industry standard by stating unequivocally that there exists a causal link between alcohol and violence: "[v]iolence can occur quickly in a nightclub and it is imperative that these establishments be prepared to respond effectively to these potentially violent incidents immediately." D.C. Council, Report on Bill 17-201 at 26 (Mar. 11, 2008).   Divyne Apollon, the head of security for Ozio, a bar in the vicinity of McDonalds that the assailants had been to prior to McDonalds on the night of the incident, testified:
> >
> > > Q.   Why is it important to make sure that patrons don't get too intoxicated?
> > > A.   **They can hurt themselves, they can hurt others, they can get out of hand, they can get belligerent, a whole slew of things that could happen.**
> > > Q.   As a result of the intoxication?
> > > A.   **Yeah.**
> >
> > Apollon Dep. p 12.
> >
> > > The connection between violence and intoxication does not change based on the location or the type of establishment.   Intoxicated patrons increase the risk of violent activity.

Foster Report at 5-6 [Ex. 9]. Notably, McDonalds' security expert agrees there is a correlation between intoxicated persons and violence. *See* Clark Dep. at No. 7. ("in a bar environment with large crowds and many persons consuming alcohol, the potential for verbal and physical altercations and disagreement may be elevated because of multitude of factors, including alcohol consumption.") [Ex. 22].

Rhee purposely keeps the Restaurant open for 24-hours on Thursday, Friday, and Saturday to serve intoxicated customers when the nearby bars close. Rhee Dep. 51:10-11; *Id.* at 124:14-125:1. As discussed fully in the Statement of Facts in Section II.E, during those hours the Restaurant is crowded, the customers are intoxicated, and the Restaurant is understaffed. *See also* Guild Dep. 70:9-12. ("everyone in that McDonald's that night…was intoxicated.") [Ex. 8]. As acknowledged by the D.C. Council, "violence can occur quickly in a night club" because the customers are intoxicated thereby requiring nightclubs to have security guards on the premises. D.C. Council, Report on Bill 17-201 at 26 (Mar. 11, 2008). As noted by Mr. Foster, the "connection between violence and intoxication does not change based on the location or the type of establishment." Foster Report at 6. Specifically, the same risks that exist at a bar which has intoxicated customers (*e.g.* violence), also existed at the Restaurant who served the same intoxicated customers just leaving the nearby bars. Because "intoxicated patrons increase the risk of violent activity" and McDonalds intentionally catered to those intoxicated patrons from the nearby bars, the national standard of care required the Restaurant to have a security guard.

Fourth, it is sufficient if an articulated standard "is generally known." *Briggs*, 481 F.3d at 847. Mr. Foster's articulated standard of care that the Restaurant was required to have a security guard was "generally known" among nearly all the customers and the staff in the Restaurant the night Patrick Casey was killed. Martinez Aff. at ¶ 9. ("***If there was a security guard in the***

*McDonalds, the security guard would have certainly had the opportunity to break up the fight or intervene while the customers were yelling in the restaurant*.") [Ex. 6]; Giblin Letter ("*I believe that if there was a security guard present, the situation would have been diffused at the table"*) [Ex. 20]; Guild Dep. 75:9:11 ("*if there was a security guard there the chances would have been a lot less likely that it would have happened.*") [Ex. H]. The general knowledge of the need for security at the Restaurant was not unique to the night Patrick Casey was killed. Ekpenyong Dep.131:18-132:7 (*man maliciously choke-slamm[ed] [a] woman to the ground while the McDonald's employees were looking right at them*. *No security whatsoever.*) [Ex. R]. The repeated recognition of the absence of a security guard by the customers in the McDonalds, demonstrates that the standard of care required McDonalds to have a security guard.

