## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PAUL D. CASEY, individually and as )
administrator of the Estate of )
Patrick D. Casey, *et al.*, )
          )
     Plaintiffs, )
          )
     v. )
          )
JASON WARD, *et al.*, )
          )
     Defendants. )

**FILED**

**SEP 3 0 2016**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

Civil Case No. 13-1452 (RJL)

### MEMORANDUM OPINION
(September **29**, 2016) [Dkts. ##154, 155, 156, 157, 158, 174]

Plaintiffs Paul D. Casey and Abigail O. Casey ("plaintiffs")[1] bring negligence-based survival claims against defendants Kyung Rhee ("Rhee"), doing business as Rhee's McDonald's, and McDonald's Corporation ("McDonald's") for the death of their son, Patrick D. Casey ("Casey"). *See* Am. Compl. [Dkt. #40]. Presently before the Court are defendants' Motions for Summary Judgment. Upon consideration of the parties' pleadings, the relevant law, and the entire record in this case, the Court GRANTS defendants' Motions for the reasons set forth below.

### BACKGROUND

On May 22, 1995, defendants McDonald's and Rhee entered into a franchise agreement and operator's lease under which McDonald's granted Rhee a franchise for a

---

[1] Plaintiff Paul D. Casey brings this action both in his individual capacity as well as in his capacity as administrator of the Estate of Patrick D. Casey. *See* Am. Compl. at 1. Plaintiff Abigail O. Casey brings this action in her individual capacity only. *See* Am. Compl. at 1.

particular McDonald's restaurant in Washington, D.C.   McDonald's SOMF ISO Mot. for

Summ. J. ¶¶ A–F [hereinafter "McDonald's SOMF"] [Dkt. #154-1].   Under the terms of

their agreements, McDonald's is the franchisor and owner of the restaurant's premises at

1916 M Street NW in Washington, D.C.[2]   Franchise Agreement 1 [hereinafter "FA"] [Dkt.

#154-4]; Operator's Lease 1, Schedule B. [hereinafter "OL"] [Dkt. #154-4].   Rhee, who

does business as "Rhee's McDonald's," is the franchisee, leases the premises from

McDonald's, and operates the restaurant.   FA 1; OL 1.   The Franchise Agreement

describes the "McDonald's System," a "comprehensive system for the ongoing

development, operation and maintenance of McDonald's restaurant locations . . . ."[3]   FA

¶ 1(a).   Rhee's adherence "to standards and policies of McDonald's providing for the

uniform operation of all McDonald's restaurants within the McDonald's System," the

Franchise Agreement states, is the "essence" of the franchise.   FA ¶ 1(c).   Those

standards and policies include "serving only designated food and beverage products; the

use of only prescribed equipment and building layout and designs; strict adherence to

designated food and beverage specifications and to McDonald's prescribed standards of

Quality, Service and Cleanliness in [Rhee's] restaurant operation."   FA ¶ 1(c).

---

[2] The Court will refer to the restaurant at said premises as "Rhee's McDonald's."

[3] The restaurants within the McDonald's System are those that "have been selected and developed by McDonald's for the retailing of a limited menu of uniform and quality food products, emphasizing prompt and courteous service in a clean, wholesome atmosphere which is intended to be attractive to children and families and includes proprietary rights in certain valuable trade names, service marks and trademarks, including the trade names 'McDonald's' and 'McDonald's Hamburgers,' designs and color schemes for restaurant buildings, signs, equipment layouts, formulas and specifications for certain food products, methods of inventory and operation control, bookkeeping and accounting, and manuals covering business practices and policies."   FA ¶ 1(a).

McDonald's and Rhee agreed that Rhee's McDonald's would be "operated in conformity to the McDonald's System through strict adherence to McDonald's standards and policies . . . ." FA ¶ 1(d); *see also* FA ¶ 2(a)(i) (granting Rhee the "right, license, and privilege . . . to adopt and use the McDonald's System" at Rhee's McDonald's). Rhee was to "enroll himself and his managers, present and future, at Hamburger University or such other training center as may be designated by McDonald's" to learn the McDonald's System. FA ¶ 6.

McDonald's agreed to provide Rhee with business manuals detailing "(a) required operations procedures; (b) methods of inventory control; (c) bookkeeping and accounting procedures; (d) business practices and policies; and (e) other management, advertising, and personnel policies." FA ¶ 4. In turn, Rhee agreed "to promptly adopt and use exclusively the formulas, methods, and policies contained in the business manuals . . . ." FA ¶ 4. Moreover, the manuals and the policies therein were "incorporated in [the] Franchise by reference." FA ¶ 4. One of those manuals, the U.S. Operations and Training Manual ("O&T Manual"), contains a chapter regarding safety and security. McDonald's SOMF ¶ O. The manual was issued to both franchised McDonald's restaurants like Rhee's McDonald's and to corporately owned McDonald's restaurants known as "McOpCo" restaurants. The opening of the safety and security chapter provides, "McOpCo employees should consider the information in this chapter as company policy. Subsidiaries, affiliates and licensees establish their own human resources policies and may

3

choose the information from this chapter that will be helpful to them in operating their business." McDonald's Reply 7 n.3; Ex. A [Dkt. #169-1]. To ensure compliance with the McDonald's System, McDonald's reserved the "right to inspect [Rhee's McDonald's] at all reasonable times." FA ¶ 12. Moreover, McDonald's conducts periodic operations reviews ("audits") of franchisees like Rhee.[4]  Warfield Dep. 26:3–9; 54:4–5 [Dkt. #160-44]. Although the parties disagree about their severity and significance, plaintiffs put forth evidence that thirteen incidents of violence took place either inside Rhee's McDonald's or close to it from approximately November 2009 to September 2011. Pls.' SOMF In Resp. to Def. Rhee's SOMF ¶ 1 [hereinafter "Pls.' SOMF"] [Dkt. #160-2]. Rhee, however, decided not to employ a security guard. In the event of an altercation in the restaurant, Rhee's policy provided, *inter alia*, that employees call 911 to alert law enforcement. *See, e.g.*, Rhee's Dep. 120:8–10 [Dkt. #155-22]; Martinez Aff. ¶ 4 [Dkt. #160-11].