Finally, "reliance on professional guidelines or standards is a generally appropriate methodology for experts to use when opining on an applicable standard of care." *Girdler v. United States*, 923 F. Supp. 2d 168, 191 (D.D.C. 2013). In articulating the national standard of care and arriving at his opinion, Mr. Foster rigorously applied the Forensic Methodology to the facts of this case as set forth in his 15-page expert report. *See* Foster Report [Ex. 9]. The Forensic Methodology is published by the International Association of Professional Security Consultants (IAPSC). The Forensic Methodology has been widely accepted in courts throughout the country, including this court. *See Novak II*; *Childress v. Ky. Oaks Mall Co*., 2007 U.S. Dist. LEXIS 69881 (W.D. Ky. Sept. 20, 2007) and *Reinaldo Robles Del Valle, et al v Vornado Realty Trust,* (06-1818-JAG) (D.P.R. July 8, 2009). The *Childress* court held "By all indications, the IAPSC *Forensic Methodology* has been subject to peer review and accepted by security industry professionals. It is the product of a consensus reached by security practitioners who are at the top of their field." *Childress*, 2007 U.S. Dist. LEXIS 69881, *19. Mr. Foster's expert report, and his opining on the national standard of

33

care, strictly adheres to the Forensic Methodology, which included travelling to the District of Columbia to perform a site inspection at the Restaurant. Applying the Forensic Methodology, which requires analysis of a location's crime history as well as other inherent risk factors, the national standard of care required the Restaurant to hire a security guard given its significant history of violent crime.

Mr. Foster also made it clear that this standard of care applies to "***restaurants across the United States [and] all throughout, Washington, D.C***." Foster Dep. 195:12-19.

Thus, the evidence is more than sufficient to establish the national standard of care that the McDonalds Restaurant had a duty to hire a security guard. McDonalds breached this standard of care by refusing to protect its customers by hiring a security guard. *See* Liu Dep. 46:20-21 (McDonalds would only hire a security guard if assaults occurred "everyday"). The breach of this duty to hire a security guard was the proximate cause of Patrick Casey's death. *See* Foster Security Report at 7-9; *see also* Foster Dep. 120:20-121-2l (security guard would have asked Ward to leave); *Id.* 121:18-22 (same); *Id.* 199:9-20 (explaining deterrent effect of a security guard).

**B. The McDonalds Restaurant Negligently Failed to Follow its Own Policy to Call the Police**

The McDonalds Restaurant's failure to follow its own substandard policy of calling the police resulted in the death of Patrick Casey. Not only was McDonalds required to call the police during the altercation because it voluntarily assumed the duty to call the police as part of its minimal security policies,[8] but this is also a legal duty imposed upon business invitors. *See* Restat

---

[8]     A party has a duty to act when it has assumed a duty. *See Novak I*, at 915 (dismissing negligence claims based on violation of defendant's policy because insufficient evidence that the policy existed); *Morgan v. D.C.*, 468 A.2d 1306, 1313 (D.C. 1983) (police officer "voluntarily assume a duty to proceed with reasonable care to protect individuals whom they have particularly placed in peril."); *Scott v. Watson*, 359 A.2d 548, 555 (Md. 1976) (negligent security case holding "we think it clear that even if no duty existed to employ the particular level of security measures provided by the defendants, improper performance of such a voluntary act could in particular circumstances constitute a breach of duty.").

2d of Torts, § 314A; *Southland Corp. v. Griffith*, 332 Md. 704, 633 A.2d 84 (1993) (holding that a store owner has a legal duty to call the police for invitees who are in danger). This minimal duty to call the police is further articulated by Mr. Foster as a standard of care McDonalds owed to Patrick Casey. *See* Foster Report at 11 ("This policy by itself falls below the national standard of care owed to its customer in light of the history of prior crimes in the Restaurant.") [Ex. 9]; *Id.* at 9-11 (citing to the Security Manual and to the deposition testimony of Rhee and Liu discussing this security practice across all four of Rhee's McDonalds restaurants).

Notably, McDonalds does not dispute that the Restaurant had a duty to intervene and/or call the police. Rhee MSJ at 28-34.  Instead, McDonalds disputes that it did not have the "opportunity for verbal intervention," "physical intervention," or "to call the police."  *Id.*  This argument not only fails because it is factually incorrect, but it also improperly begs the Court to make a factual determination on proximate cause.  *Hicks v. United States*, 511 F.2d 407, 420 (1975) ("proximate cause of an injury is ordinarily a question for the jury"). As set forth below, there is sufficient evidence for a reasonable jury to decide that McDonalds' failure to call the police was the proximate cause of Patrick Casey's death.