Following his service in the United States Army, which included a tour in Afghanistan, 33 year-old Patrick Casey was honorably discharged and moved to Washington, D.C. in August 2011 to pursue a master's degree at George Washington

---

[4] McDonald's states that, effective January 1, 2005, its subsidiary McDonald's USA, LLC assumed its interest in the Franchise Agreement and Operator's Lease with Rhee. McDonald's SOMF ¶¶ G–K. Thus, McDonald's persists that it is "not even the franchisor, but rather it is the parent company to McDonald's USA, LLC which is the franchisor." McDonald's Reply 3 [Dkt. #169]. McDonald's does not cite any legal authority for this proposition, and such an "unsupported assertion does not warrant granting" summary judgment. *Crumb v. McDonald's Corp.*, Civ. No. 15-1719, 2016 WL 759213, at *6 (D. Md. Feb. 26, 2016) (rejecting an unsupported argument made in a footnote that because McDonald's USA LLC was the franchisor, and not McDonald's Corporation, the complaint against McDonald's Corporation should be dismissed).

University.   Paul Casey Dep. 20:13–22; 31:10–11 [Dkt. #160-29].   In the very early morning of September 23, 2011, Casey met his friends Claire Jun and David Lindsey at Rhee's McDonald's.   Rhee's SOMF ISO Mot. for Summ. J. ¶ A(2) [hereinafter "Rhee's SOMF"] [Dkt. #155-1].   Among the other patrons in the crowded restaurant were Jason Ward ("Ward"), Justin Ruark ("Ruark"), and Brian Giblin ("Giblin"), who arrived at Rhee's McDonald's together after an evening of "bar hopping" at various establishments in Northwest, Washington, D.C.[5]   Rhee's SOMF ¶ A(3); Ruark Aff. ¶¶ 1–3 [Dkt. #160-13].   Ward and Giblin were noticeably rowdy while they waited in line to place their orders.   Rhee's SOMF ¶ (A)(3).   After receiving their food, the two groups of friends sat at tables near one another in the restaurant.   Rhee's SOMF ¶ A(4).   "Trash talking" ensued, with the groups exchanging insults from their respective tables.   Rhee's SOMF ¶ A(4).   After a few minutes, Casey got up from his seat and approached Ward, Ruark, and Giblin's table.   Rhee's SOMF ¶ A(4).   Ruark stood up to face Casey, and the banter continued.   Rhee's SOMF ¶¶ (A)(4); (B)(2)(b)(o).   Lindsey then left his seat and stood briefly with Casey.   Rhee's SOMF ¶¶ (A)(6); (B)(2)(b)(q).   Lindsey told the other group something along the lines of "Have fun going home together."   Rhee's SOMF ¶¶ (A)(6); (B)(2)(b)(q)–(r).   Lindsey then started to leave the restaurant, and Casey began to follow

---

[5] The three were defendants in the present action.   Plaintiffs dismissed their claims against Ruark, Giblin, and Ward on September 23, 2014, September 21, 2015, and January 5, 2016 respectively.   *See* Stipulations of Dismissal [Dkts. ##103, 143, 152].   The bars in which they imbibed on the evening of September 22, 2011 and the early morning of September 23, 2011 were also defendants in this action but have since all been dismissed.   *See* Order (Sept. 5, 2014) [Dkt. # 99].

him.  Rhee's SOMF ¶ A(6).

Angered by Lindsey's comment, Giblin stood up and approached him near the restaurant's door.  Rhee's SOMF ¶¶ A(7)–(8).  Pushing and shoving broke out, and Lindsey, Giblin, Casey, and Ward exited the restaurant.  Rhee's SOMF ¶¶ A(8)–(9).  Immediately outside the restaurant, the scuffling continued and culminated with Ward "sucker punching" Casey.  Rhee's SOMF ¶¶ A(9)–(11).  Casey fell backwards and struck his head on the sidewalk.  Rhee's SOMF ¶ A(11).  Giblin fled.  Rhee's SOMF ¶ A(12).  Ward went back inside the restaurant to get Ruark, and then the two exited and ran down the street.  Rhee's SOMF ¶ A(12).  Lindsey called 911 at 1:43 AM, and police officers began arriving at the restaurant within about 73 seconds.  Rhee's SOMF ¶ A(13).  The employees working at Rhee's McDonald's did not call the police during either the verbal or physical altercation.  Pls.' SOMF ¶ 19.  Jose Martinez, the shift manager on duty during the incident, stated that, after he observed the two groups yelling at one another and perceived that a physical altercation was imminent, he went to the restroom and did not emerge until after Ward had punched Casey.[6]  Martinez Aff. ¶¶ 7–8.  The paramedics took Casey to George Washington Hospital, Podlone Aff. at ¶ 14 [Dkt. #160-10], where it became apparent he had suffered severe head trauma and brain hemorrhaging.  He remained in a medically induced coma for four days and died of his injuries on September

---

[6] Martinez stated that he directly called a D.C. Metropolitan Police Department Officer he knew as "Officer Jose" after Lindsey had already called 911 and the ambulance and police were already on their way to Rhee's McDonald's.  Martinez Aff. ¶¶ 8, 11.