### 1.    McDonalds Breached its Duty (and its Policy) to Call the Police When Ward was "Belligerent" and "Wrestling" While in Line

McDonalds had a duty to ask Ward to leave the restaurant when he was wrestling in line with Giblin.   Podlone stated that he noticed Ward and his friends immediately. Podlone Aff. at ¶ 3 ("I noticed three guys right off the bat and told my friend, 'we gotta keep our eyes on these three guys.'").   At this time Ward was "***being loud and drunk at the McDonalds***…[they] ***were belligerent while waiting in line, and were looking for a fight***." *Id.* at ¶¶ 3-4 (emphasis added); *see also* Guild Dep. 70:9-12 ("I remember thinking that [Ward, Giblin, and Ruark] were intoxicated as well.") [Ex. H]. While waiting in line to order, Ward attempted to inappropriately

touch a female customer's behind. *See* Surveillance Video at 2:26:04 [Ex. 1]. Shortly after the incident with the female in line, Ward began to wrestle with Giblin. *See Id.* at 2:27:05-2:28:39. The wrestling between Ward and Giblin took place over a period of ninety-four (94) seconds. *Id.* During the wrestling, a couple in line behind Ward, cautiously backed up "a couple more feet"—about "5 to 6 feet" in total to keep a safe distance from the wrestling Ward and Giblin. Ruark Dep. 226:21-227:18 [Ex. E]. Ruark described the wrestling as "nudging, elbowing, just kind of harassing each other." *Id*. at 57:16-17. At this time, Ruark was concerned they may "get in trouble or get kicked out of the McDonald's." *Id*. at 147:21-22. Eventually, Ruark thought it was "enough jerking around," and he broke up the wrestling between Ward and Giblin because he "didn't want anything to happen." *Id*. at 149:20-150:6. Ruark explained, ***"[e]ventually, when no one with McDonalds tried to intervene, I was able to get them to stop before things got out of hand or we were asked to leave***." Ruark Aff. at ¶ 7 (emphasis added) [Ex. 9].

As McDonalds concedes, it was not Podlone's responsibility to "keep an eye" on Ward and it was not Ruark's responsibility to break up the "wrestling," it was the Restaurant's duty to ask Ward to leave or call the police. *See* Rhee Dep. 35:2-9 (if customers are wrestling the staff must call police [Ex. N]; *See* Liu Dep. 43:3-8 (if a person is intoxicated, required to ask to leave. If they do not, call 911) [Ex. M]. If the McDonalds Restaurant had asked Ward to leave the Restaurant or called the police at that time as it was required to do, a reasonable jury could find that Ward would not have been able to deliver the deadly punch to Patrick Casey 18 minutes later in the night.

### 2. The McDonalds Restaurant Breached its Duty (and its Policy) to Call the Police When the Altercation Started

The verbal altercation started when Patrick Casey, Lindsey, and Jun were "minding [their] own business," and Ward and Giblin began "trash talking" and making belligerent comments towards Patrick Casey's table. The "trash talking" quickly escalated into loud yelling. Lindsey

36

Dep. 211:11-15 [Ex. F]; Giblin Dep. 186:16-19 [Ex, C]; Rosenzweig Dep. 68:1-7 [Ex. I]. It's at this time that the shift manager, Jose Martinez, took notice of the altercation. Mr. Martinez stated:

> **It started with yelling and screaming in the front of the restaurant. I did see the three bad guys…the yelling was medium loud, every person in the restaurant could hear it. It was clear from the yelling there was to be a physical fight.**

Martinez Aff. at ¶ 7 [Ex. 6]. McDonalds Corporation and every individual in a management position for the McDonalds Restaurant testified that Martinez was required by McDonalds to call the police at this time. Rhee Dep. 121:17-122-13 (Martinez was required "to ask leave [sic]. If they don't leave, call the police.") [Ex. N]; Webb (McDonalds Corporate designee) Dep. 61:16-63:13 (Martinez should "either ask them to quiet down, or try to diffuse the situation. Or…[if] it's disruptive, and they feel unsafe to confront those—they could call the police.") [Ex. O]; Liu Dep. 66:19-68:14 (if "clearly there was going to be a fight, I believe he should have called the police. What I understand, he didn't call – try to call the police.") [Ex. M].

Although it was clear to Martinez there was going to be a fight, he did not call the police as required to do. Instead, "***during the yelling [Martinez] went to the bathroom.*** Martinez Aff. at ¶ 8 [Ex. 6]. This is an undisputed violation of the Restaurants' policy, and the standard of care.