27, 2011.   Gail Casey Dep. 26:11–17; 54:11–13 [Dkt. #160-30].

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and the record demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).   The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   To defeat summary judgment, the nonmoving party must "designate specific facts showing there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).   In determining whether there is a genuine dispute about material facts, the court "must view 'the evidence in the light most favorable to the nonmoving party and . . . draw all reasonable inferences in favor of the nonmoving party.'" *Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 23–24 (D.C. Cir. 2013) (quoting *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011) (alteration in original)).   If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment may be granted. *Celotex*, 477 U.S. at 322.

## DISCUSSION

Plaintiffs pursue negligence-based survival claims against Rhee and McDonald's. Pursuant to the District of Columbia's Survival Act, "[o]n the death of a person in whose favor or against whom a right of action has accrued for any cause prior to his death, the right of action, for all such cases, survives in favor of or against the legal representative of the deceased." D.C. Code § 12-101. The Survival Act is premised upon the recognition "that liability to the victim should not be extinguished by" the victim's death, *Greater Se. Cmty. Hosp. v. Williams*, 482 A.2d 394, 397 (D.C. 1984), and "preserves and carries forward for the benefit of the deceased's estate the right of action which the deceased would have had, had he not died," *Semler v. Psychiatric Inst. of Washington, D.C., Inc.*, 575 F.2d 922, 925 (D.C. Cir. 1978); *see also id.* ("The Act is designed to place the deceased's estate in the position it would have been in had the deceased's life not been cut short."). "At base, a survival action is a negligence action pursued by the estate of the decedent victim— all that need be proven are the ordinary elements of negligence." *Burton v. United States*, 668 F. Supp. 2d 86, 97 (D.D.C. 2009).

In the District of Columbia, the elements of a negligence claim are, of course, "a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, and damage to the interests of the plaintiff, proximately caused by the breach." *Wash. Metro. Area Transit Auth. v. Ferguson*, 977 A.2d 375, 377 (D.C. 2009). Where, as here, "the plaintiff alleges that the defendant negligently failed to prevent a third party's injurious

criminal act," the plaintiff "must prove that the criminal act was 'so foreseeable that it became [the defendant's] duty to guard against it by adhering to a recognized standard of care, that [the defendant] breached that standard of care, and that the failure to exercise due care proximately caused' the injury." *Beckwith v. Interstate Mgmt. Co., LLC*, 82 F. Supp. 3d 255, 258 (D.D.C. 2015) (quoting *Clement v. Peoples Drug Store, Inc.*, 634 A.2d 425, 427 (D.C. 1993) (alterations in original)); *see also Toy v. District of Columbia*, 549 A.2d 1, 6 (D.C. 1988) (stating the plaintiff "bears the burden of proof on three issues: the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury." (internal quotation marks omitted)).

## I.  Defendant Rhee's Motion for Summary Judgment

### a.  Plaintiffs' Claims of Failure to Prevent a Foreseeable Criminal Act

Rhee moves for summary judgment, arguing that plaintiffs cannot prove that the altercation was sufficiently foreseeable and that plaintiffs have not established the requisite standard of care. *See generally* Mem. of P&A in Supp. of Rhee's Mot. for Summ. J. [hereinafter "Rhee's Mem."] [Dkt. #155-2].   Plaintiffs respond that they have raised genuine issues of material fact as to whether the incident was foreseeable and that their expert has established that the standard of care required that Rhee employ a security guard at the restaurant and that his employees call 911 to alert law enforcement of Ward and Giblin's rowdy behavior while in line or of the altercation between the groups.   Pls.' Mem.

9

of P&A in Supp. of Pls.' Consolidated Opp'n to Defs. Kyung Rhee and McDonald's Corp.'s Mots. For Summ. J. 22–39 [hereinafter "Pls.' Opp'n"] [Dkt. #160]. Regardless of whether Ward's assault on Casey was sufficiently foreseeable, plaintiffs must establish the standard of care to survive summary judgment on their negligence claim. *Scott v. District of Columbia*, 101 F.3d 748, 757 (D.C. Cir. 1996) (stating that "[f]ailure to prove a standard of care is . . . fatal to a negligence claim" under District of Columbia law). "[E]xpert testimony regarding the appropriate standard of care is not necessary for acts within the realm of common knowledge and everyday experience." *Katkish v. District of Columbia*, 763 A.2d 703, 705 (D.C. 2000) (internal quotation marks omitted). However, "a plaintiff must put on expert testimony to establish the standard of care when the issue in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson." *Id.* (internal quotation marks omitted). Where "the defendant is alleged to have failed to protect the plaintiff from harm, the expert must clearly articulate *and reference* a standard of care by which the defendant's actions can be measured." *Varner v. District of Columbia*, 891 A.2d 260, 269 (D.C. 2006) (internal quotation marks omitted). Specifically, "the expert must clearly relate the standard of care to the practices in fact generally followed by other comparable . . . facilities or to some standard nationally recognized by such units." *Clark v. District of Columbia*, 708 A.2d 632, 635 (D.C. 1997).