Importantly, the trash talking and yelling occurred approximately for **3 to 5 minutes**. Ruark Dep. 154:20-155:4 [Ex. 8]. Murphy Dep. 85:13-19 [Ex. G]; *Id.* 87:5-7 (verbal altercation continued "between two and four minutes" after he changed tables "to better observe" an "escalation in hostilities."). The police were called by Lindsey after Patrick Casey had been punched by Ward. It took the police **73 seconds** to arrive at the Restaurant after Lindsey's telephone call. *See* MPD Event Chronology [Ex. 17]. Given the immediate arrival by the Police at the Restaurant (73 seconds) and the duration of the yelling (3 to 5 minutes), a jury could reasonably find that had Martinez called the police as he was required to do, Patrick Casey would not have been killed.

## C. The McDonalds Restaurant Negligently Failed to Train and Supervise its Employees

It is shocking that Martinez went to the bathroom rather than call the police when it became "**clear from the yelling there was to be a physical fight**." Martinez Aff. at ¶7. The blame, however, falls on the Restaurant for failing to train its employees on its security policy, and to supervise them.

There is a duty on a business to properly train its employees. *See also* Foster Dep. 115-117 (articulating the standard of care with regards to training). The Security Manual affirms this duty: "your awareness and the training of crew members on security procedure is one of the keys to running a safe and secure restaurant." *Id.* at 12 (citing to Security Manual). The Security Manual states, "you should have an effective plan in place in case a security incident occurs." *Id.* (citing to Security Manual at McD 22); *contra* Statement of Facts at § 2.F.1 (the Restaurant does not have a standard security plan). The Restaurant adopted the Security Manual as its policy. Rhee. Dep. 28:3-14 [Ex. N]. The Security Manual, however, is not followed by the employees in his Restaurant. Lainez Dep. 28:6-22 (first time seeing Security Manual was at her deposition. As a Spanish speaker, she also could not read the English written manual); Martinez Aff. ¶ 3 ("received books on the training, but they were in English" and Mr. Martinez does not read or speak English).

In fact, the McDonalds Restaurant's employees received no training on security. One Restaurant employee, who was working at the time Patrick Casey was attacked, testified:

> Q What training have you received from McDonald's in relation to the restaurant on M Street?
> **A Well, not really anything.**
> Q No training?
> **A Not a thing. I don't know. I don't know.**

Lainez Dep. 30:5-1 [Ex. K]. Another employee at the McDonalds Restaurant (who was also working the night Patrick Casey was attacked) confirmed that the employees received no training on security. Santos Dep 27:7-28 [Ex. J] (Santos had never seen a video or received any written

materials on McDonalds security practices).  Indeed, Santos confirmed that she had never seen the Security Manual. *Id.* at. 28:6-22. The shift manager for the Restaurant (also working the night of the altercation), stated, "[t]he training programs were only for managers, not regular employees. From my understanding, regular employees did not receive formal training.  As the manager, I was also never required to provide formal training to the employees."  Martinez Aff. at ¶ 5 [Ex. 6].

Indeed, McDonalds employee Santos received no training on how to respond "if customers are wrestling in line while waiting for their food."  Santos 31:15-21 [Ex. J].  Had the Restaurant's staff been trained, Ward would have been asked to leave or the police would have been called when he was wrestling in line with Giblin 18 minutes prior to the attack on Patrick Casey.

 The lack of training was abundantly clear when the verbal altercation started.  The shift manager stated "it was clear from the yelling there was going to be a physical fight."  Martinez Aff. at ¶ 7 [Ex. 6].  Rather than call the police as Rhee and McDonalds stated Martinez was required to do, Martinez instead went to the bathroom.  *Id.* at ¶ 8.  The employees did not call the police because they thought it was the manager's responsibility.  Santos Dep. 74:20-21 (Ms. Santos did not call the police, because "I imagine when I told the manager, well, the manager would have called." As we know, the shift manager, Mr. Martinez, did not call the police when it became clear there was going to be a fight, but instead went to the bathroom. Martinez Aff. at ¶ 7.

District of Columbia law also imposes a duty upon a business to reasonably supervise its employees.  *Moore v. District of Columbia*, 79 F. Supp. 3d 121, 143 (D.D.C. 2015) (holding that an expert is not required for negligent supervision cases).  Again, the Security Manual reinforces the duty to properly supervise the Restaurant's employees: "[a]s the restaurant manager, you are ultimately responsible for enforcing security policies and procedures. By implementing security measures that are fully supported by highly aware crew members, you can better protect your

restaurant from crime-related danger." Foster Report at 12 [Ex. 9] (citing to Security Manual).