Rhee contends that expert testimony is necessary to establish the relevant standard of care as to security practices at issue. Rhee's Mem. 18–20 (quoting *Briggs v.*

*Washington Metro. Area Transit Auth.*, 481 F.3d 839, 845–46 (D.C. Cir. 2007) ("[E]xpert testimony is routinely required in negligence cases . . . which involve issues of safety, security and crime prevention.") (internal quotation marks omitted)).   Plaintiffs do not dispute this point and put forth the expert testimony and report of Lance R. Foster, a Certified Protection Professional and Certified Security Consultant.   *See* Foster Security Expert Report [hereinafter "Foster Report"] [Dkt. #160-14].

### i. Utilization of a Security Guard

Foster relies largely on McDonald's O&T Manual's safety and security chapter and the fact that the Verizon Center and U Street McDonald's restaurants in Washington, D.C. use security guards to conclude that "the national standard of care required Rhee's McDonald [sic] to provide adequate security measures in the form of security guards to ensure the safety of its patrons."   Foster Report 8.   Foster's report and testimony are insufficient to establish a national standard of care.   As an initial matter, Foster has not articulated a standard of care with specificity.   He suggests that his determination that the national standard of care requires use of "security measures in the form of security guards" is based on his conclusions that Rhee's McDonald's is open 24 hours, that given its proximity to night clubs and bars it serves intoxicated customers, and that violent crime has taken place both inside and near the restaurant.   Foster Report 8.   He does not, however, identify in a concrete or discernable manner a standard governing the circumstances under which a security guard should be on duty at a restaurant or comparable

11

business so as to allow the factfinder to measure Rhee's conduct against that standard.  *See Briggs*, 481 F.3d at 847 (stating that "generalized references" to standards are not sufficient and that "the expert must proffer 'a specific, articulable (and articulated) standard of care'" (quoting *District of Columbia v. Moreno*, 647 A.2d 396, 400 (D.C. 1994) and *District of Columbia v. Carmichael*, 577 A.2d 312, 315 (D.C. 1990))).

Even if Foster had articulated a specific standard, his report and testimony do not demonstrate that a standard requiring the provision of security guards to protect patrons "ha[s] been promulgated, or [is] generally known" by restaurants or businesses comparable to Rhee's McDonald's.  *Messina v. District of Columbia*, 663 A.2d 535, 539 (D.C. 1995). Foster relies heavily on McDonald's O&T Manual's safety and security chapter, which states that "security guards are often good protection against robberies," and further suggests that restaurants consider hiring security guards to assist with "crowd control," "burglary prevention," and "robbery prevention."  Foster Report 7.  The safety and security chapter purports to establish policy only for McOpCo restaurants.  McDonald's Reply 7 n.3; Ex. A.  It does not, however, require McOpCo restaurants to hire security guards but instead merely recognizes that "*[s]ome* restaurants use security guards as additional measures to maintain the restaurant in a safe and secure environment for their guests and crew." [7]  Foster Report 7 (emphasis added).  At most, the chapter's

---

[7] In their opposition, plaintiffs suggest that because the security chapter recommends McOpCo restaurants consider hiring security guards, all 105 McOpCo restaurants in the Baltimore-Washington region necessarily have hired guards. Pls.' Opp'n 31 (citing Webb Dep. 49:8–50:6; 118:7–15 [Dkt. #160-43]). The testimony plaintiffs cite establishes that McOpCo restaurants were required to adhere to the safety and

recommendation that restaurants consider the possibility of hiring security guards constitutes a "best practice," which is not a standard of care under District of Columbia law. *See Varner*, 891 A.2d at 272 ("Aspirational practices do not establish the standard of care which the plaintiff must prove in support of an allegation of negligence."). Even if the safety and security chapter did promulgate a standard requiring security guards, which it clearly does not, Foster's report and testimony focuses on McDonald's restaurants and provide no indication that any similarly situated restaurants or businesses that are not affiliated with McDonald's have issued or acknowledged a standard under which security guards should be used to ensure patron's safety.[8]   Internal distribution of a document, like the security chapter, does not demonstrate that a standard is generally known or recognized outside the purview of McDonald's and its franchisees.[9]

---

security chapter, but the relevant content of the chapter is plainly advisory in nature.  Plaintiffs cite no evidence as to the actual practices of the 105 local McOpCo restaurants.

[8] Plaintiffs play up Foster's discussion of the District of Columbia Alcoholic Beverage Control Board's recognition of a correlation between alcohol consumption and violence and his unsupported statement that "[d]rinking establishments in the District of Columbia are required to have a security plan and dedicated security personnel."  Foster Report 5–6 ("Violence can occur quickly in a nightclub and it is imperative that these establishments be prepared to respond effectively to these potentially violent incidents immediately.") (quoting D.C. Council Report on Bill 17-201 at 26 (Mar. 11, 2008)).  But Rhee responds that District of Columbia law does *not* require businesses other than bars and nightclubs to have security personnel.  Rhee's Reply 15 [Dkt. #170].  Moreover, Foster's recognition that a connection between alcohol and violence could impact restaurants or businesses like Rhee's McDonald's, which do not serve alcohol, does nothing to demonstrate how such restaurants and businesses respond or have been instructed to respond to that issue.