Here, the Restaurant failed to supervise its employees. The manager's standard shift is between 7:00am to 4:00am and closes the store on occasion. Fuentes Dep. 26:9-13 [Ex. L]. When asked about the Restaurant's security policies and incidents of violence, the Restaurant Manager answered "I don't remember" forty-five (45) times in her 58-page deposition. When shown the video of the prior altercation where the woman was struck in the face [Ex. 2], the store manager replied that she was unaware of the incident, did not remember if an employee had reported it to her, or if an incident report was generated. *Id*. at 34:13-36:3. In fact, the manager was unaware of any written incident reports relating to the crime that occurred in the Restaurant. Similarly, Rhee was not aware of the prior altercation where the woman was struck in the face until Plaintiffs brought it to his attention during the course of this lawsuit. Rhee Dep. 65:7-66:5 [Ex. N]. The reason is because Rhee only goes to the Restaurant "about twice a month." *Id*. at. 36:6-8; *contra* Franchise Agreement at 2 (franchisee shall "work full-time at their McDonald's"). One employee did not even know that Rhee was the owner of the Restaurant. Santos Dep. 12:19-20.

Due to the lack of supervision in the Restaurant, the employees at the Restaurant failed to follow the proclaimed security policy that if there (1) **yelling**, (2) **fighting** (or "wrestling"), or (3) an **intoxicated person** in the restaurant, then the **staff must call 911**. *See* Statement of Facts § II.E.1. A jury could reasonably find that the management's failure to implement and enforce the Restaurant's security policy was the proximate cause of the attack on Patrick Casey.

## D. McDonalds Corporation's Negligence

McDonald Corporation submitted two pages of argument claiming it had no duty to Patrick Casey, a customer in a McDonalds restaurant, because it had no contractual duty through its Franchise Agreement. McDonalds Corp MSJ at 10-11. McDonalds Corporation is wrong.

### 1.    McDonalds Corporation Had a Duty to Patrick Casey

"Unlike contractual duties, which are imposed by agreement of the parties to a contract, a duty of due care under tort law is based primarily upon social policy." *Caldwell v. Bechtel, Inc.,* 631 F.2d 989, 997 (1980).  The D.C. Circuit further held that "[t]he law imposes upon individuals certain expectations of conduct, such as the expectancy that their actions will not cause foreseeable injury to another. These societal expectations, as formed through the common law, comprise the concept of duty." *Id.*  The *Caldwell* court reasoned that unlike a contractual duty, under tort law a duty is owed to a foreseeable plaintiff. *Id*. at 998.

In *Caldwell*, the defendant, Bechtel, entered into a contract with WMATA to provide "'safety engineering services' with respect to work to be done by various contractors."  *Id*. at 992. The plaintiff, who worked for one of the contractors, was injured and sued Bechtel, arguing that Bechtel had a "duty and responsibility…to provide, inter alia, overall direction and supervision of safety measures."  *Id.* at 994.    The D.C. Circuit agreed.  Although Bechtel did not have a contractual relationship with the plaintiff, it did have a duty under tort law.  *Id.* at 1001-1002. *Caldwell* held that Bechtel's duty to protect the plaintiff, a third party, was derived from its contract with WMATA to supervise the work of the various contractors. *Id.*  This remains true even though the contract disclaimed that Bechtel would only use its "best efforts" to ensure the contractors complied with safety regulation, and thus would be not absolutely liable in the event of a safety violation and that Bechtel. *Id.* The court, nonetheless, held the significance of the contract "is that once Bechtel undertook responsibility for overseeing safety compliance, it assumed a duty of reasonable care in carrying out such duties."  *Id.*  at 1001.