[9] Plaintiffs attempt to demonstrate that Foster's proffered standard is "generally known" by pointing to testimony from Rhee's customers and staff that in their opinions, a security guard could have made a difference.  Pls.' Opp'n 32–33.  But plaintiffs have not argued that the standard of care here is in the layman's domain and have instead relied on expert testimony.  When an expert's testimony is required to demonstrate a standard of care, as plaintiffs do not dispute it is in this instance, the *expert* must demonstrate that standard of care is recognized by similarly situated parties or generally followed by similarly situated parties.  *See Clark*, 708 A.2d at 635.  Plaintiffs do not argue that the patrons and staff identified here are in fact security experts.

Further, Foster's report and testimony do not suffice to show that his purported standard of care "has been accepted as controlling in facilities and enterprises that are similar to [Rhee's] facilities or enterprises." *Briggs*, 481 F.3d at 847 (internal quotation marks and alterations omitted).  Foster does not provide data or estimates as to how many similar restaurants and businesses actually use security guards and, thus, does nothing to establish that employing security guards is a practice "in fact generally followed by" entities comparable to Rhee's McDonald's. *Clark*, 708 A.2d at 635; *see also Messina*, 663 A.2d at 539.  Instead, Foster's report merely identifies *two* McDonald's restaurants in Washington, D.C. that used security guards as of September 2011.[10]  Foster Report 7. This information does not come close to establishing that security guards are generally used by comparable restaurants or businesses in this city, let alone across the *nation*.[11]  *See*

---

[10] Foster notes that these franchised McDonald's locations hired security guards at the recommendation of a consultant for McDonald's Corporation.  Foster Report 7.  This fact alone does not bear on whether using security guards constitutes a national standard, because the consultant could have been recommending a practice that exceeded industry norms.  Moreover, even if it was established that all McDonald's restaurants use security guards, "there is no evidence that those entities alone can define the national standard of care for the [] industry as a whole." *Beckwith*, 82 F. Supp. 3d at 264.

[11] Plaintiffs rely on *Novak v. Capital Mgmt. & Dev. Corp.*, 570 F.3d 305, 313 (D.C. Cir. 2009) for the proposition that merely pointing to a couple comparable Washington, D.C. establishments employing a practice is sufficient to establish a national standard of care.  But the expert in *Novak* testified that "post[ing] security personnel outside [a nightclub's] exit at closing until patrons dispersed" was "widespread practice," "standard practice," and "normal practice" in the industry and further relied on testimony from an industry professional who was unable to name a single nightclub in the city that did not do so.  *Id.*  Foster made no such statements here as to the overall prevalence of security guards in the industry.  Plaintiffs purport that he did, Pls.' Opp'n 34 (citing Foster Dep. 195:12–19 [Dkt. #160-47]), but in the testimony they reference Foster merely states that it is his opinion that restaurants across the country with certain unidentified "risk factors" should hire security guards.  *See Travers v. District of Columbia*, 672 A.2d 566, 568 (D.C. 1996). ("The personal opinion of the testifying expert as to what he or she would do in a particular case, without reference to a standard of care, is insufficient to prove the applicable standard of care.").

*Beckwith*, 82 F. Supp. 3d at 263 (finding evidence as to hotel chains' practices in Baltimore and Washington, D.C. insufficient to establish a "nationally recognized" standard of care).

### ii. Calling 911 to Alert Law Enforcement of the Altercation

Plaintiffs next argue that Foster articulated a standard of care under which Rhee's McDonald's was required to call the police during the altercation between the two groups. Pls.' Opp'n 38 (citing Foster Report 9–11). Foster discusses Rhee's McDonald's own security policy, which required employees to first ask individuals engaged in "arguing" and using "abusive language" to leave the restaurant and, if they refused, to then call the police. Foster Report 9. Moreover, in the event of a physical altercation or assault in the restaurant, Foster states that Rhee's McDonald's policy was for employees to call 911. Foster Report 9–10. Foster goes on to note that these policies are "substandard" and "fall[]" below the national standard of care . . . in light of the history of prior crimes in the Restaurant." Foster Report 11. Unfortunately for plaintiffs, however, Foster fails to articulate the national standard of care; he merely states that Rhee's policies did not comport with some unidentified national standard. Nor does he make any reference to the practices of other comparable restaurants or businesses. Further, Rhee's internal policies, alone, cannot establish the national standard of care because they could exceed that which are required by the applicable standard. *See Briggs*, 481 F.3d at 848; *Varner*, 891 A.2d at 269–270. Plaintiffs have thus failed to meet their burden of putting forth expert testimony as to the standard of care.

15

Plaintiffs attempt to skirt the issue by presenting alternative theories.   They first argue that by instituting a policy of calling 911 during altercations in the restaurant, Rhee's McDonald's "voluntarily assumed" a duty to do so.   Pls.' Opp'n 34.   But plaintiffs' cursory briefing on this issue presents no legal authority supporting a proposition that institution of an internal business policy constitutes voluntary assumption of a duty to follow that policy or any authority "even suggest[ing] a categorical rule [under District of Columbia law] that a business is necessarily negligent if it fails to abide by its own policies."   *Novak v. Capital Mgmt. & Dev. Corp.*, Civ. No. 01-00039, 2004 WL 4881276, at *5 (D.D.C. July 12, 2004), *vacated on other grounds*, 452 F.3d 902 (D.C. Cir. 2006); *see also id.* ("While [] a failure [to follow a business's own policy] indeed can be some evidence of negligence, that in itself is insufficient to show negligence unless plaintiffs also show that non-compliance with policy was also non-compliance with the duty of care.").   Next, plaintiffs assert that a duty to call 911 in the event of an altercation in a business is "a legal duty imposed upon business invitors."   Pls.' Opp'n 34.   They rely on the *Restatement (Second) of Torts* § 314A's recognition that "[a] possessor of land who holds it open to the public is under a . . . duty to members of the public who enter in response to his invitation . . . to take reasonable action . . . to protect them against unreasonable risk of physical harm" and "to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by