Here, the same as in *Caldwell*, the Franchise Agreement entered into by Kyung Rhee and McDonalds Corporation created a duty for the customers at the McDonalds Restaurant, such as Patrick Casey.  Franchise Agreement [Ex. 21].  The Franchise required that Rhee strictly adhere to

the "McDonalds System." *Id.* at 1; *Id.* at 6 ("shall comply with the entire McDonalds System").
The Franchise Agreements details the requirements of the McDonalds System; *Id* at 1; *see also
infra* at § IV.D.2 (detailing the "McDonalds System"). Under the agreement. McDonalds
Corporation was required to provide "business manuals" which detail: "(a) required operations
procedures;...(d) business practices and policies; and (e) other management, advertising, and
personnel policies." *Id.* at 2. The franchisee, such as Rhee, must "adopt and use exclusively the
formulas, methods, and policies contained in the business manuals." *Id.* One of those business
manuals is the Security Manual. Warfield Dep. 39:21-40:2 [Ex. P].

In order to ensure compliance with the McDonalds System, McDonalds Corporation
performed audits referred to "Short Operations Review" and "Full Operations Review." Warfield
Dep. 26:3-9; 54:4-5. The Full Operations Review contains 700 questions, of which only 3 relate
to security. Warfield Dep. 35:19-36:3.[9] With respect to security, McDonalds Corporation has a
regional security manager. One of the responsibilities of the regional security manager is to
provide security "consultations" for franchise owned restaurant, as was the case for the 14th St and
Verizon Center McDonalds. Webb Dep. 44:16-19; Garrido Dep. 29:21-22. The audits and
consultations performed by McDonalds Corporation were carried out as part of its contractual
duties to franchisees to ensure uniformity and compliance with the McDonalds System.
McDonalds Corporation acknowledge the duty it has to customers in franchise owned restaurant
when it tweeted in response to an assault occurring in a Restaurant in 2011 in this region: "there's
no room for violence under the Golden Arches & our thoughts are with the victim. Action has
been taken." *See* McDonalds Twitter Message (written in response to violent assault in a restaurant

---

[9]     Although requested, McDonalds Corporation has not produced either the Full Operations
Reviews or Short Operations Reviews that were performed at the McDonalds Restaurant.

within Corporation's the Baltimore-Washington region) [Ex. 16]; *contra* Webb Dep. 91:14-92:20 (in actuality the regional security manager took no action and did not investigate the incident) [Ex. O]. The same as *Caldwell*, it was foreseeable to McDonalds that if it did not ensure uniformity and compliance with the McDonalds System that customers at the franchise owned restaurants, such as Patrick Casey, would be injured. Thus, McDonalds Corporation owed a duty to Patrick Casey.

Similarly, a reasonable jury could find that McDonalds breached this duty owed to Patrick Casey by failing to implement and enforce McDonalds Corporation's security practice in the McDonalds Restaurant. Webb Dep. 70:13-20 (the regional security manager for McDonalds Corporation never had any communication with Kyung Rhee regarding security in the Restaurant) [Ex. O]; Warfield Dep. 30:10-14 (no consequences if a franchise fails the security compliance portion of the Full Operations Review) [Ex. P]; Webb Dep. 82:9-12 (regional security manager did not learn Patrick Casey until three (3) days before his deposition). Thus, McDonalds Corporation's Motion should be denied because there remains a factual question for a jury to decide.

## 2.    The McDonalds Restaurant is the Agent of McDonalds Corporation

McDonalds Corporation is also vicariously liable to Plaintiffs for the actions of its agent, the McDonalds Restaurant.   In the District of Columbia, whether a principal-agent relationship exists "depends on the particular fact of each case," with the most important factor being "the power to control the servant's conduct."   *District of Columbia v. Hampton*, 666 A.2d 30, 38 (D.C. 1995).   A defendant cannot, however, "simply rely on statements in an agreement to establish or deny agency.  Rather, an agency relationship is essentially determined by examining whether there is a right of control of one party over another." *Butler v. McDonald's Corp.,* 110 F. Supp. 2d 62, 67 (D.R.I. 2000).   Contrary to McDonalds Corporation's position, courts in other jurisdiction have found a franchise restaurant to be the agent of McDonalds Corporation.  *Butler v. McDonalds Corp.* 110 F. Supp. 2d at 62 (D.R.I. 2000) (holding that McDonald's Corporation's franchise

43

agreement demonstrates the Corporation's control over the franchise); *Miller v. McDonald's Corp.,* 945 P.2d 1107 (Or. Ct. App. 1997) (holding that McDonalds Corporation sufficiently maintains control for purposes of agency liability through its "McDonald's System").