others."[12]   *See also Hall v. Ford Enters., Ltd.*, 445 A.2d 610, 611 n. 4 (D.C. 1982) (acknowledging a special relationship exists between business invitors and their invitees under District of Columbia law).   Recognition of a "special relations[hip] giving rise to [a] duty to aid or protect," *Restatement (Second) of Torts* § 314A, would serve to lighten plaintiffs' burden to demonstrate the heightened foreseeability of the altercation.   *See Beckwith*, 82 F. Supp. 3d at 259 (citing *Bd. of Trustees of Univ. of D.C. v. DiSalvo*, 974 A.2d 868, 872 (D.C. 2009)).   It would not, however, affect plaintiffs' burden to establish the requisite standard of care.   The *Restatement* references "reasonable action," *Restatement (Second) of Torts* § 314A, and, indeed, "[i]n the typical negligence case, the standard of care applicable to a person's conduct is simply that of a 'reasonable man under like circumstances.'"   *Godfrey v. Iverson*, 559 F.3d 569, 572 (D.C. Cir. 2009) (quoting *Restatement (Second) of Torts* § 283).   However, as discussed above, "'if the subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson,' D.C. law requires expert testimony to establish the pertinent standard of care unless it is 'within the realm of common knowledge and everyday experience' of the jurors."   *Id.* (quoting *District of Columbia v. Arnold & Porter*, 756 A.2d 427, 433 (D.C. 2000)).   Here, defendant Rhee argues and plaintiffs do not dispute that expert testimony is required to establish the standard of care.   Rhee's Mem.

---

[12] Plaintiffs also cite *Southland Corporation v. Griffith*, 633 A.2d 84 (Md. Ct. of Appeals 1993) for the proposition that a store owner has a legal duty to call the police for invitees who are in danger.   This case interpreted Maryland law.   As a federal court sitting in diversity jurisdiction, I will not rely on cases interpreting the law of another jurisdiction to find and impose a duty under District of Columbia law.

19; Pls.' Opp'n 35.   Therefore, assuming, without deciding, that Rhee had a special duty of protection that extended to Casey,[13] plaintiffs must still establish through expert testimony that the standard of care required calling 911 to alert police of Giblin and Ward's rowdy behavior while in line, the verbal altercation between the groups, or the ensuing physical altercation. *See, e.g.*, *Beckwith*, 82 F. Supp. 3d at 259, 262 (finding hotel had a special duty to protect guests and going on to consider whether plaintiff's expert established the requisite standard of care); *see also Varner*, 891 A.2d at 269 ("An expert may not rely upon a general duty of care to establish an objective standard requiring specific conduct.").   As discussed above, plaintiffs have failed to set forth sufficient evidence to do so.   Because failure to establish a standard of care is "fatal to a negligence claim" under District of Columbia law, *Scott*, 101 F.3d at 757, Rhee is entitled to summary judgment on plaintiffs' claims of negligent failure to prevent a foreseeable crime.

### b. Plaintiffs' Claim of Breach of Duty to Train and Supervise Employees

Plaintiffs next oppose Rhee's Motion for Summary Judgment by arguing that a reasonable jury could find that Rhee's negligent failure to train and supervise his employees was the proximate cause of the assault on Casey.   Pls.' Opp'n 38–40. Plaintiffs point to the fact that Rhee's shift manager Jose Martinez went to the restroom, instead of calling 911, when it became "clear from [the two group's] yelling there was to

---

[13] Rhee argues that he did not have a duty to protect Casey, both because Ward's punch was delivered outside the doors of the restaurant and because Casey and Lindsey legally became "uninvited trespassors" when they engaged in the confrontation with the other group.   Rhee's Mem. 38–45.

be a physical fight." Pls.' Opp'n 38 (quoting Martinez Aff. at ¶ 7). Moreover, another employee on duty at the time testified that she did not call the police during the altercation because she thought the manager would do so. Pls.' Opp'n 39 (quoting Santos Dep. 74:20–21 [Dkt. #160-38]). "To prevail on a claim of negligent training and supervision under D.C. law, a plaintiff must [, *inter alia*,] 'show that an employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee.'" *Blakeney v. O'Donnell*, 117 F. Supp. 3d 6, 21 (D.D.C. 2015) (quoting *District of Columbia v. Tulin*, 994 A.2d 788, 794 (D.C. 2010)). Plaintiffs point to testimony that Rhee's McDonald's did not present employees with the O&T manual's safety and security chapter or explain its provisions to them and that Rhee and one of the restaurant's managers were either unaware of or did not recall a previous altercation that had taken place in the restaurant in which a woman was struck in the face. Pls.' Opp'n 39–40. But in order to survive summary judgment, plaintiffs must set forth some evidence that Rhee knew or should have known that the staff on duty during the incident at hand was prone to dangerous or incompetent behavior. *See Sokos v. Hilton Hotels Corp.*, 283 F. Supp. 2d 42, 51–52 (D.D.C. 2003); *Murphy v. Army Distaff Found., Inc.*, 458 A.2d 61, 63 (D.C. 1983). As plaintiffs have not pointed to any evidence as to the relevant employees' behavior before the incident, summary judgment shall be awarded in favor of