Here, McDonalds Corporation maintains control over the McDonalds Restaurant through the Franchise Agreement, the Full and Short Operation Reviews, and uniform business standards imposed on the Franchise in the "McDonalds System." In particular, the Franchise Agreement requires the Restaurant to strictly adhere to the "McDonalds System," which is a:

> comprehensive system for the…operation and maintenance of McDonald's restaurant locations which have been selected and developed by McDonalds for the retailing of a limited menu of uniform and quality food products…in a clean, wholesome atmosphere…[which includes] designs and color schemes for restaurant building, signs equipment layout, formulas and specification for certain food products, methods of inventory and operation control, bookkeeping and accounting, and manuals covering business practices and policies.
> ….
> The foundation of the McDonalds and the essence of this Franchise is adherence of [Kyung Rhee] to standards and policies of McDonald's providing for the uniform operation of all McDonald's restaurants within the McDonalds system.

Franchise Agreement at 1 [Ex. 21]. McDonalds Corporation implements these strict, uniform standards through its training at Hamburger University and its business manuals which the McDonalds Restaurant was required to "adopt and use exclusively the formula, methods and policies contained in the business manuals." *Id*. at 2. One of the business manuals is indeed the Security Manual. Warfield Dep. 39:21-40:2 [Ex. P]. Furthermore, McDonalds Corporations maintains the uniformity of its franchise restaurants through uniform logos, trademarks, and "national advertising."[10] *Id.* at 3.

---

[10]    In addition, this Circuit has recognized, "many jurisdictions have permitted a finding of vicarious liability under an apparent agency doctrine -- typically in a franchisor/franchisee context. *Wilson v. Good Humor Corp*., 757 F.2d 1293, 1302 (D.C. Cir. 1985). Here, the McDonalds Restaurant's food, designs, color schemes, trademark, logo, advertising, and signs were in complete uniformity with all other McDonalds restaurants, including the corporate owned restaurants. The uniform image that McDonalds Corporation requires, certainly provides a basis for a reasonable jury to find that even if the McDonalds

Furthermore, McDonalds Corporation's requires "Compliance with the Entire System" including the "uniformity of facilities and service." *Id.* at 5.    Under the Franchise Agreement, McDonalds Corporation has the "right to inspect the Restaurant at all reasonable times." *Id.* at 5. Indeed, McDonalds performs the Full and Short Operations Review on a routine basis to ensure compliance with the McDonalds System.  If franchise fails one of those reviews, the restaurant is put into a "viper (sic) process." Warfield Dep. 30:19-22. Furthermore, if the McDonalds Restaurant fails to adhere to the McDonalds System, McDonalds Corporation has the ability to terminate the Franchise Agreement with the Restaurant.  Franchise Agreement at 8.

The very nature and "essence" of the Franchise Agreement and the McDonalds System is to control the operations of the McDonalds Restaurant.  Thus, the same as in *Butler* and *Miller*, a reasonable jury could find that an agency relationship exists.  Accordingly, the issue of whether the McDonalds Restaurant was an agent of McDonalds Corporation should proceed to a jury.

## V.    CONCLUSION

The McDonalds Restaurant had a significant history of violent crime, which established a heightened showing of foreseeability that its customers would be assaulted in the Restaurant. The Restaurant's acute awareness that its customers were exposed to an unreasonable danger, required it to take reasonable measures to protect its customers. The Restaurant took none.  Even more egregious, on the night Patrick Casey was attacked, the McDonalds Restaurant had multiple opportunities to ask Ward to leave (as required by its own policies) or to call the police (also required by its policies), but it did nothing.  This is sufficient evidence for a reasonable jury to find that McDonalds had a duty to protect Patrick Casey, and negligently breached that duty by failing to take any reasonable measures.  Thus, Plaintiffs' respectfully request the Court to deny the

---

Restaurant was not the actual agent, it was at a minimum, the apparent agent of McDonalds Corporation.

Motions for Summary Judgment filed by Defendant Rhee and McDonalds Corporation.

Dated: February 27, 2016                     Respectfully submitted,

                                             ___/s/ Brendan Klaproth_____
                                             Brendan Klaproth (D.C. Bar No. 999360)
                                             Klaproth Law PLLC
                                             406 5th Street NW
                                             Suite 350
                                             Washington, DC 20001
                                             Tel:     202-618-2344
                                             Email:  bklaproth@klaprothlaw.com
                                             *Attorney for Plaintiffs*