19

Rhee.[14]

## II. Defendant McDonald's Motion for Summary Judgment

### a. Plaintiffs' Claim of Vicarious Liability

Plaintiffs claim that McDonald's is vicariously liable for Rhee's actions under the doctrine of agency. Pls.' Opp'n 43–44. McDonald's counters that no agency relationship existed between it and Rhee. McDonald's Reply 7–8. Assuming *arguendo* that it did, under either a theory of actual or apparent agency, plaintiffs failed to set forth the required evidence to move forward with their claims of *Rhee's* liability. "[V]icarious liability is not an independent cause of action, but rather is a legal concept used to transfer liability from an agent to a principal at trial." *Crawford v. Signet Bank*, 179 F.3d 926, 929 (D.C. Cir. 1999) (quoting *Young v. 1st American Fin. Servs.*, 977 F. Supp. 38 (D.D.C.1997) (alteration in original)). "In the absence of agent liability, therefore, none can attach to the principal." *Id.* Thus, entry of summary judgment in favor of Rhee on all claims against him warrants summary judgment for McDonald's as to plaintiffs' vicarious liability claims.

### b. Plaintiffs' Claim of Direct Liability

McDonald's next argues summary judgment should be granted in its favor because it neither controlled security measures at Rhee's McDonald's nor had a duty to do so. Mem. of P&A in Supp. of McDonald's Mot. for Summ. J. 1–2; 10–11 [Dkt. #154-2].

---

[14] Plaintiffs argue expert testimony is unnecessary for purposes of the negligent failure to supervise claim. Pls.' Opp'n 39. The Court need not and does not reach the issue.

Plaintiffs respond that McDonald's itself was negligent because it assumed responsibility for ensuring Rhee complied with certain security practices but failed to implement those practices. Pls.' Opp'n 41–43. The inquiry here turns on the first element of negligence. Under District of Columbia law, "[t]he existence of the first element [of a negligence claim], a legal duty owed by the defendant to the plaintiff, is a question of law, to be determined by the court." *In re Sealed Case*, 67 F.3d 965, 968 (D.C. Cir. 1995) (citing *Zhou v. Jennifer Mall Restaurant*, 534 A.2d 1268, 1274 (D.C. 1987)). As our Circuit Court has held, in the District of Columbia, when one assumes a contractual duty to be responsible for overseeing another entity's safety or security compliance, he acquires a corresponding "duty of reasonable care in carrying out such duties" that extends to those within "the orbit of danger as disclosed to the eye of reasonable vigilance." *Caldwell v. Bechtel, Inc.*, 631 F.2d 989, 1001 (D.C. Cir. 1980) (quoting *Palsgraf v. Long Island R. Co.*, 248 N.Y. 339 (1928)).

Plaintiffs claim that through the Franchise Agreement, McDonald's assumed responsibility for ensuring security at Rhee's McDonald's and that it therefore owed a duty of care to customers of the restaurant, including Casey. Pls.' Opp'n 41. Plaintiffs' sole legal authority is *Caldwell*. In that case, consultant engineering firm Bechtel, Inc. ("Bechtel") entered into a contract with the Washington Metropolitan Area Transit Authority ("WMATA") to provide "safety engineering services" related to work being performed by various other WMATA contractors. *Caldwell*, 631 F.2d at 992. Bechtel

21

specifically agreed to be present on job sites "overseeing the enforcement of safety provisions in relevant safety codes, and inspecting job sites for violations." *Id.* at    992– 93.  Our Court of Appeals explained that pursuant to the contract between Bechtel and WMATA, Bechtel was required to "ensure" and "supervis[e ] safety at [WMATA's] various construction sites," *id.* at 994, "direct[] the contractor to correct any unsatisfactory condition," *id.*, and "develop and ensure a uniform system of safety and accident prevention procedures," *id.*  If Bechtel could not persuade contractors to adhere to the relevant safety regulations, it was authorized "to order a work stoppage." *Id.* at 996.  The Court of Appeals reasoned that, having assumed responsibility and authority over WMATA project safety, Bechtel "was required to observe a standard of care ordinarily adhered to by one providing such services, possessing such skill and expertise." *Id.* at 997.  This duty of reasonable care extended to workers at WMATA project sites, including Clem Caldwell, "who allegedly contracted silicosis while he was mucking in a tunnel under construction as a part of the metropolitan subway system." *Id.* at 992, 1001.

Unlike in *Caldwell*, however, there is simply no evidence here that McDonald's agreed to provide security-related services for Rhee's McDonald's or that it assumed authority or responsibility over Rhee's McDonald's compliance with any security practices.  The Franchise Agreement obliges Rhee to comport with the McDonald's System, but plaintiffs point to no provisions in that agreement demonstrating the McDonald's System includes uniform security practices or that McDonald's agreed to

22

ensure certain security practices were followed at Rhee's McDonald's.  *See Frederick v. TPG Hosp., Inc.*, 56 F. Supp. 2d 76, 80 (D.D.C. 1999) (discussing *Caldwell* and stating, "It was because [Bechtel] had assumed those broad contractual obligations that the court found it also had assumed a duty to plaintiff in tort." (internal quotation marks and alteration omitted)).  Instead, plaintiffs cite the Franchise Agreement's requirement that Rhee "adopt and use exclusively the formulas, methods, and policies contained in [McDonald's] business manuals."  Pls.' Opp'n 42 (quoting FA ¶ 4).  They argue that the safety and security chapter of the O&T Manual was one of those businesses manuals.  Pls.' Opp'n 42 (citing Warfield Dep. 39:21–40:2).  But the safety and security chapter specifically states that although corporately owned McDonald's Restaurants ("McOpCo restaurants") are to consider the chapter "as company policy," "[s]ubsidiaries, affiliates, and licensees establish their own human resources policies and may choose the information from this chapter that will be helpful to them in operating their businesses."  McDonald's Reply 7 n.3; Ex. A; *see also* Webb Dep. 49:8–10*; cf. VanDeMark v. McDonald's Corp.*, 904 A.2d 627, 632 (N.H. 2006) (reviewing similar handbook language and finding that it did not, "impose an explicit mandate upon the franchisee to implement [McDonald's] security policies").  Plaintiffs have set forth no contradictory evidence suggesting the safety and security chapter was indeed binding on Rhee's McDonald's.  That McDonald's promulgated safety and security practices for McOpCo restaurants and made that information available to franchisees with the clear stipulation that only McOpCo

restaurants were required to follow the practices therein does not demonstrate that McDonald's assumed any responsibility, control, or oversight over Rhee's McDonald's security.

Plaintiffs next point to McDonald's practice of auditing franchisees to ensure compliance with the McDonald's System and note that a full audit included approximately three questions related to safety. Pls.' Opp'n 42 (citing Warfied Dep. 26:3–9, 35:19–36). The problem for plaintiffs is that they do not establish that McDonald's had authority to mandate correction of any security issues it could have detected in an audit of Rhee's McDonald's.[15] *See Caldwell*, 631 F.2d at 996 (emphasizing that Bechtel's authorization "to order a work stoppage" gave its experts in the field "effective authority"); *cf. Kerl v. Dennis Rasmussen, Inc.*, 682 N.W.2d 328, 334 (Wis. 2004) (citing direct liability cases that "look to the franchisor's actual control or retained right of control to determine the presence of a duty for purposes of evaluating whether the franchisor was itself negligent"). Similarly, plaintiffs cite McDonald's deployment of consultants and regional security managers to provide advice on topics such as safety and security to franchised McDonald's

---

[15] Plaintiffs cite McDonald's authority to terminate the Franchise Agreement in the event of a material breach by Rhee, including "fail[ure] to maintain and operate the Restaurant in a good, clean, wholesome manner and in compliance with the standards prescribed by the McDonald's System." FA ¶ 18(a); *see also* FA ¶ 20(a) (stating that the effect of a material breach would be to give McDonald's "an immediate right to enter and take possession of the Restaurant"). As already stated, however, plaintiffs set forth no evidence that the McDonald's System included uniform security practices for franchisees, which is especially problematic given the safety and security chapter's explicit limitation of its mandate only to McOpCo restaurants. Moreover, the broad language in the Franchise Agreement is insufficient to establish that McDonald's "could terminate the license agreement if a franchisee failed to meet specific security" requirements. *VanDeMark*, 904 A.2d at 632.

restaurants, including the 14th and U Street and Verizon Center locations in Washington, D.C.  Pls.' Opp'n 42 (citing Webb Dep. 44:16–19 and Garrido Dep. 29:21–22 [Dkt. #160-45]).  But plaintiffs point to no evidence that McDonald's was under an obligation to provide security consultations or that Rhee ever requested or received one.  Plaintiffs concede that that regional security manager had *no communication* with Rhee regarding security at Rhee's McDonald's.  Pls.' Opp'n 43 (citing Webb Dep. 70:13–20).  Indeed, plaintiffs cite no evidence that McDonald's participated in or had any role in decisions regarding security whatsoever at Rhee's McDonald's.[16]  *Cf. Allen v. Choice Hotels Int'l, Inc.*, 276 F. App'x 339, 343 (4th Cir. 2008) (stating franchisor did not owe duty to franchisee hotel guests where it had not participated in decisions regarding fire or safety equipment at the hotel and did not have a role in determining "whether or not to install fire sprinklers").

*Caldwell* stands for the proposition that those who are responsible for ensuring that others comply with set safety or security requirements are governed by a duty of care when executing their responsibilities.  631 F.2d at 997.  There is no evidence here, however, that McDonald's ever agreed to or actually did dictate, implement, or oversee Rhee's security practices.  McDonald's therefore did not assume a duty of care to customers of

---

[16] Plaintiffs make much of a "tweet" by McDonald's, issued on Twitter after an assault occurred in an unidentified McDonald's restaurant in the Baltimore-Washington region that stated "There's no room for violence under the Golden Arches & our thoughts are with the victim."  McDonald's Tweet [Dkt. #160-21].  Because the tweet does not relate to Rhee's McDonald's, it is not evidence that McDonald's assumed any responsibility over Rhee's security operations.

Rhee's McDonald's that would be applicable here as a matter of law, and summary judgment is granted in favor of McDonald's on plaintiffs' direct liability claim.

## CONCLUSION

For all the foregoing reasons, the Court GRANTS defendants' Motions for Summary Judgment. In light of this ruling, defendants' Motions to Dismiss Claim for Punitive Damages, plaintiffs' Motion to Strike Defendants' Motions to Dismiss Claim for Punitive Damages, and defendants' Motion for Partial Reconsideration of the Court's May 17, 2016 Order are MOOT. An Order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge